No. 26A304

IN THE

# Supreme Court of the United States

DENNY HOSKINS, *in his official capacity as Missouri Secretary of State*,

*Applicant,*

*and*

NATIONAL REPUBLICAN COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND MISSOURI REPUBLICAN STATE COMMITTEE,

*Intervenor-Applicants,*

*v.*

RICHARD VON GLAHN,

*Respondent.*

## RESPONDENT'S OPPOSITION TO EMERGENCY APPLICATION FOR STAY AND ADMINISTRATIVE STAY PENDING APPEAL


ABHA KHANNA
*Counsel of Record*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law

KATIE CHAMBLEE-RYAN
LUCAS LALLINGER
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW
Suite 400
Washington, DC 20001
(202) 948-1135
KChambleeRyan@elias.law
LLallinger@elias.law

CHARLES W. HATFIELD
ALEXANDER C. BARRETT
ALIXANDRA S. COSSETTE
GRETA M. BAX
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com
alix.cossette@stinson.com
greta.bax@stinson.com

*Counsel for Respondent Richard von Glahn*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Missouri law has long permitted voters to suspend legislation through the referendum process, including congressional redistricting legislation. ........ 3

II. Voters timely invoked the referendum process against HB 1. ........ 5

III. The Missouri Supreme Court confirmed that HB 1's effectiveness would remain unresolved until the referendum review process was complete. ........ 7

IV. The Secretary implemented HB 1 for the primary and delayed ruling on the referendum until primary day. ........ 8

V. The Missouri Supreme Court held the referendum sufficient and concluded that HB 1 had never taken effect. ........ 9

VI. The general election is on track to proceed using the 2022 congressional map. ........ 12

ARGUMENT ........ 13

I. This Court lacks jurisdiction because Applicants' federal claims are barred on an adequate and independent state-law ground. ........ 13

II. Applicants seek relief a stay cannot provide. ........ 18

III. Applicants have no fair prospect of success on any federal claim. ........ 20

A. Neither the Missouri Supreme Court decision nor the Missouri Constitution's referendum process violates the Elections Clause. ........ 21

1. Applicants lack standing to assert the alleged Elections Clause violations. ........ 21

2. Referendum petitions may properly be applied to congressional redistricting legislation under the Elections Clause. ........ 23

B. The Missouri Supreme Court's judgment does not create an equal protection violation.......... 28

C. Article I, Section 2 does not create a right to vote in the same constituency during successive stages of an election.......... 32

IV. The equities foreclose relief for Applicants' self-inflicted harm.......... 35

A. The Secretary manufactured the timing he now invokes as a basis for relief.......... 35

B. The general election can proceed as scheduled without a stay.......... 38

CONCLUSION.......... 41



Appellate Case: 26-2797 Page: 3 Date Filed: 09/08/2026 Entry ID: 5681035

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Robertson*,
520 U.S. 83 (1997) .......... 14, 16

*Ala. State Fed'n of Lab. v. McAdory*,
325 U.S. 450 (1945) .......... 20

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 37

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) .......... 34

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 11, 21, 24, 25

*Barthuli v. Bd. of Trs. of Jefferson Elementary Sch. Dist.*,
434 U.S. 1337 (1977) .......... 19

*Bost v. Ill. State Board of Elections*,
607 U.S. 71 (2026) .......... 34

*Burdick v. Takushi*,
504 U.S. 428 (1992) .......... 34

*Busbee v. Smith*,
549 F. Supp. 494, 459 U.S. 1166 (D.D.C. 1982) .......... 40

*California v. Freeman*,
48 U.S. 1311 (1989) .......... 17

*Coleman v. Thompson*,
501 U.S. 722 (1991) .......... 14

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016) .......... 33

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .......... 34

*Cruz v. Arizona*,
598 U.S. 17 (2023) .......... 16

*Donatelli v. Mitchell*,
2 F.3d 508 (3d Cir. 1993) .......... 30

*Ferrell v. Okla. ex rel. Hall*,
339 F. Supp. 73, 406 U.S. 939 (W.D. Okla. 1972) .......... 31

*Foster v. Chatman*,
578 U.S. 488 (2016) .......... 17

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
503 U.S. 653 (1992) .......... 36

*Graddick v. Newman*,
453 U.S. 928 (1981) .......... 22

*Gray v. Sanders*,
372 U.S. 368 (1963) .......... 28

*Growe v. Emison*,
507 U.S. 25 (1993) .......... 37

*Harris v. Reed*,
489 U.S. 255 (1989) .......... 2, 14, 15, 16

*Hawke v. Smith*,
253 U.S. 221 (1920) .......... 11, 24

*Hill v. McDonough*,
547 U.S. 573 (2006) .......... 36

*Hollingsworth v. Perry*,
558 U.S. 183 (2010) .......... 41

*Int'l Longshoremen's Ass'n v. Davis*,
476 U.S. 380 (1986) .......... 14

*Lance v. Coffman*,
549 U.S. 437 (2007) .......... 21

*Lux v. Rodrigues*,
561 U.S. 1306 (2010) .......... 20

*Maggard v. State*,
733 S.W.3d 411 (Mo. banc 2026) .......................................................... 7, 19, 35

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ........................................................................................ 36

*Missourians to Protect the Initiative Process v. Blunt*,
799 S.W.2d 824 (Mo. banc 1990) ....................................................................... 28

*Mo. Gen. Assembly, v. von Glahn & People Not Politicians*,
No. 4:25-cv-1535-ZMB, 2025 WL 3514277
(E.D. Mo. Dec. 8, 2025) ............................................................ 5, 11, 12, 22, 35

*Moore v. Harper*,
600 U.S. 1 (2023) ........................................................................................ 24, 27

*NAACP Mo. State Conf. v. Kehoe*,
734 S.W.3d 338 (Mo. banc 2026) .................................................................. 8, 35

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................ 2, 13, 18, 19, 22, 35, 41

*Ohio ex rel. Davis v. Hildebrant*,
241 U.S. 565 (1916) ...................................................................................... 23, 25

*Padberg v. Roos*,
404 S.W.2d 161 (Mo. banc 1966) ......................................................................... 4

*Page v. Va. State Bd. of Elections*,
58 F. Supp. 3d 533, 575 U.S. 931 (E.D. Va. 2014) ........................................... 33

*Preisler v. Hearnes*,
362 S.W.2d 552 (Mo. banc 1962) ......................................................................... 3

*Republican Party of Oregon v. Keisling*,
959 F.2d 144 (9th Cir. 1992) .............................................................................. 30

*Rodriguez v. Popular Democratic Party*,
457 U.S. 1 (1982) ............................................................................... 29, 30, 33

*Rose v. Raffensperger*,
143 S. Ct. 58 (2022) ............................................................................................ 37

*Smith v. Allwright*,
321 U.S. 649 (1944) .......... 33

*State ex rel. Davis v. Hildebrant*,
114 N.E. 57 (Ohio 1916) .......... 23, 25

*State ex rel. Kemper v. Carter*,
165 S.W. 773 (Mo. banc 1914) .......... 4

*State ex rel. Moore v. Toberman*,
250 S.W.2d 701 (Mo. banc 1952) .......... 3, 4

*State ex rel. Schrader v. Polley*,
127 N.W. 848 (1910) .......... 27

*State ex rel. Stewart v. King*,
562 S.W.2d 704 (Mo. banc 1978) .......... 15

*Terrazas v. Slagle*,
821 F. Supp. 1154 (W.D. Tex. 1992) .......... 32

*Texas v. Interstate Com. Comm'n*,
258 U.S. 158 (1922) .......... 19

*Uhler v. AFL-CIO*,
468 U.S. 1310 (1984) .......... 17

*United States v. Classic*,
313 U.S. 299 (1941) .......... 32

*Va. House of Delegates v. Bethune-Hill,*
587 U.S, 658, 663–68 (2019) .......... 22

*Vera v. Bush*,
933 F. Supp. 1341 (S.D. Tex. 1996) .......... 40

*Vera v. Richards*,
861 F. Supp. 1304, 517 U.S. 952 (S.D. Tex. 1994) .......... 33

*Walker v. Martin*,
562 U.S. 307 (2011) .......... 17



Appellate Case: 26-2797 Page: 7 Date Filed: 09/08/2026 Entry ID: 5681035

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. art. I, § II ........ 3, 32

U.S. Const. art. III ........ 18, 19

Mo. Const. art. III, § 49 ........ 3, 24, 27

Mo. Const. art. III, § 29 ........ 5, 26

Mo. Const. art. III, § 52 ........ 4, 5, 8, 25

2 U.S.C. § 2 ........ 34

28 U.S.C. § 1257 ........ 14

Mo. Rev. Stat. § 1.185 ........ 22

Mo. Rev. Stat. § 115.361 ........ 40

Mo. Rev. Stat. § 115.363 ........ 40

Mo. Rev. Stat. § 115.369 ........ 40

Mo. Rev. Stat. § 115.527 ........ 12, 39

Mo. Rev. Stat. § 115.531 ........ 12, 39

Mo. Rev. Stat. § 116.120 ........ 4, 7, 9

Mo. Rev. Stat. § 116.150 ........ 4, 7, 15

Mo. Rev. Stat. § 116.200 ........ 4, 10, 19

Mo. Rev. Stat. § 128.348 ........ 5

**REGULATIONS**

Mo. Code Regs. Ann. tit. 15 sec. 30-15.030 ........ 9

## OTHER AUTHORITIES

Kacen Bayless, *'We will be ready.' Jackson County says it will comply with Supreme Court map ruling*, The Kan. City Star (Sept. 4, 2026), https://perma.cc/9CN3-3KP4 ............................................................ 2, 13, 38, 40



Appellate Case: 26-2797 Page: 9 Date Filed: 09/08/2026 Entry ID: 5681035

## INTRODUCTION

The Emergency Application for Stay does not present a real emergency, and it does not actually request a stay. Applicants, by their own admission, waited as long as possible to manufacture the present dispute over Missouri's congressional districting map. *See* App. 739a (Missouri's Attorney General publicly proclaiming that "delay works in our favor"). After the General Assembly passed HB 1, a mid-decade redistricting bill, voters timely submitted a valid referendum petition, which—by operation of Missouri law—prevented HB 1 from taking effect. As the Missouri Supreme Court explained, **"HB 1 is not the law and has never been the law."** App. 12a n.8. "[T]he congressional districts the General Assembly established in 2022 remain in full force and effect for the November 2026 election." App. 13a.

Yet Missouri's Secretary of State waited until the last possible day—and only *after* he had implemented HB 1 in the congressional primary—to object to the referendum, in the hopes of running out the clock on the judiciary's tolerance for a last-minute reversion to the 2022 districts. Now that the Missouri Supreme Court has rejected his gambit, he asks this Court to deliver him the political victory to which he was never entitled under the Missouri Constitution. This Court cannot and should not reward the Secretary's scheme to outsmart Missouri voters, Missouri law, and the Missouri Supreme Court by granting Applicants the extraordinary relief they seek.

Even considering Applicants' request would require this Court to disregard the ordinary limits on its review of state-court judgments. The Missouri Supreme Court



Appellate Case: 26-2797 Page: 10 Date Filed: 09/08/2026 Entry ID: 5681035

expressly held that the Secretary "waived and abandoned" his federal objections by failing to preserve them in the manner Missouri law requires. App. 5a n.5. Under this Court's settled adequate-and-independent-state-ground doctrine, that state procedural ruling ends the matter: this Court does not review federal claims barred on an adequate and independent state-law ground. *See Harris v. Reed*, 489 U.S. 255, 260–61 (1989).

If Applicants clear that hurdle, the next problem is the request itself: a stay will not provide the relief Applicants seek. What Applicants really seek is a green light from this Court to allow the Secretary to violate the Missouri Constitution by implementing HB 1, notwithstanding the Missouri Supreme Court's ruling that HB 1 is not and never has been the status quo under Missouri law. But that extraordinary request would require an *injunction*—not a stay—relief Applicants have not sought, and which requires an exceptionally demanding showing Applicants cannot make. *See Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

Nor do the merits provide any grounds for relief. Applicants' Elections Clause theory runs headlong into more than a century of precedent recognizing that state constitutional referendum procedures may constrain congressional-redistricting legislation. And their theories under the Equal Protection Clause and Article I, Section 2 ask this Court to recognize a right no precedent confers: a guarantee to preserve every consequence of a primary vote through November.

Equity does not support a stay where, as here, the applicants both created the alleged problem and cannot show that a stay is necessary to solve it. This Court need



Appellate Case: 26-2797 Page: 11 Date Filed: 09/08/2026 Entry ID: 5681035

not rescue the Secretary from a timing problem of his own making—much less by authorizing use of a map Missouri's highest court has held has never been law. The application should be denied.

## BACKGROUND

### I. Missouri law has long permitted voters to suspend legislation through the referendum process, including congressional redistricting legislation.

The Missouri Constitution grants its citizens the "power to approve or reject by referendum *any act of the general assembly*," subject to enumerated exceptions. Mo. Const. art. III, § 49 (emphasis added). That power extends to congressional redistricting legislation. As the Missouri Supreme Court recognized more than 60 years ago, Missouri voters retain "a remedy for even valid [congressional] redistricting[] which they do not like, through [Missouri's] initiative and referendum provisions." *Preisler v. Hearnes*, 362 S.W.2d 552, 557 (Mo. banc 1962).

Under Missouri law, a referendum on an act of the General Assembly may be ordered either by the General Assembly itself or "by petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, § 52(a). Such petitions must be filed with the Secretary of State before a bill takes effect and becomes law. *Id.*; *see State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706 (Mo. banc 1952). The petition is then subject to a statutory certification process, where the Secretary must "examine the petition to determine whether it complies with the Constitution of Missouri" and state law. Mo. Rev. Stat. § 116.120(1). The Secretary completes the process by issuing a certificate of

sufficiency or insufficiency by the statutory deadline. *Id.* § 116.150(3). Any citizen may then challenge the Secretary's determination in state court within ten days. *Id.* § 116.200.1.

Missouri law also defines the effect of a referendum on the challenged legislation while the referendum process remains underway. Under Article III, Section 52(b), once legislation has been "referred to the people," it "shall take effect when approved by a majority of the votes cast thereon, *and not otherwise.*" Mo. Const. art. III, § 52(b) (emphasis added). In short, under the Missouri Constitution, a "legal, sufficient, and timely" referendum petition suspends the challenged legislation unless and until the voters approve it. *State ex rel. Kemper v. Carter*, 165 S.W. 773, 779 (Mo. banc 1914); *Toberman*, 250 S.W.2d at 706 (explaining that the "'[p]urpose of [a] referendum is to suspend or annul a law which has not gone into effect" and "require [voters'] approval before it become operative" (citations omitted)).

While the people retain the power to override legislation by referendum, Missouri law provides the General Assembly a corresponding check: the General Assembly may attach an "emergency clause" to the legislation. App. 8a. Such "emergency" legislation is exempted from referendum challenges when a court determines that the act is "necessary for the immediate preservation of the public peace, health or safety." App. 9a (quoting *Inter-City Fire Prot. Dist. v. Gambrell*, 231 S.W.2d 193, 199–200 (Mo. banc 1950)). The General Assembly may thus insulate its redistricting legislation when it can show "a manifest necessity for immediate legislative change." *Padberg v. Roos*, 404 S.W.2d 161, 168 (Mo. banc 1966).



Appellate Case: 26-2797 Page: 13 Date Filed: 09/08/2026 Entry ID: 5681035

## II. Voters timely invoked the referendum process against HB 1.

On September 12, 2025, the Missouri General Assembly enacted House Bill 1, a congressional redistricting law replacing Missouri's 2022 congressional map. App. 17a. The General Assembly did not include an emergency provision in the bill, *see* Mo. Const. art. III, § 29, leaving it ineligible for the "immediate preservation" referendum exemption, *id.* art. III, § 52(a). By operation of law, the bill was scheduled to take effect on December 11, 2025. *See* Mo. Rev. Stat. § 128.348 (effective Dec. 11, 2025); Mo. Const. art. III, § 29.

Respondent Richard von Glahn and People Not Politicians then launched a referendum campaign for a popular vote on HB 1. By September 29, 2025, the campaign had submitted a referendum petition to the Secretary to obtain the approval required to circulate the petition for signatures. App. 17a; App. 409a. The Secretary approved the petition for circulation on October 14, 2025. App. 475a.

The following day, the Secretary and the Missouri General Assembly jointly filed a federal action seeking to enjoin the referendum on both state and federal constitutional grounds. App. 608a–631a. Specifically, the Secretary alleged that the referendum provision does not apply to congressional redistricting legislation under the state constitution and could not restrict the General Assembly's redistricting authority under the Elections Clause of the federal Constitution. App. 627a–630a. On December 8, the district court dismissed the case as unripe. *See Mo. Gen. Assembly v. von Glahn & People Not Politicians*, No. 4:25-cv-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025); App. 637a. The court reasoned that the Secretary had the authority



Appellate Case: 26-2797 Page: 14 Date Filed: 09/08/2026 Entry ID: 5681035

to assess the petition's legal sufficiency, giving him "a tool at his disposal that almost no other litigant could boast—the power to declare the petition unconstitutional himself." *Mo. Gen. Assembly*, at *4; App. 643a. Nor would conducting this assessment "impose any measurable burden," since the State had already "completed an exhaustive analysis" of the issue "in briefing this case." *Mo. Gen. Assembly*, at *4; App. 643a. The court also recognized that, if the petition proved sufficient, "the new map w[ould] be frozen until after the referendum." *Mo. Gen. Assembly*, at *2; App. 639a.

On December 9, 2025, von Glahn and People Not Politicians submitted 691 boxes of referendum petitions to the Secretary containing more than 300,000 signatures—more than twice the required number. App. 738a; App. 18a. That submission triggered the Secretary's statutory duty to determine whether the petition complied with Missouri law. *See* Mo. Rev. Stat. §§ 116.120–.140. The statutory deadline for completing that review was "5:00 p.m. on the thirteenth Tuesday prior to the general election." *Id.* § 116.150(3). Here, that deadline fell on August 4, 2026—the same day as Missouri's primary election.



Appellate Case: 26-2797 Page: 15 Date Filed: 09/08/2026 Entry ID: 5681035

### III. The Missouri Supreme Court confirmed that HB 1's effectiveness would remain unresolved until the referendum review process was complete.

With both the statutory deadline and the primary still months away, the Missouri Supreme Court confirmed that HB 1's legal status would remain unresolved until the Secretary acted and judicial review was complete. After the petition and signatures were submitted, two qualified Missouri voters who signed the referendum petition sought clarity as to whether HB 1 was in effect while the petition remained pending. *Maggard v. State*, 733 S.W.3d 411, 413 (Mo. banc 2026). In a decision on May 12, 2026, the Missouri Supreme Court reaffirmed that a "legal, sufficient, and timely" referendum petition pauses the effective date of the legislation at issue until a majority of voters approve it. *Id.* at 420.

The *Maggard* court explained, however, that whether the December 9 petition had that effect could be determined "[o]nly" after the Secretary "has issued a certificate of sufficiency or insufficiency . . . *and the judicial review of that certificate . . . is complete*." *Id.* at 419 (emphasis added). If the petition "[wa]s ultimately determined to be insufficient, HB 1 became the law on December 11," its scheduled effective date. *Id.* at 419–20. If the petition was "ultimately determined to be sufficient," however, "HB 1 did not take effect on December 11." *Id.* at 420. It instead "was 'referred to the people' as of December 9," and "shall take effect when approved by a majority of the votes cast thereon, *and not otherwise*." *Id.* (emphasis added) (quoting Mo. Const. art. III § 52(b)). That ultimate sufficiency determination—

not the Secretary's interim view of HB 1's legal status—would "decide whether HB 1 did (or did not) go into effect on December 11." *Id.* at 419.

### IV. The Secretary implemented HB 1 for the primary and delayed ruling on the referendum until primary day.

The day after *Maggard* was decided, the Missouri Attorney General issued an opinion directing the Secretary and local election officials to use HB 1 for the 2026 primary. Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026); *see also* App. 19a. The Secretary followed suit, instructing election officials that HB 1 "remain[ed] in full force and effect until a determination and certification of sufficiency or insufficiency has been issued under the referendum process." App. 1355a.

Less than two weeks later, in an opinion addressing whether HB 1 was constitutional under Missouri law, the Missouri Supreme Court reiterated the consequence if the petition were found sufficient: "If the December 9, 2025 referendum petition is sufficient after any judicial review—HB 1 never went into effect and will not go into effect unless and until approved by the voters." *NAACP Mo. State Conf. v. Kehoe*, 734 S.W.3d 338, 341 n.4 (Mo. banc 2026). Nevertheless, pursuant to the Secretary's instructions, local election officials implemented HB 1 in Missouri's Centralized Voter Registration system, creating new districts matching those described in HB 1. App. 19a.[1]

When the Missouri Supreme Court made those pronouncements, the petition had been pending for nearly six months, and more than two months remained before

---

[1] The Missouri Centralized Voter System is under the control of, and managed by, the Secretary of State. Mo. Code Regs. Ann. tit. 15 sec. 30-15.030.

the primary. Still, the Secretary issued no certification decision on sufficiency. Instead, he undertook individual review of hundreds of thousands of signatures, even though Missouri law permitted him to verify them through random sampling or by relying on the circulator affidavits accompanying the petition. *See* Mo. Rev. Stat. § 116.120(1); App. 12a n.8. In January 2026, as the signature review process began, the Missouri Attorney General publicly acknowledged the strategic value of the delay: "As long as the status quo is the new maps, delay works in our favor." App. 739a.

At approximately 4:00 p.m. on August 4, 2026—one hour before the statutory deadline and while Missouri's primary was underway—the Secretary issued a certificate declaring the referendum petition insufficient. App. 4a, 599a. To explain the decision, the certificate offered a single sentence expressing just one rationale: "I find the referendum petition insufficient under the Missouri Constitution because the Missouri Constitution does not authorize a referendum on congressional redistricting plans passed by the General Assembly." *Id.* The certificate also purported to incorporate by reference the Attorney General's May opinion directing officials to use HB 1 for the primary. App. 599a–606a.

**V. The Missouri Supreme Court held the referendum sufficient and concluded that HB 1 had never taken effect.**

On August 4, 2026, within hours after the Secretary issued his certificate of insufficiency, von Glahn filed a state-court action challenging the Secretary's certification decision, as authorized by statute. *See* Mo. Rev. Stat. § 116.200.1. The trial court affirmed the Secretary's decision, and Mr. von Glahn appealed to the Missouri Supreme Court, which reviewed the case *de novo*. App. 4a. On September 3,



Appellate Case: 26-2797 Page: 18 Date Filed: 09/08/2026 Entry ID: 5681035

2026, the Missouri Supreme Court unanimously reversed, ordered the Secretary to place the referendum on the November ballot, and enjoined implementation of HB 1 until the voters approved it. App. 2a.

The Court explained that the case presented a question of state law: whether the Missouri Constitution permits a referendum on congressional redistricting legislation enacted by the General Assembly. App. 1a. As a matter of "plain language," the Court held that it does. App. 2a. The consequence was that HB 1 never took effect: "Because the referendum petition was legal, sufficient, and timely, HB 1 never took effect and was referred to the voters as of December 9, 2025. The congressional districts the General Assembly established in 2022 remain in full force and effect for the November 2026 general election, and HB 1 will not take effect unless and until approved by the voters." App. 13a. The Court made it clear that, under Missouri law, "HB 1 is not the law and has never been the law. There is only one valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022." App. 12a n.8.

Although the Secretary raised federal-law objections in his briefing, the Missouri Supreme Court held that, as a matter of state law, the Secretary's review—and therefore judicial review of his decision—was limited to compliance with the Missouri Constitution and governing state statutes. App. 5a. The Court also held that, as a matter of state law, the Secretary had waived any federal-law objections not stated in his certificate of insufficiency and could not cure that omission by purporting to incorporate the Attorney General's opinion by reference. App. 5a n.5.



Appellate Case: 26-2797 Page: 19 Date Filed: 09/08/2026 Entry ID: 5681035

The Court also noted that, "the United States Supreme Court has held on multiple occasions the United States Constitution permits a state to authorize a referendum as to legislation drawing new congressional districts." App. 6a (citing *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916); *Hawke v. Smith*, 253 U.S. 221, 230–31 (1920); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n* ("*AIRC*"), 576 U.S. 787, 805 (2015)).

As he does here, the Secretary argued that "confusion, expense, and practical difficulties . . . may result" if HB 1 were not used in November 2026. App. 12a n.8. The Court rejected that argument, finding that "the [S]ecretary's delay created the confusion, expense, and practical difficulties of which he complains." *Id.* And the Secretary was *always* on notice that this would be the result if the Missouri Supreme Court ultimately found the referendum petition sufficient. A federal court stated it plainly in December 2025, and the Missouri Supreme Court twice explained it in May 2026: a sufficient referendum petition would *suspend HB 1* as of the date the petition and signatures were filed, December 9, 2025. *Id.* (first citing *Mo. Gen. Assembly*, 2025 WL 3514277, at *2; then citing *Maggard*, 733 S.W.3d at 419–20; and then citing



Appellate Case: 26-2797 Page: 20 Date Filed: 09/08/2026 Entry ID: 5681035

*NAACP*, 734 S.W. 3d at 341 n.4). "[D]espite this clear guidance," the Secretary chose to delay certification "until the last possible day." *Id.*[2]

"Given these undisputed facts," the Missouri Supreme Court found the Secretary's arguments about electoral confusion "wholly unpersuasive." *Id.* And whatever the Secretary had "incorrect[ly] assum[ed]" about the petition's sufficiency, using HB 1 in November would "not comport with the Missouri Constitution because the 2022 map is the only map in effect." *Id.* As the Missouri Supreme Court made clear, "HB 1 is not the law and has never been the law." *Id.*

## VI. The general election is on track to proceed using the 2022 congressional map.

The general election is currently on track to take place under the 2022 map. The Secretary certified the candidates based on the primary results on August 25, 2026, supplying nominees for each of the districts in the 2022 map. No one challenged those nominees, as Missouri law permits, within the statutory timeframe, which has now passed. Mo. Rev. Stat. §§ 115.527, 115.531.

On the day after the Missouri Supreme Court's ruling in this case, the Election Board of Directors for Jackson County—where the map's most dramatic changes are concentrated—issued a public statement reporting that it was prepared to implement

[2] The Court noted that the Secretary also chose to incur "the time and expense of signature verification," even though, as the federal court had observed, there was "no apparent reason why [the Secretary] would incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient," App. 12a n.8 (alteration in original) (quoting *Mo. Gen. Assembly*, 2025 WL 3514277, at *2 n.2). And indeed, once the deadline arrived, the Secretary denied the petition on the constitutional grounds he had articulated nine months earlier, with no mention of signature verification at all. *Id.*



Appellate Case: 26-2797 Page: 21 Date Filed: 09/08/2026 Entry ID: 5681035

the 2022 map in November. *See* Bayless, *supra* note 1. "We are equipped to make the necessary changes," the directors reported. "It will take some work on our end, but we will be ready." *Id.*

## ARGUMENT

"A stay is an 'intrusion into the ordinary processes of administration and judicial review.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quoting *Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)). Applicants therefore "bear[] the burden of showing that the circumstances justify" one. *Id.* at 433–34. To decide whether to grant a stay, the Court considers (1) whether "the stay applicant has made a strong showing that he is likely to succeed on the merits," (2) "whether the applicant will be irreparably injured absent a stay," (3) whether a stay "will substantially injure the other parties," and (4) the public interest. *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Applicants have not carried their burden here. Their federal defenses are waived on state procedural grounds, which supplies an adequate and independent basis for their disposition; a stay would not provide Applicants the relief they seek; and their claims are plainly without merit. The equities independently foreclose relief: the Secretary knowingly created the urgency and disruption he now invokes, and a stay would compound rather than alleviate uncertainty surrounding the November election.

### I. This Court lacks jurisdiction because Applicants' federal claims are barred on an adequate and independent state-law ground.

Applicants' stay request cannot succeed because this Court lacks jurisdiction over the federal-law questions they seek to raise. As the Missouri Supreme Court stated in express terms, Applicants' asserted federal-law violations were "waived and abandoned" under state procedural law. App. 5a n.5.

This Court lacks jurisdiction to review a state court's decision on a question of state law. *See* 28 U.S.C. § 1257(a). Consequently, this Court will not consider a federal issue on review from a state-court judgment when it rests on a state-law ground that is both "independent" of the merits of the federal claim and "adequate" to support the court's decision. *Harris v. Reed*, 489 U.S. 255, 260–61 (1989). "This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A federal claim is thus properly before this Court *only if* it was raised "at the time and in the manner required by state law." *Adams v. Robertson*, 520 U.S. 83, 87 (1997) (per curiam). Where a state procedural rule independently bars consideration of a federal claim, this Court's "review is at an end." *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 387 (1986).

The Missouri Supreme Court left no room for doubt about the basis for its disposition of the federal claims: the Secretary had "waived and abandoned" the federal-law theories Applicants now ask this Court to decide. App. 5a n.5. Missouri law required the Secretary to "issue a certificate stating the reason for the insufficiency.'" *Id.* (quoting Mo. Rev. Stat. § 116.150.2). The Secretary "stated a single reason: 'the Missouri Constitution does not authorize a referendum on congressional



Appellate Case: 26-2797 Page: 23 Date Filed: 09/08/2026 Entry ID: 5681035

redistricting plans passed by the general assembly.'" *Id.* And although he purported to "incorporate[] by reference" an Attorney General opinion addressing additional theories, the Missouri Supreme Court held that Missouri law "does not authorize" the Secretary "to delegate his statutory duty by attaching and incorporating by reference a document prepared and signed by another person or entity." *Id.*[3] Accordingly, "to the extent the [S]ecretary, by attaching the attorney general's 'opinion' or through subsequent briefing, has attempted to raise other arguments beyond those set out in his certificate, those arguments have been waived and abandoned," including "claimed federal law violations and whether the congressional redistricting in HB 1 should or must remain in place through the 2026 election cycle." *Id.* That "plain statement" by the Missouri Supreme Court is dispositive of this Court's jurisdiction here. *Harris*, 489 U.S. at 261–62 (citing *Michigan v. Long*, 463 U.S. 1032, 1042 (1983)).

Applicants attempt to evade that holding by pretending the Missouri Supreme Court simply declined to engage with their federal arguments. The Secretary repeatedly claims the court "simply ignored" his federal constitutional defenses. Appl., 2; *see also id.* at 15 ("What of the Secretary's federal defenses? The Missouri Supreme Court blatantly ignored them."). Intervenors offer the same account. In their telling, the Court "simply ignored federal law when crafting its remedy because

[3] There is no role for the Attorney General in the final sufficiency certification. Mo. Rev. Stat. § 116.150. In Missouri, the opinion of the attorney general is entitled to "no more weight 'than that given the opinion of any other competent attorney.'" *State ex rel. Stewart v. King*, 562 S.W.2d 704, 709 (Mo. banc 1978) (quoting *Gershman Inv. Corp. v. Danforth*, 517 S.W.2d 33, 36 (Mo. banc 1974)).



Appellate Case: 26-2797 Page: 24 Date Filed: 09/08/2026 Entry ID: 5681035

it concluded that state law limits review of a referendum petition to compliance with the Missouri Constitution." Intervenors' Br. 3.

That erases the procedural grounds for the Missouri Supreme Court's holding. True, the Court also concluded that the federal defenses fell outside the scope of the Secretary's statutory review of the referendum petition. App. 2a, 5a n.5. But that was not the Court's sole basis for declining to address Applicants' federal theories. The court's separate finding that those theories had been "waived and abandoned" independently barred consideration of the federal claims. *Harris*, 489 U.S. at 260–61; *see Adams*, 520 U.S. at 87 (finding that this Court lacked jurisdiction because petitioners had not shown they had presented the federal claim in accordance with state procedural rules). Even when a state court articulates another basis for rejecting a federal issue, a state procedural bar is independently dispositive "as long as the state court explicitly invokes" it "as a separate basis for decision." *Harris*, 489 U.S. at 264 n.10.

Applicants can seek no recourse in the narrow exception this Court has recognized where a state court adopts a "novel and unforeseeable" approach to a state procedural bar that lacks "fair or substantial support in prior state law." *Cruz v. Arizona*, 598 U.S. 17, 30–31 (2023) (quoting *Walker v. Martin*, 562 U.S. 307, 320 (2011)). There is nothing "novel" about the Missouri Supreme Court's reading of Missouri law's express command that the Secretary's certificate "stat[e] the reason for the insufficiency." Mo. Rev. Stat. § 116.150(2). Indeed, in a separate case decided on the same day, the Missouri Supreme Court independently applied the same



Appellate Case: 26-2797 Page: 25 Date Filed: 09/08/2026 Entry ID: 5681035

construction of section 116.150.2, holding that, "because the [S]ecretary failed to state *any* reason for his insufficiency determination, he failed to comply with section 116.150.2 and preserved nothing for this Court's review." *Harris v. Hoskins*, No. SC101806, slip. op. at 6 (Mo. banc. Sept. 3, 2026). Applicants do not even argue that anything about section 116.150.2 was uncertain—which would still not be enough to render it inadequate, *Walker*, 562 U.S. at 320 (quoting *Prihoda v. McCaughtry*, 910 F.2d 1379, 1385 (7th Cir. 1990))—much less that this was the sort of "freakish[]" application of state law that displaces the ordinary rule, *id.* (quoting *Prihoda*, 910 F.2d at 1383).

Because the Missouri Supreme Court expressly invoked an independent state procedural bar as a separate basis for refusing to consider Applicants' federal theories, this Court lacks jurisdiction to review those theories. That alone forecloses relief. *See Uhler v. AFL-CIO*, 468 U.S. 1310, 1311–12 (1984) (Rehnquist, C.J.) (denying election-related stay where "a majority of this Court would conclude that there [wa]s an adequate and independent state ground" for the decision below); *see also California v. Freeman*, 48 U.S. 1311, 1313–15 (1989) (O'Connor, J.) (denying stay application because the challenged state-court judgment rested on an adequate and independent state law ground); *Foster v. Chatman*, 578 U.S. 488, 521 (2016) (Alito, J., concurring) (explaining that "[t]o the extent that [a state court] decision" is "based on a state [procedural] rule . . . the decision has a state-law component, and we have no jurisdiction to review a state court's decision on a question of state law").



Appellate Case: 26-2797 Page: 26 Date Filed: 09/08/2026 Entry ID: 5681035

## II. Applicants seek relief a stay cannot provide.

Applicants face a second serious obstacle under Article III: a stay would not grant Applicants the relief they seek. The judgment below did not replace one legally operative map with another. App. 2a. The Missouri Supreme Court held that, under Missouri law, HB 1 *never became effective* because a timely and sufficient referendum petition suspended it. App. 13a ("HB 1 did not go into effect and will not go into effect unless and until approved by the voters. The congressional redistricting the General Assembly established in 2022 remains in full force and effect for the November 2026 election."). On that basis, the court ordered the Secretary to put the redistricting referendum on the ballot in November. *Id.* The Secretary does not contest that mandatory injunction. *See* Appl. 34 ("Regardless of this Court's decision, Respondent will get a statewide vote on the HB 1 congressional map."). The Court further "restrained and enjoined" the Secretary and those acting in concert with him from "implementing, using, or mandating the use of" HB 1 until the voters approve it. App. 2a. That prohibitory injunction against using HB 1 in November is the sole target of Applicants' stay.

A stay from this Court can only be used to "suspend[] judicial alteration of the status quo," *Nken*, 556 U.S. at 429—but HB 1 was *not* the legal status quo before the judgment. Months earlier, the Missouri Supreme Court had held that, "[o]nly when the chapter 116 certification process is final"—meaning only after the Secretary issues a certificate "*and the judicial review the General Assembly authorized . . . is complete*"—can it be determined whether the referendum petition was sufficient and



Appellate Case: 26-2797 Page: 27 Date Filed: 09/08/2026 Entry ID: 5681035

thus whether HB 1 took effect. *Maggard*, 733 S.W.3d at 419 (emphasis added). Section 116.200 itself confirms that judicial review includes an appeal to the Missouri Supreme Court. *See* Mo. Rev. Stat. § 116.200(1)–(3). In conducting that review, the Missouri Supreme Court not only found the referendum petition sufficient, it made clear that, as a result, **"HB 1 *is not the law and has never been the law.*"** App. 12a n.8 (emphasis added). Instead, "[t]here is only one valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022." *Id.* In short, under Missouri law, the 2022 Plan is the legal status quo, not HB 1.

A stay of the Missouri Supreme Court's judgment therefore would not supply an affirmative determination that HB 1 became effective, nor would it direct election officials to administer the November election under HB 1. *See Nken*, 556 U.S. at 428 (noting that a stay "temporarily suspend[s] the source of authority to act" but does not "direct[] an actor's conduct"). At most, a stay could relieve Applicants of the Missouri Supreme Court's affirmative bar on implementing a map that the Secretary never had authority to use in the first place. It could *not* make HB 1 legally effective or authorize the Secretary or anyone else to implement a legally defunct map. Merely lifting the injunction on HB 1 would thus "affect no [party's] present right[]" to implement HB 1 in November. *Barthuli v. Bd. of Trs. of Jefferson Elementary Sch. Dist.*, 434 U.S. 1337, 1338 (1977) (Rehnquist, J., in chambers). Article III does not authorize federal courts to issue such abstract relief. *See Texas v. Interstate Com. Comm'n*, 258 U.S. 158, 162 (1922) (stating that judicial power extends only where

legally cognizable rights "are being, or [are] about to be, affected prejudicially"); *see also Ala. State Fed'n of Lab. v. McAdory*, 325 U.S. 450, 461 (1945) (courts do not decide "abstract, hypothetical or contingent questions").

Ultimately, if what Applicants seek is this Court's blessing to implement HB 1 in contravention of Missouri law, they must secure an order affirmatively establishing the Secretary's authority to use it. That requires an injunction, not a stay. *See Nken*, 556 U.S. at 429 (distinguishing a stay, which "suspend[s] judicial alteration of the status quo," from an injunction, which "grants judicial intervention that has been withheld by lower courts" (alteration in original) (citation omitted)). Applicants have not sought that relief. And to do so, Applicants would be required to show "legal rights at issue" are "indisputably clear" in their favor. *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) (citation omitted). Applicants have not even attempted to make that showing. The petition should be denied.

## III. Applicants have no fair prospect of success on any federal claim.

Applicants are unlikely to secure this Court's review and even less likely to prevail if review is granted. Their Elections Clause claims fail twice over: neither Applicant has standing to assert the General Assembly's alleged institutional injury, and their legal theory is squarely foreclosed by this Court's precedent. Applicants' purported voting rights claims fare no better; this Court has rejected any asserted entitlement to vote for the same candidates within the same constituency at successive stages of an election.

### A. Neither the Missouri Supreme Court decision nor the Missouri Constitution's referendum process violates the Elections Clause.

#### 1. Applicants lack standing to assert the alleged Elections Clause violations.

Applicants' Elections Clause theories fail at the outset because neither the Secretary nor the Republican Intervenors have standing to assert them. Their core contention is that the Missouri Supreme Court unlawfully displaced authority the Elections Clause assigns to the state legislature. Appl. 17–23; Intervenors' Br. 18–29. But while a *state legislature* undoubtedly has standing to vindicate such an injury to its institutional authority, *see, e.g.*, *AIRC*, 576 U.S. at 802–03, this Court has rejected an Elections Clause claim brought by private citizens, *see Lance v. Coffman*, 549 U.S. 437, 441–42 (2007) (per curiam). The Court in *Lance* held that the plaintiffs' alleged injury that "the Elections Clause[] has not been followed" is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Id.* at 442.

This is at bottom the same argument that Applicants—a political party (Intervenors) and a state executive official (the Secretary)—make here. Neither is the General Assembly, nor has any power or authority to assert an institutional injury on that entity's behalf. And Applicants provide no reason to find otherwise. Any Elections Clause claim that Intervenors purport to bring on behalf of their voters is squarely foreclosed by *Lance*, *see* App. 244a (stating that the Missouri Republican State Committee represents "its voters"), while the Secretary's claim to standing fails on multiple levels. Whether one state governmental entity is authorized to represent

another's interests in federal court turns on state law. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S, 658, 663–68 (2019). Missouri law affirmatively prescribes who may litigate on its legislature's behalf: the Speaker may intervene "on behalf of the house of representatives," the President Pro Tem "on behalf of the senate," and the two acting jointly may intervene "on behalf of the general assembly." Mo. Rev. Stat. § 1.185(6)–(8). No statute designates the Secretary as the General Assembly's representative in court.

The State's own litigation conduct *concerning this petition* confirms the distinction. When Missouri pressed the same Elections Clause theory in a federal lawsuit challenging the referendum last year, it did not rely on the Secretary to raise those concerns: the Missouri General Assembly itself appeared as a plaintiff. *See generally Mo. Gen. Assembly*, 2025 WL 3514277. The reason is obvious: an alleged usurpation of the General Assembly's constitutionally assigned authority is the General Assembly's injury to assert.

Since neither Applicant has established standing to press the General Assembly's alleged Elections Clause injury, they can show neither a reasonable probability of certiorari nor a fair prospect of reversal on those claims. *See Graddick v. Newman*, 453 U.S. 928, 934 (1981) (Powell, J., in chambers) (denying stay application where state attorney general "had made no showing that he was the proper official to assert that claim").

#### 2. Referendum petitions may properly be applied to congressional redistricting legislation under the Elections Clause.

Applicants' Elections Clause theory fares no better on the merits. More than a century ago, this Court rejected the contention that applying a state constitutional referendum provision to congressional redistricting legislation violates the Elections Clause, finding that argument "plainly without substance." *Hildebrant*, 241 U.S. at 569. That precedent—reaffirmed multiple times since—forecloses Applicants' Elections Clause challenge to Missouri's referendum process.

In *Hildebrant*, this Court considered an Elections Clause challenge to Ohio's Constitution, which—like Missouri's—reserved to the people "the power to adopt or reject any law . . . passed by the General Assembly" by referendum, absent certain exceptions. *State ex rel. Davis v. Hildebrant*, 114 N.E. 55, 56 (Ohio 1916) (quoting Ohio Const. art. II, § 1c (1912)), *aff'd*, 241 U.S. 565 (1916). After the Ohio legislature enacted a congressional redistricting plan, voters invoked that process and referred the plan for referendum, *Hildebrant*, 241 U.S. at 566. This Court unanimously upheld the referendum against an Elections Clause challenge, holding that the Elections Clause does not prohibit states from "treating the referendum as a part of the legislative power for the purpose of apportionment where so ordained by the state constitutions and laws." *Id.* at 569.

This Court has repeatedly reaffirmed that holding. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, this Court held that a "referendum authorized by" a state's "Constitution 'was a part of the legislative power



Appellate Case: 26-2797 Page: 32 Date Filed: 09/08/2026 Entry ID: 5681035

of the State,' and 'nothing in [federal statutory law] or in [the Elections Clause] operated to the contrary.'" 576 U.S. at 805 (alteration in original) (quoting *Hildebrant*, 241 U.S. at 567). And just three years ago in *Moore v. Harper*, this Court again confirmed that "whatever authority [i]s responsible for redistricting, that entity remain[s] subject to constraints set forth in the State Constitution," which "may include [a] referendum" process. 600 U.S. 1, 25–26 (2023); *see also Hawke*, 253 U.S. at 230–231 (1920) (A "referendum provision of [a] state Constitution, when applied to a law redistricting the state with a view to representation in Congress, [i]s not unconstitutional.").

This Court's precedent thus forecloses Applicants' claims. Just like the Ohio Constitution reviewed in *Hildebrant*, the Missouri Constitution reserves to the people the power to approve or reject "any act of the general assembly" by referendum, subject to enumerated exceptions. Mo. Const. art. III, § 49. Like the voters in *Hildebrant*, von Glahn and People Not Politicians invoked that process to submit redistricting legislation to the people for a vote. And as this Court concluded in *Hildebrant*, nothing about that process violated the Elections Clause. *See* 241 U.S. at 566–69; App. 5a–8a.

Applicants attempt to distinguish *Hildebrant* but cannot avoid its application here. They first attempt to style their claim as a narrow defense against overreach, arguing that, though the Elections Clause may *generally* permit referenda on state redistricting legislation, it "forbids permitting a small fraction of a State's voters from suspending a congressional map . . . before a statewide vote." Appl. 18. To that end,

they emphasize that Missouri requires approximately 3.3 percent of qualified voters to approve a referendum, Appl. 17–18,[4] compared to six percent required in Ohio, *Hildebrant*, 241 U.S. at 566. But nothing in *Hildebrant* or its progeny suggests that its constitutional holding depended on the referendum threshold. The relevant constitutional question is whether the referendum forms part of the state's lawmaking process, not how many signatures are required to invoke it. *See AIRC*, 576 U.S. at 808 (explaining that redistricting is "a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum").

Applicants next attempt to distinguish this case on the grounds that Missouri's referendum procedure suspends legislation upon the filing of a valid petition. *See* Appl. 17–18. But once again *Hildebrant* is on all fours. Ohio's Constitution, like Missouri's, provided that when a petition is filed within 90 days of a bill's enactment, "the secretary of state shall submit" that legislation "to the electors of the state, for their approval or rejection of such law" "at the next succeeding regular or general election,"—"*and no such law . . . shall go into effect until and unless approved by a majority of those voting upon the same*." *State ex rel. Davis v. Hildebrant*, 114 N.E. at 57 (quoting Ohio Const. art. II, § 1c (1912)) (emphasis added); *see also Hildebrant*, 241 U.S. at 566 ("[I]f approved, the law should be operative, and if not approved, it should have no effect whatever."). Applicants can point to no meaningful difference

[4] The requirement is 5% of the legal voters in two-thirds of Missouri's congressional districts. Mo. Const. Art. III. Sec. 52(a).

between Ohio's referendum provision approved in *Hildebrant* and Missouri's referendum provision challenged here.

And Applicants' speculation about how such suspensions might operate in practice find no purchase in the record. The Secretary contends that authorizing a referendum over congressional redistricting legislation *might* imperil the State's ability to redistrict when new district lines are mandated by federal law, after the decennial census. Appl. 20. But the Missouri Constitution allows the General Assembly to shield redistricting legislation from referendum where it can establish that a new map is "necessary for immediate preservation of the public peace." App. 8a–9a. It was the General Assembly that took that exemption off the table here by *not* attaching an emergency clause to HB 1, *see* Mo. Const. art. III, § 29. For good reason: HB 1's "optional, mid-decade redistricting" is "in no way necessary for 'the immediate preservation of the public peace' because the 2022 congressional districts established by the General Assembly"—and used in the 2022 and 2024 congressional elections—"remain in place." App. 9a.

After running into the wall of contrary authority from this Court, Intervenors try another tack, contending that a "clear statement" is necessary before any entity other than the General Assembly may participate in redistricting. Intervenors' Br. 18. That argument rests on a false premise: that the Elections Clause vests congressional redistricting authority *exclusively* in the General Assembly. Intervenors' Br. 27 (asserting that a clear statement is required to "displac[e] the General Assembly's authority over congressional redistricting"). But this Court has

rejected "the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections." *Moore*, 600 U.S. at 26. Rather, the Elections Clause assigns redistricting authority to "the lawmaking body or power of the state, *as established by the state Constitution*." *State ex rel. Schrader v. Polley*, 127 N.W. 848, 850–851 (1910) (emphasis added). As the Missouri Supreme Court confirmed, the Missouri Constitution subjects redistricting legislation to the referendum process. 2a–6a. There is no additional hurdle that must be cleared to allow Missouri's lawmaking process to operate as the Missouri Constitution designed.

In any event, the Missouri Constitution *does* include a clear statement applying the referendum power to redistricting legislation. Article III, Section 49 states that "[t]he people . . . reserve power to approve or reject by referendum *any act of the general assembly,* except as hereinafter provided." Mo. Const. art. III, § 49 (emphasis added). As the Missouri Supreme Court concluded, redistricting legislation is plainly an act of the General Assembly. App. 2a. No Elections Clause principle permits this Court to disregard the Missouri Constitution's clear statement subjecting all such legislation to the referendum process.

Ultimately, what Applicants present as efforts to distinguish *Hildebrant* amount to nothing more than policy disagreements with Missouri law. They argue that failure to stay the decision below may incentivize other groups to initiate additional petitions on subsequent redistricting measures, and that Missouri's referendum procedures are "anti-democratic." Appl. 19–20. That is an odd accusation

to level at a process that gives *the people* the ultimate say over matters that concern *their* political representation. In any event, questioning the wisdom of state constitutional and statutory provisions does not transform Applicants' policy preferences into constitutional issues. Should Applicants wish to change those processes, they must do so through the democratic process, not by repackaging their state policy disputes as violations of federal law.

Applicants have no cognizable claim about intrusion into the General Assembly's power. The only Elections Clause problem this case presents is what the Secretary is attempting now: to usurp the lawmaking process for congressional redistricting as clearly set forth under Missouri law—a process that reserves a referendum power to the people by design. *See Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990) (admonishing courts "called upon to intervene in the initiative process" to "act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course").

**B. The Missouri Supreme Court's judgment does not create an equal protection violation.**

Applicants wrongly contend that the Missouri Supreme Court's judgment violates the Equal Protection Clause "by transferring hundreds of thousands of voters to new districts, but leaving other voters in the same district." Appl. 27. They rely principally on *Gray v. Sanders*, which invalidated an electoral system that weighted votes in rural counties more heavily than votes in urban centers. 372 U.S. 368, 379 (1963). Nothing comparable is alleged here. Instead, Applicants complain that the



Appellate Case: 26-2797 Page: 37 Date Filed: 09/08/2026 Entry ID: 5681035

judgment requires some Missourians "to vote in a district different from the one in which they cast their primary ballots." Appl. 29.[5] Applicants identify no authority holding that equal protection guarantees every voter the same electoral consequence from a primary ballot.

To the contrary, this Court's precedent confirms that equal protection does not guarantee voters an uninterrupted opportunity to determine who ultimately represents them, let alone who is *nominated* to represent them. In *Rodriguez v. Popular Democratic Party*, this Court considered a statute permitting a political party to fill a legislative vacancy by appointment rather than by election. 457 U.S. 1, 10–12 (1982). The challengers argued that the scheme discriminated between voters whose elected representatives completed their terms and voters in districts with vacancies, because only the latter were "denied the opportunity to be represented by an elected legislator." *Id.* at 10 n.10. The Court found "nothing invidious or arbitrary" about this distinction that would rise to the level of an equal protection violation. *Id.* at 11. The appointment procedure did "not restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties." *Id.* at 10. As the Court observed, "[a]ll qualified voters have an equal opportunity to select a district representative in the general election," and any changes in representation due to the interim appointment provision "applies uniformly to all legislative vacancies." *Id.*

---

[5] That circumstance is not the result of the Missouri Supreme Court's decision, but the Secretary's decision to conduct a primary election using districts he had been told might not be lawful depending on the outcome of the sufficiency review.



Appellate Case: 26-2797 Page: 38 Date Filed: 09/08/2026 Entry ID: 5681035

Applying *Rodriguez*, federal courts have likewise rejected equal protection challenges to the temporary representational discontinuities that can accompany redistricting transitions. In *Donatelli v. Mitchell*, reapportionment placed voters in a newly-created state-senate district, represented for the remainder of the pending term by a senator whom those voters had not elected. 2 F.3d 508, 514–15 (3d Cir. 1993). Citing *Rodriguez*, the Third Circuit found no equal protection violation and upheld the arrangement under rational basis review. *Id.* at 514–18; *see also id.* at 516 (finding "no constitutional basis" for claim that voters' "right to vote for a state senator" was "infringed because they [were] 'assigned' a senator who was not elected by their district, or any significant portion of it"). In *Republican Party of Oregon v. Keisling*, the Ninth Circuit rejected a challenge arising from the combined consequences of reapportionment and staggered senate terms, which caused some voters to wait six years between opportunities to vote for a state senator. 959 F.2d 144, 144–46 (9th Cir. 1992) (per curiam) ("Appellants' challenge to the methods chosen by appellee for regulating elections, in this case after reapportionment, has been roundly rejected by the Supreme Court.").

The alleged injury here is substantially less severe. All qualified Missouri voters had an equal opportunity to participate in the August 4 primary, and "[a]ll qualified voters [will] have an equal opportunity to select a district representative in the general election," *Rodriguez*, 457 U.S. at 10. If HB 1 is not implemented in November, no voter will lose the right to vote or be deprived of the opportunity to vote for their representative in the general election; some voters will have simply

participated in a primary under different district lines. Even that harm is hypothetical. While Intervenors purportedly represent the interests of certain Missouri voters, App. 244a, *nothing* in the record shows how many such voters exist, how they might have voted differently, or how those votes could have altered the primary results. If, as *Rodriguez* holds, equal protection permits some voters to be represented by a legislator they had no opportunity to elect *at all*, it cannot be read to forbid the narrower and far more speculative injury alleged here.

*Rodriguez* and the cases applying it thus expose the flaw in Applicants' premise. Equal protection guarantees voters equal access to the electoral process and equal weight for their votes. It does not guarantee that every voter will have had a chance to participate in every electoral event that produced the candidates or officeholders later presented to that voter. As one three-judge court observed, "[i]t is impossible, where Senate district boundaries are changed, to avoid having some voters represented by a Senator for whom they had no opportunity to support or oppose." *Ferrell v. Okla. ex rel. Hall*, 339 F. Supp. 73, 82 (W.D. Okla. 1972), *aff'd sub nom. Ferrell v. Hall,* 406 U.S. 939 (1972).

Indeed, Applicants' theory would bar the ordinary consequences of redistricting, vacancies, and candidate substitution that federal courts, including this Court, have consistently treated as permissible features of election administration. Intervenors' own argument illustrates the point. They acknowledge that Missouri law permits a party nominee to be replaced if the nominee "dies, is disqualified, or voluntarily withdraws." Intervenors' Br. 14 (citing Mo. Rev. Stat. § 115.363(3)(1)–(3)).



Appellate Case: 26-2797 Page: 40 Date Filed: 09/08/2026 Entry ID: 5681035

A voter's primary ballot therefore does not carry an absolute constitutional entitlement to vote for that same nominee in November, even if other voters in the state will not see any change in the candidates available to them. Applicants thus fail to show that the harm they allege poses a constitutional problem.

### C. Article I, Section 2 does not create a right to vote in the same constituency during successive stages of an election.

Applicants' separate reliance on Article I, Section 2 is even less grounded in law. That provision protects the right of qualified voters to choose their representatives in Congress. *See* U.S. Const. art. I, § 2. And where a state "has made the primary an integral part" of the election process, Article I, Section 2 protects the voter's right to cast a primary ballot and "to have his ballot counted." *United States v. Classic*, 313 U.S. 299, 318 (1941). Those principles were not violated here. All qualified voters had the opportunity to vote in the primary, and the primary votes were counted and used to select nominees, all of whom are currently slated to appear on the general election ballot. Conducting the general election under different district lines does not render those ballots "null and void." Appl. 25.

Applicants seek to extract a *different* right from Article I, Section 2: entitlement to vote *in the same constituency* at both the primary and general election. No authority they cite recognizes such a rule. *Terrazas v. Slagle* did not involve Article I, Section II; there, a three-judge court barred Texas from changing districts after the primary because it had not been precleared under section 5 of the Voting Rights Act. 821 F. Supp. 1154, 1159 (W.D. Tex. 1992). And *Covington, Vera*, and *Page* concerned an entirely different remedial question: whether to permit imminent

elections to proceed under the existing districts after finding them unlawful, where no remedial maps had yet been drawn. *See Covington v. North Carolina*, 316 F.R.D. 117, 176–77 (M.D.N.C. 2016); *Page v. Va. State Bd. of Elections*, 58 F. Supp. 3d 533, 554 (E.D. Va. 2014), *vacated sub nom. Cantor v. Personhuballah*, 575 U.S. 931 (2016); *Vera v. Richards*, 861 F. Supp. 1304, 1310, 1351 (S.D. Tex. 1994), *aff'd*, *Bush v. Vera*, 517 U.S. 952 (1996). Here, by contrast, there is already a "valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022." App. 12a n.8. None of the cases on which Applicants rely suggests a substantive right to the same district lines across each stage of the election process.

Nor does *Classic* convert the right to participate in a primary into a constitutional guarantee that every downstream circumstance of that primary remain fixed until Election Day. *Smith v. Allwright* likewise affirms the right to *vote* in a primary, not the right to a particular electoral consequence. 321 U.S. 649, 661–62 (1944). And this Court has rejected the premise that the Constitution guarantees every voter an opportunity to participate personally in every electoral step that ultimately determines who represents that voter. *See Rodriguez*, 457 U.S. at 8–12.[6]

---

[6] Even if Applicants could identify a cognizable burden on the right to vote here, that does not automatically entitle them to relief. Applicants argue that changing district boundaries between the primary and general election burdens voters' opportunity to



Appellate Case: 26-2797 Page: 42 Date Filed: 09/08/2026 Entry ID: 5681035

* * *

Ultimately, Applicants' strained efforts to uncover a constitutional voting rights harm from the Missouri Supreme Court's judgment as to the meaning and consequences of Missouri law are unavailing. The U.S. Constitution's protections for political participation do not freeze every consequence of the primary through the general election.

Indeed, rather than alleviate any imagined federal law violation, a stay here would only introduce new conflicts with federal law. By Applicants' own account, a stay would facilitate an election under a map that is not and never has been the law under the Missouri Constitution, contrary to the federal statutory requirement that congressional elections proceed from districts established "in the manner provided by the law" of the State, 2 U.S.C. §2(c). That uncertainty itself weighs strongly against emergency relief. *See Bost v. Ill. State Board of Elections*, 607 U.S. 71, 80 (2026) ("Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." (quoting *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring in grant of stay)).

---

participate in both stages of the same district's electoral process. This Court ordinarily evaluates alleged burdens on electoral participation under the balancing framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190–91 (2008). Applicants provide no reason the particular burden they assert merits unique treatment as a *per se* constitutional violation.



Appellate Case: 26-2797 Page: 43 Date Filed: 09/08/2026 Entry ID: 5681035

## IV. The equities foreclose relief for Applicants' self-inflicted harm.

Applicants cannot meet their burden to show that they will be "irreparably injured absent a stay," that the stay will not "substantially injure the other parties," or that a stay serves the public interest. *Nken*, 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776). The Secretary's asserted harm is both largely hypothetical and entirely self-inflicted. And granting relief would impose concrete injuries on the other side of the ledger: voters would be required to elect their congressional representatives in districts that never lawfully took effect, while being denied the referendum rights that Missouri's Constitution guarantees them.

### A. The Secretary manufactured the timing he now invokes as a basis for relief.

Applicants' equitable argument centers on the assertion that implementing the 2022 districts in November would produce electoral chaos because the Secretary conducted the primary under HB 1. Appl. 32–36. But the Secretary engineered the timing he now presents as an insurmountable burden. The Secretary chose to conduct the primary under HB 1 even though both a federal court and the Missouri Supreme Court had expressly warned that HB 1's legal status could not be determined until the referendum-certification process—including judicial review—was complete. *See Mo. Gen. Assembly*, 2025 WL 3514277, at *2; *Maggard*, 733 S.W.3d at 419–20; *NAACP*, 734 S.W. 3d at 341 n.4; *see also* App. 12a n.8. The Secretary then waited until the statutory deadline—the day the primary was already underway—to issue a certification resting on a one-sentence rationale the State had already been advancing for months. App. 599a. The Attorney General publicly acknowledged the

strategic benefit of delay: "As long as the status quo is the new maps, delay works in our favor." App. 739a.

Equity does not reward that sort of manufactured emergency. This Court applies "a strong equitable presumption against the grant of a stay" when the need for emergency relief results from a litigant's own delay, including through "piecemeal litigation." *Hill v. McDonough*, 547 U.S. 573, 584–85 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637 (2004)). Equitable relief likewise may be denied where a party's timing reflects an "attempt at manipulation" of the judicial process. *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.,* 503 U.S. 653, 654 (1992) (per curiam). Here, the Secretary's manipulation of the calendar is apparent not just from the sequence of events but also from the boastful pronouncements of the Missouri Attorney General laying bare that strategy.

Applicants nevertheless invoke *Purcell*—while conceding that this Court has never extended that principle to a state supreme court's interpretation of state election law. Appl. 35 ("Admittedly, this Court has not addressed whether the *Purcell* principle can ever independently justify a state court's last-minute alteration to federal election rules.") (citing *Purcell v. Gonzales*, 549 U.S. 1, 4–5 (2006)). Applicants' equitable argument turns *Purcell* on its head. This Court's *Purcell* principle cautions *federal* courts to avoid interfering in *state* elections rules on the eve of an election. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (explaining that *Purcell* reflects rule that "federal courts ordinarily should not enjoin a state's

election laws in the period close to an election"). Applicants here invite the very interference *Purcell* guards against.

Even if *Purcell* did apply, that doctrine provides no refuge against timing problems the Missouri Supreme Court has already deemed "wholly unpersuasive" to derail application of Missouri law. App. 12a n.8. As this Court recently explained, "[w]hile federal courts should not impose changes close to an election, States are free to decide for themselves whether last-minute changes to an election are in their best interests." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (per curiam) (citation omitted). Here, the Missouri Supreme Court has rendered a ruling on the plain meaning of the Missouri Constitution and determined that, notwithstanding any alleged "confusion, expense, and practical difficulties," HB 1 shall not take effect unless and until it is approved by a majority of the voters in the November 2026 election. App. 12a n.8; *cf.* *Growe v. Emison*, 507 U.S. 25, 33 (1993) ("[T]he Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself."). *Purcell* offers no basis for this Court to impinge upon the Missouri Supreme Court's authority to decide whether last-minute election changes are in the best interests of the State. *See Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022) (mem.) (unanimously vacating a *Purcell* stay where the State agreed to the schedule on which the district court proceeded).

### B. The general election can proceed as scheduled without a stay.

As a practical matter, Applicants' predictions of disaster have no basis in the record—and if there were a genuine problem, Missouri law provides multiple ways of solving it without this Court's intervention.

Start with Applicants' purported evidence that the Missouri Supreme Court's judgment is impossible to implement. The application repeatedly invokes purported testimony from "Missouri election officials" that the judgment below puts "the entire congressional election . . . at risk." Appl. 30, 33. But the cited evidence consists of a single affidavit from one *former* Jackson County election official. *See id.* (citing App. 1025a–26a); 1025a.[7]

By contrast, the *current* directors of the Jackson County Election Board—which oversees the locus of the map's most substantial changes—have publicly stated that they are prepared to implement the 2022 map in November. *See* Bayless, *supra* note 1. "We are equipped to make the necessary changes," they explained. "It will take some work on our end, but we will be ready." *Id.* That contemporaneous assessment from the current officials actually charged with administering elections in the most affected area belies Applicants' assertion that compliance is impossible.

---

[7] The trial court's statement that using the 2022 maps would be "impossible" likewise relied only on that former official's affidavit. App. 52a. The Secretary emphasizes that the Missouri Supreme Court did not expressly reject that finding. But because the relevant facts were stipulated, the Missouri Supreme Court owed no deference to the trial court's conclusions. App. 4a. And on the same record, the Missouri Supreme Court concluded that the Secretary's "arguments about confusion, expense, and practical difficulties [we]re wholly unpersuasive." App. 12a n.8.



Appellate Case: 26-2797 Page: 47 Date Filed: 09/08/2026 Entry ID: 5681035

The Secretary's only other evidence is equally insubstantial. He asserts that "[e]lection analysts with prominent national media outlets" are questioning "how Missouri can possibly comply with the Missouri Supreme Court's order," citing two tweets, neither of which actually says that (instead both note that the Secretary would likely challenge the decision in this Court). Appl. 30–31. And although the Secretary insists that Missouri would "certainly" be forced to violate the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which sets a September 19 deadline for sending absentee ballots to overseas and military voters, the only evidence he cites for that proposition is the declaration he wrote and signed himself. Appl. 1–2 (citing App. 1667a–68a).[8]

Meanwhile, the district lines for the general election are clear. They come from a map whose validity is certain, and which has been in place since 2022. The candidates are clear: the Secretary certified them pursuant to Missouri law on August 25, 2026, with nominees for each of the districts in the 2022 map. No one challenged the certification within the prescribed statutory period. *See* Mo. Rev. Stat. §§ 115.527, 115.531. And county election officials confirm that they are "equipped to make the necessary changes" for the election in November. *See* Bayless, *supra* note 1. In short,

---

[8] The UOCAVA argument also presupposes that Missouri needs to conduct a new primary, which no court has ordered and no one has requested. The Secretary has never alleged that there would be a UOCAVA issue with the general election. Indeed, he has advised this court there is time to comply. Application at 6 ("More importantly, UOCAVA requires Missouri to send out absentee ballots on September 19. To enable Missouri to comply with that federal deadline, Secretary Hoskins respectfully requests this Court issue a decision no later than September 14, 2026.").



Appellate Case: 26-2797 Page: 48 Date Filed: 09/08/2026 Entry ID: 5681035

the record here makes clear that, far from "impossible," implementing the 2022 districts in the 2026 election is entirely feasible.

Moreover, to the extent the Secretary is dissatisfied with this state of affairs—whether based on legal or practical objections—he is well-equipped to choose an alternative means of complying with the Missouri Supreme Court's order. Missouri law, for instance, provides an avenue for official "disqualification" of existing candidates, allowing for party appointments of candidates to fill vacancies. *See* Mo. Rev. Stat. §§ 115.361(2), 115.363(3)(2), 115.369.[9]

Other states' experiences confirm that these circumstances are neither unprecedented nor insurmountable. Georgia held a general election in new districts after a three-judge court struck down its existing map after the primary had taken place—even though unlike here, no new map had been drawn. *See Busbee v. Smith*, 549 F. Supp. 494, 518–19 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). Texas also conducted a general election using a new congressional map after the map used during the primary was invalidated, again without a remedial map available. *Vera v. Bush*, 933 F. Supp. 1341, 1351–52 (S.D. Tex. 1996). In short, if the Secretary believes that the nominations cannot lawfully carry over to the 2022 districts, there are other lawful means of addressing it without staying the judgment below.

[9] To the extent Applicants dispute whether nominees selected under HB 1 would be "disqualified" within the meaning of Section 115.363.3(2), that only confirms that the asserted federal injury turns on an unresolved question of Missouri election law. Applicants cannot show that staying the judgment below is necessary to prevent an equal protection violation without first establishing that Missouri law leaves no other lawful means of addressing the alleged mismatch.

A stay applicant must establish that irreparable harm is likely *absent the requested relief*, not merely identify a possible injury that could arise under one assumed course of election administration—particularly one controlled by the applicant himself. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam); *Nken*, 556 U.S. at 434–35. Applicants are not entitled to a stay to address a purported problem that the Secretary created, and that the Secretary could resolve by other means.

## CONCLUSION

The Application should be denied.

Respectfully submitted,

ABHA KHANNA
*Counsel of Record*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law

KATIE CHAMBLEE-RYAN
LUCAS LALLINGER
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW
Suite 400
Washington, DC 20001
(202) 948-1135
KChambleeRyan@elias.law
LLallinger@elias.law

CHARLES W. HATFIELD
ALEXANDER C. BARRETT
ALIXANDRA S. COSSETTE
GRETA M. BAX
STINSON LLP
230 W. McCarty Stret
Jefferson City, MO 65101
(573) 636-6263
chuck.hatfield@stinson.com
alexander.barrett@stinson.com
alix.cossette@stinson.com
greta.bax@stinson.com

*Counsel for Richard von Glahn*