**No. 26-2797 (Consolidated with No. 26-2827)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

**CONGRESSMAN ROBERT ONDER, ET AL.,**
*Plaintiffs-Appellees,*

v.

**STATE OF MISSOURI AND DENNY L. HOSKINS,**
**in his official capacity as Missouri Secretary of State,**
*Defendants-Appellees,*

**RICHARD VON GLAHN AND PEOPLE NOT POLITICIANS,**
*Intervenor-Defendants/Appellants.*

---

On Appeal from the United States District Court
for the Eastern District of Missouri

Case No. 4:26-cv-01424-SRC

The Honorable Stephen R. Clark, United States District Judge

---

# BRIEF OF INTERVENORS-APPELLANTS

---

Charles W. Hatfield
Jeremy A. Root
Alexander C. Barrett
Alixandra S. Cossette
Greta M. Bax
STINSON LLP

230 W. McCarty Street
Jefferson City, MO 65101
Telephone: (573) 636-6263
chuck.hatfield@stinson.com
jeremy.root@stinson.com
alexander.barrett@stinson.com
alix.cossette@stinson.com
greta.bax@stinson.com

*Counsel for Intervenors-Appellants*

## CORPORATE DISCLOSURE STATEMENT

People Not Politicians is a Missouri non-profit corporation. It has no parent corporation and no shareholders.

## SUMMARY OF THE CASE

This appeal concerns the district court's entry of a temporary restraining order barring Missouri's Secretary of State from directing election officials to use anything other than the House Bill 1 districts. As a binding Missouri Supreme Court decision makes clear, those districts are not, and have never been, the law.

The United States Supreme Court has now stayed that restraining order, and this appeal is likely moot. To the extent the case is not moot, a web of jurisdictional issues render the temporary restraining order improper. The plaintiffs challenge the constitutionality of using Missouri's only lawful congressional districts and the district court effectively entered an election-dispositive preliminary injunction, which it lacked authority to do without convening a three-judge panel. The district court lacked Article III jurisdiction because the case is collusive. The case is also barred by the *Rooker-Feldman* doctrine and *Younger*.

Beyond all that, the restraining order was improperly entered because the *Purcell* principle bars interference in Missouri's election machinery at this late date, Plaintiffs have no likelihood of success on their novel theories, the equities overwhelmingly favor Intervenors and the public, and the district court failed to require a bond or adequately explain why one was not required. This Court has already set oral arguments for 20 minutes per side (with Plaintiffs and Defendants—who are aligned—splitting time).



Appellate Case: 26-2797 Page: 3 Date Filed: 09/15/2026 Entry ID: 5683858

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i
SUMMARY OF THE CASE ........................................................................ ii
TABLE OF AUTHORITIES ...................................................................... vii
JURISDICTIONAL STATEMENT ....................................................................1
I. This Court Had Jurisdiction When Intervenors Appealed ..............................1
II. This Matter is Likely Moot ....................................................................3
III. The Court Lacks Jurisdiction Over the Cross-Appeal ................................5
STATEMENT OF THE ISSUES .......................................................................6
I. Whether the district court lacked jurisdiction to enter the TRO because 28 U.S.C. § 2284(a) required it to convene a three-judge court for an action challenging the constitutionality of the apportionment of congressional districts.6
II. Whether the *Purcell* principle requires reversal of the district court's order, which prevents the Secretary of State from conducting the November election using congressional districts the Missouri Supreme Court unanimously declared to be the "only" lawful districts under state law at this late stage because (1) the merits of Plaintiffs' claims are not "entirely clearcut," (2) Plaintiffs would not suffer irreparable harm, (3) Plaintiffs delayed bringing their claim until the last minute, and (4) the requested changes are not feasible. .......................................6
III. Whether the district court erred by failing to apply *Younger* abstention and/or the *Rooker-Feldman* doctrine to Plaintiffs' attempt to—as a practical matter—collaterally attack the Missouri Supreme Court's judgment, which was under active review by the U.S. Supreme Court. ................................................7
IV. Whether Plaintiffs established a likelihood of success on the merits of their Equal Protection and Article I, Section 2 claims, given that no court has ever held



Appellate Case: 26-2797 Page: 4 Date Filed: 09/15/2026 Entry ID: 5683858

that these provisions guarantee individuals the right to vote in the same constituency at successive stages of an election. ....................................................7

V. Whether the TRO creates an independent conflict with 2 U.S.C. §§ 2a(c) and 2c to the extent it would require Missouri to conduct its congressional election under a map that, under controlling state law, is not, and has never been, the law. ....................................................................................................7

VI. Whether the district court abused its discretion by not requiring a bond when entering a TRO and providing no meaningful analysis of why a bond would not be required. ..........................................................................................8

STATEMENT OF THE CASE..............................................................................9

I. Initiation of Referendum Campaign ..................................................................9

II. The State Sues Intervenors ...........................................................................10

III. Intervenors Submit the Referendum Petition, the Missouri Supreme Court Addresses Its Effect, and the Secretary Delays ...................................................11

IV. The Secretary Declares the Referendum Insufficient ....................................12

V. The Supreme Court Rules HB 1 Is Not and Has Never Been the Law .....13

VI. The Secretary's Failed Applications for Emergency Relief ......................14

VII. The District Court's TRO..............................................................................15

VIII. The Secretary Changes His Directives to Local Election Officials .......18

IX. The District Court's September 9 Order ......................................................20

SUMMARY OF THE ARGUMENT .................................................................21

ARGUMENT ...................................................................................................24

I. STANDARD OF REVIEW...............................................................................24

II. THE DISTRICT COURT LACKED JURISDICTION. ...............................24

A. A Three-Judge Court Was Required .......................................................24

B. There Was No Article III Claim or Controversy Below Because the Case is Collusive ........................................................................................................27

C. *Rooker-Feldman* Bars This Action. .......... 31
III. THE *PURCELL* PRINCIPLE REQUIRES REVERSAL .......... 34
A. To the Extent the Merits are "Entirely Clearcut," It is In Favor of Intervenors, Not Plaintiffs .......... 35
B. Plaintiffs Would Not Suffer Irreparable Harm .......... 38
C. Plaintiffs Delayed .......... 39
D. The Requested Changes Are Not Feasible .......... 39
IV. THE TRO WOULD CAUSE MISSOURI TO VIOLATE FEDERAL LAW .......... 42
V. THE DISTRICT COURT SHOULD HAVE ABSTAINED .......... 43
A. *Younger* Abstention .......... 43
VI. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS .......... 44
A. The District Court Properly Rejected the Elections Clause Claim .......... 44
B. Plaintiffs Cannot Succeed on Their Equal Protection Claim .......... 45
C. Plaintiffs Cannot Succeed on Their Article I, Section 2 Claim .......... 47
VII. THE EQUITIES OVERWHELMINGLY FAVOR REVERSAL .......... 48
A. The District Court's Irreparable Harm Analysis Was Flawed .......... 48
B. The Balance of Harms Overwhelmingly Favors Reversal .......... 49
C. The Public Interest Favors Reversal .......... 50
VIII. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO REQUIRE A BOND OR MAKE ADEQUATE FINDINGS SUPPORTING WAIVER OF BOND .......... 52
A. The District Court Failed to Make Adequate Findings to Waive Bond .......... 53
B. The Collusive Defendants' Agreement Cannot Waive the Bond Requirement .......... 54
C. There Is Demonstrable Risk of Harm from a Wrongful TRO .......... 55



Appellate Case: 26-2797 Page: 6 Date Filed: 09/15/2026 Entry ID: 5683858

D. The Collusive Nature of the Proceedings Makes the Bond Requirement More Important ....................56
E. The Appropriate Remedy is Vacatur ....................57
CONCLUSION ....................57
CERTIFICATE OF COMPLIANCE ....................59
CERTIFICATE OF SERVICE ....................60

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 585 U.S. 579 (2018) ....................................................2, 49

*Allen v. Milligan*, 608 U.S. 511 (2026)........................................................41

*Alpert v. Riley*, 457 F. App'x 429 (5th Cir. 2012) .........................................56

*Am. Party of Texas v. White*, 415 U.S. 767 (1974)..........................................37

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ..........................................................................................................44

*Borden Co. v. Liddy*, 309 F.2d 871 (8th Cir. 1962). .......................................2, 3

*Brady v. NFL*, 640 F.3D 785 (8th Cir. 2011).....................................................24

*Bruce v. City & Cnty. of Denver*, 57 F.4th 738 (10th Cir. 2023) ..........................33

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) ..................................................1

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)....................................................5

*Chafin v. Chafin*, 568 U.S. 165 (2013) ..................................................................4

*Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339 (1892)................ 27, 28

*Coleman v. Ashcroft*, 696 S.W.3d 347 (Mo. banc 2024)........................................13

*Conforti v. United States*, 74 F.3d 838 (8th Cir. 1996) ...........................................9

*Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461 (10th Cir. 1987) ..........................................................................................................56

*Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016)...........................47

*Curb & Gutter District No. 37 v. Parrish*, 110 F.2d 902 (8th Cir. 1940) ...............28

*Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D. Iowa 1995) .......... 52, 56

*Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) .......................24

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326 (1980)...............5

*Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993) ...................................................46

*Dorce v. City of New York*, 2 F.4th 82 (2d Cir. 2021)..................................... 33, 34

*Eggers v. Evnen*, 48 F.4th 561 (8th Cir. 2022) .......................................................49
*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) ....................................................................................................................55
*Hill v. McDonough*, 547 U.S. 573 (2006).............................................................50
*Hill v. Xyquad, Inc.*, 939 F.2d 627 (8th Cir. 1991) .................................... 24, 53, 57
*Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005)...................34
*Hoskins v. von Glahn*, No. 26A304 (U.S. Sep. 8, 2026) .........................................15
*In re Rose*, No. 26-0916, 2026 WL 2672098 (Tex. Sept. 11, 2026) .......................37
*Kason v. Paterson*, 542 F.3d 281 (2d Cir. 2008)....................................................26
*Knutson v. City of Fargo*, 600 F.3d 992 (8th Cir. 2010) ..........................................9
*Lance v. Dennis*, 546 U.S. 459 (2006).....................................................................33
*Lord v. Veazie*, 49 U.S. (8 How.) 251 (1850) .........................................................28
*Luther v. Hoskins*, 730 S.W.3d 567 (Mo. banc 2026) ............................................13
*Lyons v. Vought*, 875 F.3d 1168 (8th Cir. 2017) ....................................................36
*Maggard v. State*, 733 S.W.3d 411 (Mo. banc 2026)...................................... 11, 12
*Malliotakis v. Williams*, 146 S. Ct. 809 (2026).......................................................41
*McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006).......................................33
*Merrill v. Milligan*, 142 S. Ct. 879 (2022).........................................................5, 35
*Merritts v. Richards*, 62 F.4th 764 (3d Cir. 2023)..................................................33
*Miller v. Ziegler*, 109 F.4th 1045 (8th Cir. 2024)...................................................25
*Mo. Gen. Assembly v. von Glahn*, No. 4:25-cv-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025) ...................................................................................10
Mo. Rev. Stat. § 116.150 ..........................................................................................14
*Montano v. Lefkowitz*, 575 F.2d 378 (2d Cir. 1978)..............................................47
*Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47 (1971) ..........................27
*Moore v. Harper*, 600 U.S. 1 (2023) ..................................................................7, 44
*MTM, Inc. v. Baxley*, 420 U.S. 799 (1975) .......................................................6, 24



Appellate Case: 26-2797 Page: 9 Date Filed: 09/15/2026 Entry ID: 5683858

*Muskrat v. United States*, 219 U.S. 346 (1911) ....................................................28
*NAACP Mo. State Conf. v. Kehoe*, 734 S.W.3d 338 (Mo. banc 2026)....................11
*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989)........................................................................................... 20, 43
*Nken v. Holder*, 556 U.S. 418 (2009). ..................................................................3
*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395 (4th Cir. 2022)..............................................................................................................27
*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (8th Cir. 2013).................. 48, 49
*Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916)................................... 44, 45
*Org. for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020).........................38
*Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001)........................................................26
*Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014)....47
*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) ...............................................7, 44
*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008)...........................................51
*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ...................................................... 4, 6, 35
*Rathmann Group v. Tanenbaum*, 889 F.2d 787 (8th Cir. 1989)................... 8, 53, 57
*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) .......5
*Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992).................46
*Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030 (8th Cir. 2016)......................................................................53
*Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982) ........................... 45, 49
*S.D. Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)................................................51
*Sampson v. Murray*, 415 U.S. 61 (1974) ..............................................................1
*Schlafly v. Eagle Forum*, 771 F. App'x 723, 724 (8th Cir. 2019).............................1
*Shapiro v. McManus*, 577 U.S. 39 (2015) .............................................. 3, 6, 24, 25
*Skit International Ltd v. DAC Technologies of Arkansas*, 487 F.3d. 1154 (8th Cir. 2007)..........................................................................................................7, 31



Appellate Case: 26-2797 Page: 10 Date Filed: 09/15/2026 Entry ID: 5683858

*Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235 (3d Cir. 2003)....................................................................................................56

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013)...........................................43

*State ex rel. Davis v. Hildebrant*, 114 N.E. 55 (Ohio 1916)..................................45

*Stratton v. St. Louis Sw. Ry. Co.*, 282 U.S. 10 (1930) .......................................2, 26

*Sutter & Gillham PLLC v. Henry*, 146 F.4th 699 (8th Cir. 2025)............. 31, 32, 34

*T. M. v. Univ. of Maryland Med. Sys. Corp.*, 146 S. Ct. 1739 (2026)....................34

*Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013 .....................................................4

*United States v. Classic*, 313 U.S. 299 (1941)........................................................47

*United States v. Johnson*, 319 U.S. 302 (1943) ......................................................28

*United States v. Munsingwear*, 340 U.S. 36 (1950) .................................................4

*United States v. Northshore Min. Co.*, 576 F.3d 840 (8th Cir. 2009).......................5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .........38

*von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846 (Mo. Sep. 3, 2026) ................................................................................................................. *passim*

*Walen v. Burgum*, No. 1:22-cv-31, 2022 WL 1688746 (D.N.D. May 26, 2022)....36

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021).......................................27

*Williams v. Nottawa*, 104 U.S. 209 (1881) ..........................................................28

*Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010) .....................55

**Statutes**

2 U.S.C. § 2a(c)...........................................................................................2, 7, 42

2 U.S.C. § 2c ..............................................................................................2, 7, 42

28 U.S.C. § 1292..........................................................................................................1

28 U.S.C. § 1359........................................................................................................27

28 U.S.C. § 2284.....................................................................................................2, 6

Colo Rev. stat. §§ 1-4-701 and 702 ........................................................................37

Mo. Rev. Stat. § 1.185 ....29, 54
Mo. Rev. Stat. § 115.281 ....1, 15, 26, 40
Mo. Rev. Stat. § 115.363 ....37
Mo. Rev. Stat. § 115.526 ....38
Mo. Rev. Stat. § 115.603 ....13
Mo. Rev. Stat. § 115.914.1 ....2, 15, 26, 40
Mo. Rev. Stat. § 116.150.3 ....11
Mo. Rev. Stat. § 116.200 ....13
Utah Code § 20A-9-403....37
Va. Code §§ 24.2-509 ....37

**Other Authorities**

Fed. R. Evid. 201(c)-(d)....9
Mo. Const. art. III, § 49 ....9
Mo. Const. art. III, § 52(b)....9
U.S. Const. art. I, § 2....7
U.S. Const. art. III, § 2 ....27

**Rules**

Fed. R. Civ. P. 65(c) ....8, 52, 56

## JURISDICTIONAL STATEMENT

### I. This Court Had Jurisdiction When Intervenors Appealed

The Court's jurisdiction in this appeal is narrow. It may determine whether the single district judge erred in issuing the temporary restraining order ("TRO"). If it concludes the district court did, this Court's jurisdiction ends there.

This Court previously noted it may lack jurisdiction. (Order [5681557], *Onder v. von Glahn*, No. 26-2797 (8th Cir. Sep. 9, 2026).) Appellate courts may not hear appeals from *true* TRO's but may hear interlocutory appeals from orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1); *see Schlafly v. Eagle Forum*, 771 F. App'x 723, 724 (8th Cir. 2019) (mem.). This Court may have had jurisdiction when this appeal was filed because, although styled as a TRO, the district court's order *functioned* as a preliminary injunction with "serious, perhaps irreparable, consequence." *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84 (1981); *Sampson v. Murray*, 415 U.S. 61, 86–88 & n.58 (1974).

Specifically, the single-judge district court entered a TRO that prevented Missouri's Secretary of State from implementing, using, or mandating the use of Missouri's *only* lawful congressional districts until September 22, 2026. (App. 120-132, R. Doc. 35, Add. 1-13.) As explained below, September 22 is the deadline by which Missouri must transmit all absentee ballots. Mo. Rev. Stat. § 115.281; Mo.

Rev. Stat. §115.914. Thus, the TRO prevented Missouri's chief election official from taking steps to ensure the election was conducted in districts "established by law," as federal statutes require. 2 U.S.C. § 2a(c); 2 U.S.C. § 2c. Orders that are "effectively injunctions in that they bar[] [a state] from using the districting plans now in effect to conduct this year's elections" are immediately appealable. *Abbott v. Perez*, 585 U.S. 579, 594 (2018). Intervenor-Appellants filed their notice of appeal on September 8, 2026.

This Court's review is also limited by the nature of the case. Federal law provides that "[a] district court of three judges shall be convened" when "an action is filed challenging the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a). Although a single judge may enter a temporary restraining order, he may not "hear and determine any application for a preliminary or permanent injunction." 28 U.S.C. § 2284(b)(3).

A court of appeals may review a single district judge's failure to refer a case to a three-judge court. *See Borden Co. v. Liddy*, 309 F.2d 871, 876 (8th Cir. 1962). But if a three-judge court was required, the court of appeals is precluded from reviewing [the case] on the merits. *Stratton v. St. Louis Sw. Ry. Co.*, 282 U.S. 10, 16 (1930); *Borden Co.*, 309 F.2d at 876–77. Thus, in these circumstances, the proper course is to set aside relief improperly entered by a single judge, dismiss the appeal,

and remand with instructions to constitute the required three-judge court. *Borden*, 309 F.2d at 876.

That is the correct disposition here if this Court agrees that a three-judge court was required. *See infra* § II.A. The Complaint asks the court to declare the use of Missouri's only lawful congressional districts unconstitutional and to mandate use of HB 1—relief that falls squarely within § 2284(a). "It follows that the district judge was *required* to refer the case to a three-judge court." *Shapiro v. McManus*, 577 U.S. 39, 43 (2015).

## II. This Matter is Likely Moot

Two factual developments since Intervenors appealed affect the jurisdictional analysis. First, on September 10, the U.S. Supreme Court stayed the TRO under appeal. That stay will remain in effect through this appeal and any denial of certiorari or disposition of further appeals. (App. 884.)

To the extent there is any other role for this Court beyond enforcing the requirements of § 2284, it has no authority to reinstate the TRO. The Supreme Court has stayed the district court's September 8 order "pending the disposition of the appeal in the United States Court of Appeals for the Eighth Circuit and disposition of a petition for a writ of certiorari in this Court, if such a writ is timely sought." (App. 746.) That stay renders the TRO unenforceable for as long as the Supreme Court's order remains in force. *See Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

However the Court decides this appeal, that timeline will likely extend beyond September 22, when the TRO expires.

A case becomes moot when it is impossible for a court to grant any effectual relief, though even a partial remedy preserves a live controversy. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). This Court's "normal practice when a case has been rendered moot by events outside the parties' control" is to "vacate the decision of the district court and remand the case with directions that it be dismissed." *Teague v. Cooper*, 720 F.3d 973, 978 (8th Cir. 2013) (citing *United States v. Munsingwear*, 340 U.S. 36, 39–40 (1950)).

If this Court does not issue a decision before September 22, the TRO (which is otherwise stayed) will expire and this appeal will be moot. The appeal may already be moot given the duration of the Supreme Court's stay. This ties into the second factual development: the Secretary of State has now directed election officials to use the 2022 congressional map. (App. 738.)

As explained below, the *Purcell* principle reinforces the Supreme Court's stay and points toward reversal of the TRO. Federal court orders affecting elections, especially conflicting orders, can themselves create voter confusion, with increasing risk as the election approaches. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). Lower federal courts should not ordinarily alter election rules on the eve of an election. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205,

1207 (2020) (per curiam); *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). Thus, even assuming a live controversy remains between argument and September 22 (when the TRO expires and Missouri must send out all absentee ballots), *Purcell* weighs overwhelmingly against any action that would reinstate the TRO and make it impossible for Missouri's local election officials to transmit absentee ballots by statutory deadlines.

## III. The Court Lacks Jurisdiction Over the Cross-Appeal

This Court lacks jurisdiction entirely over the cross-appeal. On September 11, Plaintiffs filed a cross-appeal, which has been consolidated with this case for briefing and argument. Regardless of potential mootness of Intervenors' appeal, the Court lacks jurisdiction over the cross-appeal because Plaintiffs are not aggrieved by the district court's order. *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 333 (1980); *United States v. Northshore Min. Co.*, 576 F.3d 840, 846–47 (8th Cir. 2009).

## STATEMENT OF THE ISSUES

I. Whether the district court lacked jurisdiction to enter the TRO because 28 U.S.C. § 2284(a) required it to convene a three-judge court for an action challenging the constitutionality of the apportionment of congressional districts.

- *Shapiro v. McManus*, 577 U.S. 39 (2015)
- *MTM, Inc. v. Baxley*, 420 U.S. 799 (1975)
- 28 U.S.C. § 2284(a)

II. Whether the *Purcell* principle requires reversal of the district court's order, which prevents the Secretary of State from conducting the November election using congressional districts the Missouri Supreme Court unanimously declared to be the "only" lawful districts under state law at this late stage because (1) the merits of Plaintiffs' claims are not "entirely clearcut," (2) Plaintiffs would not suffer irreparable harm, (3) Plaintiffs delayed bringing their claim until the last minute, and (4) the requested changes are not feasible.

- *Merrill v. Milligan*, 142 S. Ct. 879 (2022)
- *Purcell v. Gonzalez*, 549 U.S. 1 (2006)



Appellate Case: 26-2797 Page: 18 Date Filed: 09/15/2026 Entry ID: 5683858

III. Whether the district court erred by failing to apply *Younger* abstention and/or the *Rooker-Feldman* doctrine to Plaintiffs' attempt to—as a practical matter—collaterally attack the Missouri Supreme Court's judgment, which was under active review by the U.S. Supreme Court.

- *Skit International, Ltd. v. DAC Technologies of Arkansas*, 487 F.3d 1154 (8th Cir. 2007)
- *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)

IV. Whether Plaintiffs established a likelihood of success on the merits of their Equal Protection and Article I, Section 2 claims, given that no court has ever held that these provisions guarantee individuals the right to vote in the same constituency at successive stages of an election.

- *Moore v. Harper*, 600 U.S. 1 (2023)
- *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982)
- U.S Const. art. I, § 2

V. Whether the TRO creates an independent conflict with 2 U.S.C. §§ 2a(c) and 2c to the extent it would require Missouri to conduct its congressional election under a map that, under controlling state law, is not, and has never been, the law.

- *von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846 (Mo. Sep. 3, 2026)
- 2 U.S.C. §§ 2a(c)
- 2 U.S.C. §§ 2c



Appellate Case: 26-2797 Page: 19 Date Filed: 09/15/2026 Entry ID: 5683858

VI. Whether the district court abused its discretion by not requiring a bond when entering a TRO and providing no meaningful analysis of why a bond would not be required.

- *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)
- Fed. R. Civ. P. 65(c)



Appellate Case: 26-2797 Page: 20 Date Filed: 09/15/2026 Entry ID: 5683858

## STATEMENT OF THE CASE[1]

### I. Initiation of Referendum Campaign

On September 12, 2025, the Missouri General Assembly passed House Bill 1 ("HB 1"), which—had it gone into effect—would have replaced Missouri's prior congressional apportionment enacted in 2022. The General Assembly did not include an emergency clause, leaving HB 1 subject to the Missouri Constitution's referendum process. Mo. Const. art. III, § 49. That same day, People Not Politicians and its executive director, Richard von Glahn (collectively, "Intervenors"), immediately proposed to conduct a referendum on HB 1. *See Mo. Gen. Assembly v. von Glahn*, No. 4:25-cv-1535-ZMB, 2025 WL 3514277, at *1 (E.D. Mo. Dec. 8, 2025). Under the Missouri Constitution, "[a]ny measure referred to the people shall take effect when approved by a majority of the voters cast thereon, and not otherwise." Mo. Const. art. III, § 52(b).

---

[1] Due to the fast-moving nature of this case, many of the parties' filings in the state-court action and at the U.S. Supreme Court were not formally made part of the record at the district court. These pleadings are not subject to reasonable dispute and the Court may take judicial notice of them. *See, e.g.*, *Conforti v. United States*, 74 F.3d 838, 840 (8th Cir. 1996); *Knutson v. City of Fargo*, 600 F.3d 992, 1000 (8th Cir. 2010). Intervenors have included relevant pleadings from those proceedings in their Appendix to ease the Court's review. Intervenors request that the Court take judicial notice of these pleadings. Fed. R. Evid. 201(c)-(d).



Appellate Case: 26-2797 Page: 21 Date Filed: 09/15/2026 Entry ID: 5683858

## II. The State Sues Intervenors

When Intervenors asked Hoskins to approve the forms for gathering signatures, he and the General Assembly immediately sued in the United States District Court for the Eastern District of Missouri, seeking to enjoin Intervenors from submitting the signatures they would gather. *See Mo. Gen. Assembly v. von Glahn*, No. 4:25-cv-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025). Hoskins asserted that if Intervenors "succeed in obtaining the requisite signatures, the new duly enacted congressional map is placed on hold and cannot take effect until after the referendum." (App. 213.) The plaintiffs claimed Intervenors' "efforts to displace the Federal Constitution's vesting of redistricting authority in the General Assembly is unlawful under the Elections Clause" (App. 189.) and that their "efforts to revisit the General Assembly's exercise of its authority under the Elections Clause are unlawful" (App. 193).

The district court eventually dismissed the lawsuit, explaining the Secretary could avoid any claimed harm by promptly rejecting the referendum on constitutional grounds: "Fortunately for the State, Secretary Hoskins has a tool at his disposal that almost no other litigant could boast—the power to declare the petition unconstitutional himself." (App. 242.) Using this tool would not "impose any measurable burden," since the State had already "completed an exhaustive analysis" in briefing. (*Id*.) The court also recognized that, if the petition proved sufficient, "the

new map w[ould] be frozen until after the referendum." (App. 238.) The State never appealed. (*See* App. 168-172.)

## III. Intervenors Submit the Referendum Petition, the Missouri Supreme Court Addresses Its Effect, and the Secretary Delays

Meanwhile, Intervenors circulated their referendum petition. (App. 51, R. Doc. 12 at 1.) On December 9, 2025, they submitted more than 300,000 signatures to the Secretary, (App. 51, R. Doc. 12 at 1-2, ¶ 2), who did not immediately reject the referendum. *See von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846 *2 (Mo. Sep. 3, 2026).

The Secretary had until August 4 to make his decision. Mo. Rev. Stat. § 116.150.3. Well before that deadline, he declared the submission of signatures did not suspend HB 1 and that it was operative law. Missouri citizens sued over that announcement. *See Maggard v. State*, 733 S.W.3d 411 (Mo. banc 2026). The Missouri Supreme Court held that the "mere" submission of signatures did not automatically suspend HB 1, but HB 1 would be suspended retroactive to December 9, 2025, if the petition was ultimately determined to be sufficient. *Id.* at 419–20. The Court cautioned that HB 1's legal status would remain unresolved until the certification process—including judicial review—was complete. *See id.*; *see also NAACP Mo. State Conf. v. Kehoe*, 734 S.W.3d 338, 341 n.4 (Mo. banc 2026).

Specifically, the Missouri Supreme Court unanimously reaffirmed that a "legal, sufficient, and timely" referendum petition pauses the effective date of the legislation at issue until a majority of voters approve it. *Maggard*, 733 S.W.3d at 420. That ultimate sufficiency determination— not the Secretary's interim view of HB 1's legal status— would "decide whether HB 1 did (or did not) go into effect on December 11." *Id.* at 419.

## IV. The Secretary Declares the Referendum Insufficient

Despite these warnings, the Secretary did not make a sufficiency determination before his deadline and chose to conduct the August 4, 2026 primary under the HB 1 districts. Missouri's Attorney General—who represented the Secretary in all aforementioned cases—publicly acknowledged the strategic benefit of delay: "As long as the status quo is the new [HB 1] maps, delay works in our favor." (App. 302.)

At approximately 4:00 p.m. on August 4, 2026—one hour before the statutory deadline and on Missouri's primary election day—the Secretary issued a certificate declaring the referendum petition insufficient. His certificate offered a single-sentence rationale: the Missouri Constitution does not authorize a referendum on congressional redistricting plans. *von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846, at *1-2 (Mo. Sep. 3, 2026).



Appellate Case: 26-2797 Page: 24 Date Filed: 09/15/2026 Entry ID: 5683858

## V. The Supreme Court Rules HB 1 Is Not and Has Never Been the Law

von Glahn immediately sued to overturn that decision, as Missouri law authorized. Mo. Rev. Stat. § 116.200. The Republican National Committee, National Republican Congressional Committee, and Missouri Republican State Committee intervened in that case. *von Glahn*, 2026 WL 2628846 at *2 n.3. The State Committee maintains "a congressional district committee for each congressional district in the state," Mo. Rev. Stat. § 115.603, and claimed to intervene "on behalf of itself, its committees, its voters, and its candidates" (App. 258, ¶¶ 13-14). The intervenors' reply brief likewise emphasized they were advocating on behalf of "their candidates[] and their voters." (App. 271.) The order granting intervention similarly stated this. (App. 283.)

The Missouri courts expedited their review. On September 3, 2026, the Missouri Supreme Court unanimously reversed the Secretary's declaration of insufficiency, holding the Missouri Constitution authorizes referenda on the General Assembly's adoption of congressional district maps.[2] *von Glahn*, 2026 WL 2628846. The Court ordered the Secretary to issue a certificate of sufficiency and place the referendum on the general election ballot. *See* Mo. Rev. Stat. § 116.200; *von Glahn*, 2026 WL 2628846 at *7. Critically, the Court made clear HB 1 "is not the law and

---

[2] Not infrequently, ballot and election matters produce split opinions. *See, e.g.*, *Luther v. Hoskins*, 730 S.W.3d 567 (Mo. banc 2026); *Coleman v. Ashcroft*, 696 S.W.3d 347 (Mo. banc 2024).

has never been the law." *Id.* at *6 n.8. The Court further "restrained and enjoined" the Secretary from using the HB 1 map for the general election. *Id.* at *7.

The Missouri Supreme Court also held the Secretary had "waived and abandoned" his federal-law objections by failing to preserve them as Missouri law requires—*i.e.*, by failing to state them in his certificate of insufficiency. *Id.* at *5 n.5. Under Missouri law, the Secretary's certificate must "stat[e] the reason for the insufficiency." Mo. Rev. Stat. § 116.150.2. The Secretary stated only one reason—a state-law ground—and the court held he could not cure the omission by purporting to incorporate by reference an Attorney General opinion.

Despite the Secretary's explicit waiver, the Missouri Supreme Court analyzed and rejected the Secretary's Elections Clause arguments. Citing substantial precedent, the Court observed: "[T]he United States Supreme Court has held on multiple occasions the United States Constitution permits a state to authorize a referendum as to legislation drawing new congressional districts." *von Glahn*, 2026 WL 2628846 at *3.

## VI. The Secretary's Failed Applications for Emergency Relief

After unsuccessfully seeking a stay from the Missouri Supreme Court, the Secretary—with supporting suggestions by the intervenor political committees--filed an Emergency Application for Stay with the U.S. Supreme Court on September 4, 2026, raising claims under the Elections Clause, Article I, Section 2, and the Equal

Protection Clause. (*See* App. 307-354.) These are the same claims the Missouri Supreme Court concluded had been "waived and abandoned." Justice Kavanaugh denied the application on September 8, 2026 without referring it to the full Court. *See Hoskins v. von Glahn*, No. 26A304 (U.S. Sep. 8, 2026).

In that application, the Secretary told the Supreme Court he needed a decision by September 14 so he could comply with the Uniformed and Overseas Absentee Voting Act ("UOCAVA"). (App. 321.) Under Missouri law implementing UOCAVA, ballots must be transmitted to members of the military and overseas voters by September 18, 2026. Mo. Rev. Stat. § 115.914.1. Local Election Authorities must transmit other absentee ballots by September 22. Mo. Rev. Stat. § 115.281.1. After the Supreme Court denied the Secretary's stay application, the Secretary's office emailed local election officials directing them to implement the Missouri Supreme Court's order and finalize ballots using the 2022 map. (App. 763.)

## VII. The District Court's TRO

Also on September 4—the same day the Secretary sought emergency relief from the U.S. Supreme Court—Plaintiffs filed a complaint and TRO motion in the district court raising the exact same federal claims. Plaintiffs' counsel is the same firm that represented the state-court intervenors. The candidate Plaintiffs (Congressman Onder and State Senator Rick Brattin) are Missouri Republican

Congressional Candidates, and the voter Plaintiffs (Thomas and Havens) are members of Missouri Republican committees. (App. 1-2, R. Doc. 1 at 1-2.)

On September 5, Intervenors filed their Motion to Intervene pursuant to Rule 24 (App. 51-54, R. Doc. 12, at 1-4), attaching a proposed Motion to Dismiss on multiple grounds and requesting a three-judge panel because of the congressional apportionment impact. (App. 55-74, R. Doc 12-4). On September 7, the district court ordered the parties to respond to Intervenors' Motion to Dismiss (R. Doc. 14) and to provide supplemental briefing on abstention doctrines. (R. Doc. 13.) Both parties responded. (App. 75-106, R. Doc. 19, R. Doc. 25.)

Rather than defending the claim, Defendants stated they would "join" Plaintiffs "in requesting that the Court issue" a TRO and that the "Court should therefore grant Plaintiffs' requested relief." (App. 44-50, R. Doc. 11.) Subsequently, Plaintiffs and Intervenors filed Supplemental Briefing on abstention, while Defendants did not submit a brief. (App. 107-111, R. Doc. 29, App. 112-119, R. Doc. 30.) On September 8, the district court granted Intervenors permissive intervention. (R. Doc. 32.) Intervenors were not asked to provide a response to the motion for TRO. Intervenors' Motion to Dismiss remains pending.

Within roughly two-and-a-half hours of granting intervention—and within about 15 minutes of Plaintiffs notifying the court that Justice Kavanaugh had denied the Application for Emergency Stay—the district court entered a TRO. (App. 120-



Appellate Case: 26-2797 Page: 28 Date Filed: 09/15/2026 Entry ID: 5683858

132, R. Doc. 35. Add. 1-13.) The court concluded Plaintiffs were unlikely to prevail on their Elections Clause claim but likely to prevail on their other claims. (App. 125-130, R. Doc. 35 at 6-11, Add. 6-11.) It found the public interest favored a TRO, applying a "*Purcell* in reverse" theory. (App. 129-130, R. Doc. 35 at 11-12, Add. 11-12.) The district court declined to set a bond, reasoning: "Neither Defendants nor Intervenor Defendants asks the Court to set a bond, and having considered the issue, the Court finds a bond unnecessary on these unique facts and circumstances." (App. 131, R. Doc. 35 at 13, Add. 13.)

The district court enjoined "Secretary of State Hoskins—as well as his officers, agents, employees, and attorneys—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026 general election." (*Id.*) The court did not purport to abrogate the Missouri Supreme Court's injunction prohibiting the Secretary from using the HB 1 map. The practical result: the court restrained use of the districts that, under Missouri law, result from the "only . . . valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022." *von Glahn*, 2026 WL 2628846 at *6 n.8.

As a practical matter, then, the district court enjoined the Secretary from using *any* map for the general election. Several omissions are also notable. The district court: (1) never mentioned the Missouri Supreme Court's September 3 ruling or

injunction in its merits or equities analysis; (2) did not convene a three-judge panel as required by 28 U.S.C. § 2284(a); and (3) did not address the jurisdictional arguments Intervenors raised, including *Younger* and collusion.

In sum, Plaintiffs, Defendants, and the attorneys representing them share the same objective: implementation of HB 1. The Secretary, in direct violation of Mo. Rev. Stat. § 1.185 (barring any "public official, including any attorney representing or acting on behalf of a public official," from "consenting to any condition, or agree[ing] to any order" that "suspends, enjoins, alters, or conflicts with any" statutory provisions containing Missouri's congressional districts), "agree[d] that Plaintiffs [met] the thresholds warranting a temporary restraining order and join[ed] them in request that [the district court] issue said relief." (App. 44, R. Doc. 11 at 1.) Defendants urged the district court to "grant Plaintiff's requested relief." (App. 48, R. Doc. 11 at 5.) Meanwhile, the State moved to dismiss itself on sovereign immunity grounds while proposing to keep the consenting Secretary in the case. (R. Doc. 28.)

## VIII. The Secretary Changes His Directives to Local Election Officials

On September 8, after the U.S. Supreme Court denied the Secretary's stay application, the Secretary's office emailed local election officials directing them to implement the Missouri Supreme Court's order and finalize ballots using the 2022 map. (App. 738.) After the TRO issued, the Secretary immediately countermanded

those instructions, informing election officials: "The Eastern District has issued a Temporary Restraining Order, requiring the use of the CD25 Missouri First Map." (App. 535.) von Glahn notified the Missouri Supreme Court of this communication, and it immediately issued an order to show cause why the Secretary should not be held in contempt. (App. 526.)

The Attorney General issued a similar statement. (App. 536.) The Secretary then asked the district court to *enjoin the Missouri Supreme Court's contempt proceeding*. (App. 133-135, R. Doc. 41, App. 136-145, R. Doc. 43.) Although the Missouri Supreme Court appears not to have been served with the motion, Intervenors offered suggestions in opposition. (App. 146-153, R. Doc. 47.) The district court denied the motion, noting it was "confident that both courts will accord each other comity, and that the Supreme Court [of the United States] will soon weigh in on Intervenor-Defendants' application for stay." (App. 162-163, R. Doc. 50.)

This Court denied Intervenors' emergency motion for a stay on September 9. (Order [5681557], *Onder v. von Glahn*, No. 26-2797 (8th Cir. Sep. 9, 2026).) The U.S. Supreme Court then granted Intervenors' emergency application for a stay on September 10. (App. 884.) After the U.S. Supreme Court granted Intervenors' application to stay the TRO and the Missouri Supreme Court held an initial hearing on whether to hold the Secretary in contempt, the Secretary sent the following message to local election officials: "Following the United States Supreme Court's

stay, the only governing court order in effect is from the Missouri Supreme Court. In accordance with that order, my Office is directing local election authorities to use the 2022 congressional map." (App. 759.)

## IX. The District Court's September 9 Order

On the evening of September 9, after Intervenors filed their Notice of Appeal and this Court denied Intervenors' motion to stay, the district court issued a separate order denying Intervenors' emergency stay application and addressing their jurisdictional arguments. (App. 154-161, R. Doc. 49.) The district court ruled: (1) Section 2284 does not apply because Plaintiffs do not challenge the constitutionality of an "apportionment" but rather the switch between maps; (2) *Rooker-Feldman* does not apply because Plaintiffs raised federal-only claims and were not parties to the state case; (3) *Younger* does not apply because no *NOPSI* category fits and state proceedings were completed before the TRO;[3] (4) *Colorado River* does not apply because no parallel state proceedings exist; and (5) the Anti-Injunction Act does not apply because Plaintiffs are "strangers" to the state-court proceeding. (*Id.*)

[3] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989).



Appellate Case: 26-2797 Page: 32 Date Filed: 09/15/2026 Entry ID: 5683858

## SUMMARY OF THE ARGUMENT

The district court's TRO is stayed by the Supreme Court of the United States. If this Court chooses to review entry of the TRO, it should reverse. The order suffers from multiple, independently fatal defects.

**First,** the district court lacked jurisdiction. Although its September 9 order found 28 U.S.C. § 2284 inapplicable because Plaintiffs do not challenge the "constitutionality of the apportionment," Plaintiffs' Complaint asks the district court to declare the use of Missouri's only lawful congressional apportionment unconstitutional—relief squarely within Section 2284(a). (App. 26, R. Doc. 1 at 26.) (asking court to "[i]ssue declaratory relief stating that Defendants' failure to use the HB1 congressional maps – as ordered by *von Glahn* – is unconstitutional"). Characterizing the case as merely about "switching" maps cannot change the substance of what Plaintiffs sought: a declaration that conducting elections under a particular apportionment is unconstitutional.

**Second,** the *Purcell* principle requires reversal. The district court's "*Purcell* in reverse" theory has no basis in precedent. *Purcell* does not govern whether *state* courts may interpret their own election laws; it prohibits *federal* courts from swooping in to redo a state's election laws close to an election. The district court's order does precisely that—prohibiting implementation of Missouri law as unanimously interpreted by the Missouri Supreme Court. The resulting chaos—with

election officials subject to irreconcilable directives—is exactly what *Purcell* forbids.

**Third,** the district court's reasoning on abstention is flawed. On *Younger*, the district court emphasized that the Missouri Supreme Court proceedings were "complete" before the TRO issued. But the Missouri Supreme Court's order expressly contemplated ongoing enforcement, and the contempt proceedings that immediately followed demonstrate that enforcement of the state court's judgment was still active. The district court's narrow reading of "ongoing" proceedings ignores that *Younger* extends to federal court intrusion into "the processes by which the State compels compliance with the judgments of its courts." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13–14 (1987).

On *Rooker-Feldman*, Plaintiffs are unlikely to prevail in their position that they are not in collusive privity with the parties to the state action (both the Secretary and the political committees their counsel represents). The district court's reasoning that Plaintiffs raised "distinct" federal claims overlooks that those claims are inextricably intertwined with the Missouri Supreme Court's judgment and *identical* to those pressed in the state-court proceedings by the parties there. The TRO's practical effect is to prevent the Secretary from directing use of any map other than HB 1, which the Missouri Supreme Court has held is not law and cannot be used—the kind of de facto appellate review *Rooker-Feldman* prohibits.



Appellate Case: 26-2797 Page: 34 Date Filed: 09/15/2026 Entry ID: 5683858

**Fourth,** Plaintiffs have no likelihood of success on the merits. The Equal Protection and Article I, Section 2 theories are unprecedented. No court has ever held that these provisions guarantee individuals the right to vote in the same constituency at both the primary and general election. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), forecloses the Equal Protection theory. The district court correctly rejected the Elections Clause claim, which is contrary to all applicable precedent.

**Fifth,** the TRO creates an independent conflict with 2 U.S.C. §§ 2a(c) and 2c by preventing the Secretary from taking steps to conduct Missouri's congressional election using the only lawful districts (*i.e.*, leaving Missouri with *no* congressional districts).

**Sixth,** the district court abused its discretion by failing to set a bond and failing to meaningfully explain *why* not setting a bond was appropriate. As explained below, while district courts in this circuit have discretion not to require bond, the bond requirement is nearly universal and the trial court failed to supply any persuasive analysis to justify waiving bond. The facts make clear—for the same reason the *Purcell* doctrine exists—that the TRO will cause substantial harm.

## ARGUMENT

## I. STANDARD OF REVIEW

The Court reviews *de novo* the legal issues underlying the district court's injunctive relief order, including questions of jurisdiction, abstention, and the merits of the underlying claims.[4] *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). It reviews the district court's decision not to require bond for abuse of discretion. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991).

## II. THE DISTRICT COURT LACKED JURISDICTION.

### A. A Three-Judge Court Was Required

"A district court of three judges shall be convened" when "an action is filed challenging the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a).[5] "It follows that the district judge was required to refer the case to a three-judge court." *Shapiro v. McManus*, 577 U.S. 39, 43 (2015). This requirement is "'impervious to judicial discretion.'" *Id.*

---

[4] This is in contrast to the more deferential standard that applied to this Court's review of Intervenors' stay motion. *See Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011); Fed. R. App. P. 8(a).

[5] The statute is grounded in judicial restraint principles not unlike *Purcell*. The "congressional policy behind the three-judge court and direct review apparatus [is] the saving of state and federal statutes from improvident doom at the hands of a single judge." *MTM, Inc. v. Baxley*, 420 U.S. 799, 804 (1975).

The district court concluded in its September 9 order that Section 2284 does not apply because Plaintiffs "do not contest the constitutionality of the underlying apportionment in the prior congressional district map from 2022" but instead "challenge only that the Secretary of State can, consistent with the United States Constitution, switch congressional district maps between the primary and general elections." (App. 154, R. Doc. 49 at 1.)

That reasoning is flawed. Plaintiffs claim that using the 2022 congressional districts for the general election would violate the U.S. Constitution. (App. 9-25, R. Doc. 1 at 9-25.) That is an as-applied challenge to the constitutionality of the 2022 apportionment.[6] The Complaint asks the court to declare the use of Missouri's only lawful congressional apportionment unconstitutional and effectively mandate use of the HB 1 apportionment—relief squarely within Section 2284(a). (App. 26, R. Doc. 1 at 26.) A party cannot evade the three-judge-court requirement through artful pleading. *Shapiro*, 577 U.S. at 44.

Even accepting the district court's reasoning that Section 2284(b)(3) permits a single judge to enter a TRO before referring the matter to a three-judge panel, and further assuming the TRO did not function as a preliminary injunction, the TRO here

---

[6] As discussed elsewhere, Plaintiffs offered no *evidence* to support their claims. The lack of such evidence is particularly problematic in the context of an as-applied challenge, which requires a "case-by-case-analysis" into "individual circumstances." *Miller v. Ziegler*, 109 F.4th 1045, 1050 (8th Cir. 2024).



Appellate Case: 26-2797 Page: 37 Date Filed: 09/15/2026 Entry ID: 5683858

has been stayed by the U.S. Supreme Court. Any further proceedings on a federal constitutional challenge to the use of Missouri's 2022 legislative districts in the 2026 general election must take place before a three-judge panel pursuant to Section 2284(a). Given the applicable absentee ballot transmission deadlines (*see* Mo. Rev. Stat. § 115.281; Mo. Rev. Stat. § 115.914), the TRO, if affirmed, would be the kind of practical adjudication of the apportionment controversy that a single judge cannot make. *See Stratton v. St. Louis Sw. Ry. Co.*, 282 U.S. 10, 17 (1930); *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001).

In sum, the district court erred by failing to convene a three-judge court. To the extent this Court concludes the TRO operates as a mandatory injunction requiring the use of HB 1 (as opposed to prohibiting use of other maps), that ends the matter for this Court's review. It is obligated to vacate the district court's order with instructions to convene a three-judge court. *See, e.g.*, *Kason v. Paterson*, 542 F.3d 281, 286 (2d Cir. 2008) ("When a single district court judge improperly adjudicates a case required to be heard by a three-judge court, a court of appeals normally lacks jurisdiction over the merits and is limited to deciding whether the district court erred by not referring the case to a three-judge court.").

B. There Was No Article III Claim or Controversy Below Because the Case is Collusive

The district court also lacked Article III jurisdiction. The Constitution limits federal judicial power to actual "Cases" and "Controversies" between genuinely adverse parties. U.S. Const. art. III, § 2. Congress has expressly prohibited district courts from exercising jurisdiction over collusive cases. 28 U.S.C. § 1359. Where a lawsuit is collusive—where the parties share a common objective and have manufactured a dispute—the case must be dismissed because it does not present the "honest and actual antagonistic assertion of rights" upon which judicial integrity depends. *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021).

For a district court to have Article III jurisdiction, "the parties [must] have adverse *interests* when federal jurisdiction was invoked." *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 401–02 (4th Cir. 2022) (concluding courts lack jurisdiction to "rubberstamp an agreement the parties [made] before ever arriving on a federal court's doorstep"). That jurisdiction is lacking when "both litigants desire precisely the same result." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48 (1971) (dismissing election case where parties agreed on outcome).



Appellate Case: 26-2797 Page: 39 Date Filed: 09/15/2026 Entry ID: 5683858

The Supreme Court has long enforced these requirements. In *Muskrat v. United States*, 219 U.S. 346, 361 (1911), the Court held that "judicial power . . . is the right to determine actual controversies arising between adverse litigants," and that an attempt to obtain a judicial declaration is not a "case" or "controversy" where the defendant "has no interest adverse to the claimants." As the Court explained: "It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Id.* (quoting *Wellman*, 143 U.S. at 345); *see also United States v. Johnson*, 319 U.S. 302, 305 (1943); *Lord v. Veazie*, 49 U.S. (8 How.) 251, 255 (1850). This Court has also applied these principles. *See Curb & Gutter District No. 37 v. Parrish*, 110 F.2d 902, 907 (8th Cir. 1940).

The duty to police collusion is mandatory: "it is the duty of the circuit court, on its own motion, as soon as the collusive character of the case is shown, to stop all further proceedings and dismiss the suit." *Williams v. Nottawa*, 104 U.S. 209, 211 (1881). Here, the collusion is unmistakable.

There were two "defendants" in this case—Secretary Hoskins and the State of Missouri. When Plaintiffs sought a TRO, both "join[ed] them in requesting that [the] Court issue said relief." (App. 44, R. Doc. 11 at 1.) In doing so, Defendants and their lawyers violated Missouri law:

> In any civil action in a state or federal court, no public official, including any attorney representing or acting on

> behalf of a public official, has any authority to compromise or settle an action, consent to any condition, or agree to any order in connection therewith if the compromise, settlement, condition, or order nullifies, suspends, enjoins, alters, or conflicts with any provision of chapters 115 to 128.

Mo. Rev. Stat. § 1.185.2.

Chapter 128 includes Missouri's congressional apportionment. *See* Mo. Rev. Stat. §§ 128.461–.469. By agreeing to the entry of a TRO—and *opposing* Intervenors' motion to dismiss—Defendants violated state law. As a matter of state law, any "order to which a public official agrees that conflicts with subsection 2 of this section is void and has no legal effect." Mo. Rev. Stat. § 1.185.3.[7] Although this statute does not bind federal courts, state law makes Defendants' agreement void and illustrates the unmistakable collusion in this case.

Separately, Plaintiffs are in concert with parties to the *von Glahn* action in state court. The Secretary, Plaintiffs, and the state-court intervenors share common interests and strategies. The Complaint advances identical arguments that Plaintiffs' lawyers raised—and the Missouri Supreme Court rejected—in the state-court proceeding.[8] (*Compare* App. 9-25, R. Doc. 1 at 9-25 ¶¶ 50–109, *with* App. 466-477.)

---

[7] This is one of several reasons the district court erroneously relied on Defendants' lack of objection as a basis to waive the bond requirement.

[8] The named plaintiffs were not technically parties to the state-court action. But their lawyers, Ellinger Bell LLC, represented the state-court intervenors. Those state-court intervenors purported to act "on behalf of" their "committees, [] voters, and []

Likewise, Ellinger Bell LLC's September 4, 2026 brief to the U.S. Supreme Court in *Hoskins v. von Glahn*, No. 26A-304, explicitly supported the Secretary's stay application. (App. 355.) The Complaint was also filed as "related" to *Mo. Legislature v. von Glahn*, No. 4:25-CV-1535-ZMB—a lawsuit the Secretary filed in October 2025 pressing identical Elections Clause arguments. (R. Doc 1-4.) Plaintiffs' counsel filed an amicus brief (on behalf of the Missouri Republican Party) supporting the Secretary in that case. (*See* App. 219.) The Complaint explicitly targets the Missouri Supreme Court's *von Glahn* ruling, seeking the exact relief the Missouri Supreme Court denied. (App. 6, 9, R. Doc. 1 at 6, 9, ¶¶ 33-37, 51.)

The Missouri Attorney General's office was obligated to defend this lawsuit while simultaneously serving as counsel for the Secretary on the then-pending stay application in the U.S. Supreme Court—seeking the same relief Plaintiffs request here. This structural conflict is another hallmark of a non-adversarial proceeding. This is a textbook case of manufactured litigation that Article III and 28 U.S.C. § 1359 forbid.

At minimum, Plaintiffs were unlikely to succeed on their claims given the serious questions about Article III jurisdiction. The district court should have considered the collusive nature of the suit before proceeding to the merits. It was an

candidates." (App. 258.) Plaintiffs' interests were thus expressly represented in the state-court action. They are not independent litigants pursuing unrelated interests.

error to overlook the fact that Defendants joined in the TRO request. That error was compounded by failing to seek briefing on the TRO from intervenors or to hold any hearing at all on the TRO motion.

C. *Rooker-Feldman* Bars This Action.

*Rooker-Feldman* "prohibits lower federal courts from exercising appellate review of state court judgments." *Skit International, Ltd. v. DAC Technologies of Arkansas*, 487 F.3d 1154, 1156 (8th Cir. 2007). The district court concluded *Rooker-Feldman* does not apply because Plaintiffs raised "issues distinct" from the Missouri Supreme Court's state-law ruling and because they were not parties to the state case.

To be sure, *Rooker-Feldman* must be confined to the narrow circumstances the Supreme Court has authorized. *Sutter & Gillham PLLC v. Henry*, 146 F.4th 699, 702–04 (8th Cir. 2025). "[M]odern *Rooker-Feldman*" bars federal actions "brought by a state court loser complaining of injuries caused by a state-court judgment rendered before the district court proceedings commenced and inviting a district court review and rejection of that judgment." *Id.* at 702 (cleaned up). The "anchor" for application "is the underlying state-court judgment itself." *Id.* In short, "the legal wrong cannot be the state-court judgment itself, with its rejection being the remedy." *Id.*

This case sits in *Rooker-Feldman*'s heartland. Plaintiffs directly attack the judgment in *von Glahn*. (App. 6, R. Doc. 1 at 6, ¶¶ 33-41.) They say they are injured



Appellate Case: 26-2797 Page: 43 Date Filed: 09/15/2026 Entry ID: 5683858

because "the Missouri Supreme Court ordered Defendants to use the 2022 Congressional district map," they are forced to run in districts "[u]nder *von Glahn*," and because Defendants are following "the course of action ordered by *von Glahn*." (App. 6-7, R. Doc. 1 at 6-7, ¶¶ 33, 37, 41.) They seek an order "that *von Glahn*'s suspension of the General Assembly's duly enacted HB 1 plan and authorization of a referendum seeking to overturn HB 1 violates the Elections Clause." (App. 9, R. Doc. 1 at 9, ¶ 51.) They attack the Missouri Supreme Court's interpretation of *state law*. (App. 16-17, R. Doc. 1 at 16-17, ¶¶ 68-73.) They complain "*[v]on Glahn* ignores" the primary and creates election administration problems. (App. 19-20, R. Doc. 1 at 19-20, ¶¶ 79, 83.) They openly acknowledge their grievance is what "*von Glahn* commands Defendants" to do. (App. 21-23, R. Doc. 1 at 21-23, ¶¶ 90-91, 95, 98.) They argue that *Purcell* **supports** overriding the Missouri Supreme Court's decision. (App. 22-25, R. Doc. 1 at 22-25, ¶¶ 97-109.) They pray for "declaratory relief stating that Defendants' failure to use the HB1 Congressional maps – as ordered by *von Glahn* – is unconstitutional." (App. 26, R. Doc. 26.)

Plaintiffs did not even try to hide that they are attacking the judgment in *von Glahn*. It is the alleged "legal wrong" and their proposed remedy is "rejecting" the relief the Missouri Supreme Court ordered and replacing it with relief they prefer. This would, unquestionably, render *von Glahn*'s ordered remedy "null and void." *Sutter & Gillham*, 146 F.4th at 703.

So, all that remains is whether Plaintiffs "qualify as state-court losers." *Id.* at 703. Yes, this Court has observed that status as a "non-part[y]" to a state-court action may "make[] this case an awkward *Rooker-Feldman* fit." *Id.* at 703–04. But the Supreme Court has specifically left open "whether there are *any* circumstances, however limited, in which *Rooker–Feldman* may be applied against a party not named in an earlier state proceeding." *Lance v. Dennis*, 546 U.S. 459, 466 n.2 (2006). Federal appellate courts have continued to apply *Rooker-Feldman* to parties not expressly named in a state-court proceeding where the rationale behind the doctrine is satisfied.

For example, multiple Circuit Courts have concluded *Rooker-Feldman* bars attempted collateral attacks on state *in rem* proceedings, even though the federal plaintiff was not a named party. *See Dorce v. City of New York*, 2 F.4th 82, 101–03 (2d Cir. 2021); *Merritts v. Richards*, 62 F.4th 764, 774–76 (3d Cir. 2023); *Bruce v. City & Cnty. of Denver*, 57 F.4th 738, 746–50 (10th Cir. 2023). And the Sixth Circuit has applied *Rooker-Feldman* where there is sufficient privity between the federal plaintiff and the state-court parties. *McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006). Something more than the privity necessary for preclusion law is needed. *Lance*, 546 U.S. at 466.

The Second Circuit has reasoned there may be circumstances where "plaintiff voters are in reality the candidates' pawns," and "by definition the plaintiff voters'



Appellate Case: 26-2797 Page: 45 Date Filed: 09/15/2026 Entry ID: 5683858

interests are identical to the candidates' (and different from the interests of all similarly situated voters) and were adequately represented in the candidates' state-court lawsuit." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 91 (2d Cir. 2005), *abrogated on other grounds by T. M. v. Univ. of Maryland Med. Sys. Corp.*, 146 S. Ct. 1739 (2026). That is the situation here.

As explained in the preceding section, Plaintiffs' interests were fully and explicitly represented by the state-court intervenors, who in turn are fully aligned with the Secretary. This lawsuit was strategically filed within hours of the Missouri Supreme Court denying the very same relief. It directly attacks the *von Glahn* judgment. It is a friendly lawsuit in which voters and candidates represented by the state-court intervenors have now joined the state-court defendant to collaterally attack a judgment the Secretary and Plaintiffs' state-court representatives could not get the U.S. Supreme Court to stay. While all *Rooker-Feldman* requirements must be met, *Sutter & Gillham*, 146 F.4th at 704, the requirement "that the plaintiff complains of an injury caused by a state-court judgment – is the core requirement from which the other *Rooker-Feldman* requirements derive," *Dorce*, 2 F.4th at 101–02. The doctrine applies here.

## III. THE *PURCELL* PRINCIPLE REQUIRES REVERSAL

Even if the district court had jurisdiction, the *Purcell* principle independently requires reversal. The district court acknowledged its order turns *Purcell* on its



Appellate Case: 26-2797 Page: 46 Date Filed: 09/15/2026 Entry ID: 5683858

head—calling its rationale "*Purcell* in reverse." But *Purcell* runs in one direction for good reason. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). As Justice Kavanaugh has explained, "[i]t is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). Justice Kavanaugh (joined by Justice Alito) has suggested lower courts consider the following factors:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* Here, each factor weighs decisively against federal intervention.

### A. To the Extent the Merits are "Entirely Clearcut," It is In Favor of Intervenors, Not Plaintiffs

As discussed below, the merits are not entirely clearcut in Plaintiffs' favor. "Entirely clearcut" must mean something well beyond "likelihood of success"—and more than just "clearcut." When evidence of racial gerrymandering is insufficient, the issue is not "entirely clearcut." *Walen v. Burgum*, No. 1:22-cv-31, 2022 WL



Appellate Case: 26-2797 Page: 47 Date Filed: 09/15/2026 Entry ID: 5683858

1688746, at *5 (D.N.D. May 26, 2022). *Milligan*'s "entirely clearcut" language is similar to that used in qualified immunity cases requiring existing precedent placing the constitutional question "beyond debate." *See, e.g.*, *Lyons v. Vought*, 875 F.3d 1168, 1171–72 (8th Cir. 2017) (citing *White v. Pauley*, 580 U.S. 73 (2017)).

The claims here are not clearcut, much less "entirely clearcut." They are not based on clearly established law. The district court found the Elections Clause claim meritless and found only a "likelihood of success" on the Equal Protection and Article I, Section 2 claims. That finding cannot overcome *Purcell* because, as discussed below in Section VI, Plaintiffs' theories are wholly novel and unsupported by precedent.

Disrupting a state's electoral processes in proximity to an election should be done sparingly. This is why federal intervention must be supported by "entirely clearcut" claims. The non-Elections Clause claims here are anything but. Indeed, the district court relied only on general statements that the primary elections are "an integral part of the election process" to reach its conclusion that the use of the "only valid congressional redistricting" under Missouri law would violate Article I, Section 2. (App. 127, R. Doc. 35 at 8, Add. 8.)

Neither this Court nor the Supreme Court has ever held it is unconstitutional to conduct a primary using one set of legislative districts and the general election

using another.[9] The primary election is merely the process by which partisan political parties choose nominees. There is no constitutional guarantee to *have* a primary, or that the popular vote be conducted in any particular districts. *See Am. Party of Texas v. White*, 415 U.S. 767, 781 (1974) (rejecting contention state could not require smaller parties to nominate by convention and observing Equal Protection plaintiff has "burden [] to demonstrate in the first instance a discrimination against them of some substance"). Indeed many states, including Missouri, allow for selection of primary candidates in ways other than a popular vote. *See* Mo. Rev. Stat. § 115.363. Some states allow nomination of candidates without a popular vote at all. *See, e.g.*, Colo Rev. stat. §§ 1-4-701 and 702; Utah Code § 20A-9-403; Va. Code §§ 24.2-509, *et seq*. Nothing about use of the 2022 congressional districts for the general election conflicts with the U.S. Constitution.

Under *Purcell*, a district court must have stark *proof* of a "clear-cut" constitutional violation to disrupt a state court's election processes. None is present here.

---

[9] On Friday, the Texas Supreme Court held that Texas's Election Code does not permit counties to alter local redistricting maps between primary and general elections. *See In re Rose*, No. 26-0916, 2026 WL 2672098 (Tex. Sept. 11, 2026). That case is nothing like this one. It was decided on state-law grounds, and here the Missouri Supreme Court has held it was the Secretary's use of HB 1 in the *primary* that was unlawful. In *In re Rose*, it was the planned general election districts that were unlawful.

B. Plaintiffs Would Not Suffer Irreparable Harm

Plaintiffs will suffer no harm from voting or campaigning in congressional districts that are, and have always been, Missouri law. To the extent they have any cognizable harm,[10] it stems from the fact that they voted and ran in the primary in districts that were not the law—due to the Secretary's failure to timely do his job. But they do not take issue *with the primaries*. For good reason.

If Plaintiffs had a problem with Missouri's primary elections, they had time to challenge those under Missouri law. *See* Mo. Rev. Stat. § 115.526. Defendant Hoskins certified the primary election winners (including Onder and Brattin) and Plaintiffs never challenged those results. Instead, they want the benefit of winning those primaries in districts that were never the law and to now run in those same districts. But two wrongs will not make it right—Plaintiffs have no cognizable interest in running in districts that have never been the law. It is also unclear why Plaintiffs believe the alternative—running an election pursuant to which they cannot be seated under 2 U.S.C. §§ 2a(c) and 2c—is preferable.

[10] Plaintiffs' alleged harms are entirely speculative. Onder and Brattin may win their races. (They also chose to register to run in districts with full knowledge they might not be the law and the Secretary was gambling they were.) Thomas and Havens do not explain who they *would* have voted for had the Secretary not prevented them from voting in the correct districts in the primaries, or that they oppose their party's candidate in their correct district assignments (among many other defects). Such claims require evidence in support. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607-09 (8th Cir. 2020) (discussing Anderson-Burdick framework).



Appellate Case: 26-2797 Page: 50 Date Filed: 09/15/2026 Entry ID: 5683858

C. Plaintiffs Delayed

Plaintiffs also unreasonably delayed bringing this suit. They knew in December 2025, when *General Assembly v. von Glahn* was decided[11] (and were reminded again in May 2026, when the Missouri Supreme Court decided *Maggard* and *NAACP*), that HB 1 was not in legal effect if the referendum petition was sufficient. Yet they did not sue for a declaration on which districts should be used. They also knew the Missouri Republican Party had been advancing arguments in state and federal courts seeking to require use of the HB 1 districts since September 2025. Rather than bringing suit to protect their alleged interests, they bided their time to try to force Missouri into holding an election using districts that are not the law.

D. The Requested Changes Are Not Feasible

The requested changes—enjoining use of the only lawful districts—are simply not feasible at this stage without significant costs and hardship. In compliance with the Missouri Supreme Court's orders, the Secretary has directed local election officials throughout Missouri to use the lawful maps (App. 738.), and they have begun to do so. The Secretary and attorneys representing Plaintiffs have repeatedly insisted it would be impossible to change the districts at this late stage.

[11] Plaintiff Brattin was a member of the Missouri General Assembly when that suit was filed.



Appellate Case: 26-2797 Page: 51 Date Filed: 09/15/2026 Entry ID: 5683858

(*See, e.g.*, App. 345.) Most recently, in his opposition to a stay at the U.S. Supreme Court, the Secretary submitted an affidavit claiming the same.

A bipartisan coalition of Missouri's local election authorities is expected to confirm in an amicus filing that they are actively implementing the 2022 districts, and any reversal of course would be enormously disruptive and expensive. They have waited months to be given clarity about which districts will govern and are now moving at breakneck speed to implement the only lawful districts so they can conduct the November election.[12]

Election authorities—not currently represented in this litigation—would face costs associated with reprinting ballots, reconfiguring precincts, reprogramming voting equipment, retraining poll workers, and communicating new district assignments to voters—all on an extraordinarily compressed timeline. These are not speculative harms; they are the inevitable consequences of enjoining a state's election apparatus from using the only lawful map. *See von Glahn*, 2026 WL 2628846 at *6 n.8.

---

[12] Missouri has 116 independent local election authorities responsible for administering elections across the state. By statute, they must begin transmitting ballots to military and overseas voters by September 18. Mo. Rev. Stat. § 115.914.1. We expect the amicus to confirm that the printing of those ballots is already complete. They must also print and have absentee ballots available by September 22. Mo. Rev. Stat. § 115.281.1.



Appellate Case: 26-2797 Page: 52 Date Filed: 09/15/2026 Entry ID: 5683858

The district court's "reverse-*Purcell*" maneuver purports to save Missouri from a decision of Missouri's highest court interpreting Missouri's Constitution and laws. But as the U.S. Supreme Court has made clear, "federal courts should not impose changes close to an election," even as "States are free to decide for themselves whether last-minute changes to an election are in their best interests." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (per curiam).

The State has argued *Purcell* supports the TRO because it preserves the "de facto status quo" of the HB 1 map used in the primary. (App. 881.) But the Missouri Supreme Court has authoritatively determined HB 1 was never the legal status quo. *von Glahn*, 2026 WL 2628846 at *6 n.8. The Secretary cannot manufacture a "status quo" by implementing a map whose validity was always subject to the outcome of the referendum process and then invoke *Purcell* to entrench it. When the primary was conducted, the Missouri Supreme Court had *already* twice advised that HB 1's status was in limbo.

The State has also cited *Malliotakis v. Williams*, 146 S. Ct. 809 (2026), but that case is distinguishable. (App. 848.) In *Malliotakis*, the U.S. Supreme Court stayed a state court order that changed a congressional map four months before a primary election, specifically so the courts *would not* run into a *Purcell* problem down the line. *Id.* at 811. Here, the TRO is the disruptive order—it overrides the



Appellate Case: 26-2797 Page: 53 Date Filed: 09/15/2026 Entry ID: 5683858

Missouri Supreme Court's ruling on the eve of the general election and creates the very chaos *Purcell* forbids.

## IV. THE TRO WOULD CAUSE MISSOURI TO VIOLATE FEDERAL LAW

The TRO creates an independent conflict with federal statutes. The now-stayed TRO prevented Secretary Hoskins from using any apportionment other than that contained in HB 1. The logical consequence: Missouri may not use the apportionment in Mo. Rev. Stat. §§ 128.461–.469, which is the *only* congressional apportionment under state law.

Using something *other than* state law would violate federal law. Representatives must be elected from districts established "in the manner provided by the law" of the State. 2 U.S.C. §§ 2a(c) (requiring Representatives to be "elected from the districts then prescribed by the law of such state"); 2 U.S.C. §2c ("Representatives shall be elected only from districts so established [by state law]"). The TRO prevents the Secretary from conducting elections pursuant to districts "prescribed by law" or any other districts other than HB 1, which is not the law—the opposite of what federal law requires.

The State's argument that Section 2a(c) "does not require federal courts to enforce" state congressional maps is a distraction. (App. 739.) Intervenors do not argue that Section 2a(c) compels any particular judicial action. They argue simply

that the TRO affirmatively prevents Missouri from complying with Section 2a(c) by limiting elections to districts that are decisively *not* "the districts then prescribed by the law" of Missouri. The TRO ignores this consequence entirely and should be reversed.

## V. THE DISTRICT COURT SHOULD HAVE ABSTAINED

### A. *Younger* Abstention

Multiple abstention doctrines counseled against the district court's intervention in Missouri's election. The district court's September 9 order reasoned that *Younger* does not apply because: (1) the case does not fall into a *NOPSI* category, and (2) no state-court proceedings were "ongoing" when the TRO issued because the Missouri Supreme Court had entered judgment and denied rehearing. (App. 156-159, R. Doc. 49 at 3-6.) Both conclusions are wrong.

First, the third *NOPSI* category—"civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions," *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (quoting *NOPSI*, 491 U.S. at 368)—encompasses the Missouri Supreme Court's enforcement of its own injunction. The TRO directly interferes with that enforcement. Second, the state proceedings were "ongoing." While the Missouri Supreme Court had entered judgment, that does not end a case for *Younger* purposes when the state court's enforcement mechanisms remain active. The Missouri Supreme Court's

injunction was in effect and subject to ongoing enforcement—as the immediate contempt proceedings demonstrate. *Younger* extends to federal court intrusion into "the processes by which the State compels compliance with the judgments of its courts." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13–14 (1987).

Additionally, the district court's analysis that Plaintiffs lacked an opportunity to raise federal challenges in the state case ignores that they are raising claims *identical* to those the Secretary and state-court intervenors raised. The Secretary and state-court intervenors had every opportunity to raise these arguments before the Missouri Supreme Court and in subsequent certiorari proceedings to the U.S. Supreme Court. That is where they should properly be reviewed.

## VI. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A. The District Court Properly Rejected the Elections Clause Claim

The district court correctly concluded Plaintiffs failed to establish a likelihood of success on their Elections Clause claim, recognizing that more than a century of Supreme Court decisions have concluded that "states may permit their voters to challenge redistricting maps by referendum without running afoul of the Elections Clause." *See Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 805 (2015); *Moore v. Harper*, 600 U.S. 1, 25–26 (2023).

The Secretary and Plaintiffs' counsel have offered an alternative spin on the Elections Clause: while referenda on redistricting may be permissible, the Missouri Constitution's suspension mechanism is constitutionally problematic. (App. 332-346.) That is wrong. The referendum petition does not "void" HB 1; it suspends its effectiveness pending a vote, as the Missouri Constitution expressly provides. Mo. Const. art. III, § 52(b). This is functionally identical to the Ohio referendum provision upheld in *Hildebrant*, which provided that legislation "shall go into effect" only when "approved by a majority of those voting upon the same." *State ex rel. Davis v. Hildebrant*, 114 N.E. 55, 57 (Ohio 1916); *Hildebrant*, 241 U.S. at 566.

B. Plaintiffs Cannot Succeed on Their Equal Protection Claim

The district court's Equal Protection analysis rests on the premise that voters who do not "stay in their HB 1 congressional districts" and candidates who do not "retain the same electorate" "are divested of their fundamental electoral rights." (App. 129, R. Doc. 35 at 10, Add. 10.) Supreme Court precedent forecloses this theory.

In *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), the Court found "nothing invidious or arbitrary" about a statutory scheme allowing some voters to be represented by a legislator they had no opportunity to elect. The appointment procedure did "not restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties." *Id.* at 10. The



Appellate Case: 26-2797 Page: 57 Date Filed: 09/15/2026 Entry ID: 5683858

Court emphasized: "All qualified voters have an equal opportunity to select a district representative in the general election." *Id.* Under Plaintiffs' theory, the procedures states have adopted to replace nominees who become unable to run after a primary would be constitutionally impermissible. That is absurd.

In its briefing to the Supreme Court, the State argues *Rodriguez* actually supports its position because it recognized Equal Protection applies where "qualified voters" lack "an equal opportunity to select a district representative in the general election." (App. 618.) But that is precisely what will happen under the 2022 map: all qualified voters will have an equal opportunity to vote in the general election. The State's argument conflates the right to vote in the general election with a putative right to have primary and general elections conducted under identical district lines (which no court has ever recognized).

Federal courts have rejected Equal Protection challenges to representational discontinuities that accompany redistricting transitions. In *Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993), the Third Circuit found no Equal Protection violation where reapportionment placed voters in a district represented by a senator they had not elected. In *Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992), the Ninth Circuit rejected a challenge arising from the combined consequences of reapportionment and staggered senate terms.

The State's reliance on cases like *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), and *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014), in its briefing to the Supreme Court is misplaced. (App. 870.) Aside from being non-controlling district court opinions, those cases involved courts declining to order elections under new remedial maps after finding existing maps unconstitutional—a different remedial question than whether the Constitution affirmatively requires a state to use a map that has *never* been the law to preserve primary-general consistency.

C. Plaintiffs Cannot Succeed on Their Article I, Section 2 Claim

Article I, Section 2 fares no better. That provision protects the right of qualified voters to choose their representatives in Congress. Where a state "has made the primary an integral part" of the election process, Article I, Section 2 protects the voter's right to cast a primary ballot and "to have his ballot counted." *United States v. Classic*, 313 U.S. 299, 318 (1941). That is all. And that principle was not violated here. All qualified voters had the opportunity to vote in the primary, the primary votes were counted and used to select nominees, and all nominees will appear on the general election ballot.

The State, in its Supreme Court briefing, cites *Montano v. Lefkowitz*, 575 F.2d 378 (2d Cir. 1978) (Friendly, J.), for the proposition that "it is simply inconsistent with the concept of election of Representatives by districts that a candidate should

be chosen in part by persons outside the district elected to these posts as such." *Id.* at 385. (App. 872.) But *Montano* involved the entirely different question of whether votes cast in one congressional district could be counted in another district's primary—a direct dilution of primary votes. Here, no one's vote is being "counted" in a different district. Every primary vote was properly counted in the relevant district.

*Classic* does not convert the right to participate in a primary into a constitutional guarantee that every downstream circumstance of that primary remain fixed until Election Day. The Constitution's protections for political participation do not freeze every consequence of the primary through the general election. *See Rodriguez*, 457 U.S. at 8–12.

## VII. THE EQUITIES OVERWHELMINGLY FAVOR REVERSAL

### A. The District Court's Irreparable Harm Analysis Was Flawed

A TRO requires a showing "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). Plaintiffs claimed they would be "disenfranchised" if Missouri uses a different map for the general election. But no court has ever held that Article I, Section 2 or the Equal Protection Clause requires a state to use the same district boundaries for primary and general elections—particularly where the primary map was subject to a lawful referendum.

The district court cited no authority supporting its novel "disenfranchisement" theory, and the Supreme Court was unmoved by identical claims hours before the TRO issued.

Moreover, no record evidence supports the district court's conclusions about alleged disenfranchisement. Equal Protection permits voters to be represented by a legislator they had no opportunity to elect. *Rodriguez*, 457 U.S. at 8–12. If so, it cannot forbid the narrower injury alleged here. The district court did not address how many voters would actually be affected, how they might have voted differently, or how the primary results could have changed. This falls short of showing harm that is "certain and great." *Novus Franchising*, 725 F.3d at 895.

B. <u>The Balance of Harms Overwhelmingly Favors Reversal</u>

On one side of the ledger, the TRO purports to nullify the Missouri Supreme Court's judgment and deprives Missouri voters of the referendum right that judgment protects. A federal injunction "barring [a] State from conducting this year's elections pursuant to a valid provision in its constitution" causes "serious[] and irreparabl[e] harm." *Eggers v. Evnen*, 48 F.4th 561, 566–67 (8th Cir. 2022) (quoting *Abbott*, 585 U.S. at 602).

The TRO subjects the Secretary to facially irreconcilable commands. The Secretary must be permitted to tell local official which districts to use and those should be the ones state law requires. The irreparable harm to Intervenors and

Missouri's election infrastructure is self-evident—compliance with one sovereign's order necessarily means defiance of the other.

On the other side, Plaintiffs' claimed harm is both largely hypothetical and self-inflicted. The Secretary engineered the decisional timing he and Plaintiffs complain about—he chose to conduct the primary under HB 1 despite express warnings that HB 1's legal status was in doubt, then waited until the statutory deadline to issue a certification resting on a rationale the State had been advancing for months. Plaintiffs sat on their hands throughout this process. The Attorney General publicly acknowledged the strategic benefit: "As long as the status quo is the new maps, delay works in our favor." (App. 250.) Equity does not reward manufactured emergencies.

There is "a strong equitable presumption against the grant of a stay" when the need for emergency relief results from a litigant's own delay. *Hill v. McDonough*, 547 U.S. 573, 584–85 (2006). There is no equity in requiring an illegal election because of the Secretary's own strategic choices. And "it is not the province of a state executive official to re-write the state's election code." *Carson*, 978 F.3d at 1060.

C. <u>The Public Interest Favors Reversal</u>

The public has a paramount interest in orderly, lawful elections administered without confusion. The TRO undermines that interest. It bars the Secretary from

requiring use of anything other than a map that, under the authoritative decision of Missouri's highest court, "is not the law and has never been the law." *von Glahn*, 2026 WL 2628846 at *6 n.8. It creates irreconcilable conflict between state and federal court orders. And it would deprive Missouri voters of the constitutional referendum right the Missouri Supreme Court's judgment protects.

"[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). The constitutional rights at stake here belong to the 300,000 Missourians who signed the referendum petition and every voter entitled to participate in the referendum at the November election. Interference with those rights also has First Amendment implications. *See S.D. Voice v. Noem*, 60 F.4th 1071, 1078 (8th Cir. 2023).

Reversal would close the book on a prolonged, confusing attempt to deprive Missourians of their referendum rights. It would bring certainty by making clear that the district court erred in purporting to require the Secretary to refrain from using any map other than HB 1. The Secretary can and must use the only lawful map under Missouri law—and reversal would eliminate the chaos of conflicting judicial mandates. Election officials have confirmed this outcome is feasible; at this late stage, changing course would not be. Conversely, allowing the TRO to stand while its jurisdictional basis remains in serious doubt risks sowing confusion among



Appellate Case: 26-2797 Page: 63 Date Filed: 09/15/2026 Entry ID: 5683858

voters, candidates, and election administrators—the very harms that *Purcell* admonishes federal courts to avoid.

## VIII. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO REQUIRE A BOND OR MAKE ADEQUATE FINDINGS SUPPORTING WAIVER OF BOND

A court can issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purposes of bond are twofold: "to provide a fund for compensation of an incorrectly enjoined party who may suffer from the effects of an incorrect interlocutory order, and to deter rash applications for interlocutory orders." *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1278 (N.D. Iowa 1995).

The district court's bond analysis consisted of one sentence: "Neither Defendants nor Intervenor Defendants asks the Court to set a bond, and having considered the issue, the Court finds a bond unnecessary on these unique facts and circumstances. *See* Fed. R. Civ. P. 65(c)." (App. 132, R. Doc. 35 at 13, Add. 13.) This cursory treatment was an abuse of discretion. The district court's statement that "Intervenor Defendants" did not ask for a bond is particularly striking given that Intervenors were granted intervention only two-and-a-half hours before the TRO was entered and were never asked to brief the TRO motion.

## A. The District Court Failed to Make Adequate Findings to Waive Bond

While this Court affords district courts "much discretion" in setting a bond, it will reverse if the district court "abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). A district court abuses its discretion by "neglect[ing] to consider the question of requiring a bond." *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989).

"Courts in this circuit have almost always required a bond before issuing a preliminary injunction," with limited exceptions only "where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing cases). Even in *Richland/Wilkin*, where this Court upheld a bond waiver, it did so after thorough analysis of the public interests at stake *and* the defendants' failure to demonstrate damages—not a single conclusory sentence.

Here, the district court's invocation of "unique facts and circumstances," without identifying what those facts and circumstances are or how they bear on the harm analysis, is inadequate. The district court made no findings about the costs of wrongful enjoinment. It cited no evidence. It did not address the interests of the

parties who would actually be harmed by the TRO. This falls well short of the "necessary findings" that *Hill*, *Rathmann Group*, and *Richland/Wilkin* require.

B. <u>The Collusive Defendants' Agreement Cannot Waive the Bond Requirement</u>

The two recognized bond exceptions are: (1) the defendant has not objected, and (2) the damages resulting from a wrongful issuance have not been shown. *Richland/Wilkin*, 826 F.3d at 1043. Neither applies here.

The first exception is premised on the enjoined party's non-objection—that is, the party who stands to be harmed by a wrongful injunction. Here, Defendants unlawfully consented to the TRO. *See* Mo. Rev. Stat. § 1.185.2. They filed a joint statement supporting Plaintiffs' motion. (App. 44-50, R. Doc. 11 at 1-7.) The Secretary and Attorney General (representing Defendant State of Missouri) share Plaintiffs' objective: implementation of HB 1. Their non-objection to the absence of a bond is a feature of the collusion, not a legitimate basis for waiver.

The real adverse parties are Intervenors, who secured a unanimous judgment from the Missouri Supreme Court vindicating their rights under the Missouri Constitution. The TRO effectively nullifies that judgment. Intervenors were granted intervention shortly before the district court entered the TRO in the midst of active briefing at the U.S. Supreme Court. At no point did the district court request or direct

Intervenors to respond to the TRO motion.[13] Their silence on the bond issue under these circumstances cannot fairly be treated as a waiver of the bond's protections. Intervenors had no right to respond to the motion for a TRO before being granted intervention and did not have time to do so in the time between being granted intervention and entry of the TRO.

C. There Is Demonstrable Risk of Harm from a Wrongful TRO

The second exception—that damages from a wrongful issuance have not been shown—does not apply either. The record is devoid of any meaningful evidence about harm. But the TRO enjoins use of Missouri's *only* lawful congressional districts to conduct a general election. As the discussion above concerning *Purcell* illustrates, the costs and disruption flowing from a wrongfully issued TRO are substantial, concrete, and obvious.

Sister circuits have confirmed the circumstances under which bond should not be required are few and far between. "[A]bsent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988); *accord Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) ("the instances in which a bond

[13] Intervenors moved to dismiss and briefed jurisdictional issues as the court directed.



Appellate Case: 26-2797 Page: 67 Date Filed: 09/15/2026 Entry ID: 5683858

may not be required are so rare that the requirement is almost mandatory"); *see also Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). The district court made no finding that there is no risk of harm to Intervenors or Missouri's election infrastructure, and such a finding would be unsupportable.

D. The Collusive Nature of the Proceedings Makes the Bond Requirement More Important

The bond requirement "deter[s] rash applications for interlocutory orders." *Curtis 1000*, 878 F. Supp. at 1278; *see also Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 (3d Cir. 2003). Where, as here, Plaintiffs and Defendants have colluded to obtain a TRO, the deterrence function of the bond requirement is entirely absent. *See Alpert v. Riley*, 457 F. App'x 429, 432 (5th Cir. 2012) (emphasizing that a party injured by an injunction later determined to be erroneous has no action for damages in the absence of a bond).

The district court's waiver of bond, premised on the collusive Defendants' non-objection, effectively endorses the collusion, without any financial accountability for the harm an erroneous TRO causes. This is the circumstance in which the bond requirement has its greatest force. A party who is "found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), must have recourse to a bond. Here, those who will be most harmed by an erroneous TRO—Intervenors

and the 116 local election authorities charged with administering Missouri's elections—have been denied that protection.

E. The Appropriate Remedy is Vacatur

Normally, the remedy for an improper bond determination is reversal and remand. *See Rathmann Group*, 889 F.2d at 789; *Hill*, 939 F.2d at 632. Here, however, remand for a bond determination is insufficient. The district court's failure to require a bond is symptomatic of the broader procedural deficiencies that pervade this TRO: the order was entered without a hearing, without opposition briefing from the real adverse parties, without addressing the pending motion to dismiss, and without any meaningful analysis of the bond requirement. Under these circumstances, the appropriate remedy is vacatur of the TRO in its entirety.

## CONCLUSION

For the foregoing reasons, the TRO should be vacated.



Appellate Case: 26-2797 Page: 69 Date Filed: 09/15/2026 Entry ID: 5683858

Respectfully submitted,

**STINSON LLP**

/s/ *Charles W. Hatfield*
Charles W. Hatfield, MO 40363
Jeremy A. Root, MO 59451
Alexander C. Barrett, MO 68695
Alixandra S. Cossette, MO 68114
Greta M. Bax, MO 73354
230 W. McCarty Street
Jefferson City, MO 65101
Telephone: (573) 636-6263
chuck.hatfield@stinson.com
jeremy.root@stinson.com
alexander.barrett@stinson.com
alix.cossette@stinson.com
greta.bax@stinson.com

*Counsel for Intervenors-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Eighth Circuit Rule 28A(h), I certify that:

1. The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).
2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.
3. The brief and addendum have been scanned for viruses, and both are virus-free.

Dated: September 15, 2026

*/s/ Charles W. Hatfield*
Charles W. Hatfield
Counsel for Intervenors-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Charles W. Hatfield*
Charles W. Hatfield
Counsel for Intervenors-Appellants