No. 26-2797

# In the United States Court of Appeals for the Eighth Circuit

CONGRESSMAN ROBERT ONDER et al.,

*Plaintiffs-Appellees*,

*v.*

STATE OF MISSOURI et al.,

*Defendants-Appellees*,

*and*

RICHARD VON GLAHN et al.,

*Intervenors-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Missouri
Case No. 4:26-cv-01424-SRC

**BRIEF OF MISSOURI VOTERS JAKE MAGGARD AND GREGG LOMBARDI AS AMICI CURIAE IN SUPPORT OF INTERVENORS-APPELLANTS AND REVERSAL**


Tori Schafer
P.O. Box 11424
Clayton, Missouri 63105
(314) 947-8674
torimschafer@gmail.com

Kevin J. Hamilton
Matthew P. Gordon
Jonathan P. Hawley
ASHURST PERKINS COIE US LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Matthew.Gordon@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

*Counsel for Amici Curiae Jake Maggard and Gregg Lombardi*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... ii

INTEREST OF AMICI CURIAE .......... 1

INTRODUCTION .......... 4

ARGUMENT .......... 8

I. The TRO, not the Missouri Supreme Court's *von Glahn* opinion, threatens the constitutional rights of Missouri voters. .......... 9

II. The TRO fundamentally misconstrues the equities. .......... 14

CONCLUSION .......... 22

CERTIFICATES OF COMPLIANCE .......... 23

CERTIFICATE OF SERVICE .......... 24

## TABLE OF AUTHORITIES

**CASES**

*Abbott v. League of United Latin Am. Citizens*,
146 S. Ct. 418 (2025)........................................17

*Abbott v. Mexican Am. Legis. Caucus*,
647 S.W.3d 681 (Tex. 2022)........................................2

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020)........................................19–20

*Democratic Senatorial Campaign Comm. v. Pate*,
950 N.W.2d 1 (Iowa 2020)........................................17

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979)........................................11–12

*Klein v. United States*,
176 F.2d 184 (8th Cir. 1949)........................................11

*Maggard v. State*,
733 S.W.3d 411 (Mo. 2026)........................................3, 6, 16

*Merrill v. Milligan*,
142 S. Ct. 879 (2022)........................................8, 20

*Missourians to Protect Initiative Process v. Blunt*,
799 S.W.2d 824 (Mo. 1990)........................................4

*Mo. Gen. Assembly v. von Glahn*,
No. 25-CV-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025)........................................15

*Moore v. Harper*,
600 U.S. 1 (2023)........................................13–14, 19

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996)........................................10–11

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 20–21

*Nichols v. Robinson*,
211 S.W. 11 (Mo. 1919) .......... 12

*No Bans on Choice v. Ashcroft*,
638 S.W.3d 484 (Mo. 2022) .......... 2, 4

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... passim

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) .......... 16–17

*Riley v. Kennedy*,
553 U.S. 406 (2008) .......... 20

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990) .......... 21

*State ex rel. Drain v. Becker*,
240 S.W. 229 (Mo. 1922) .......... 4–5

*State ex rel. Moore v. Toberman*,
250 S.W.2d 701 (Mo. 1952) .......... 1, 12

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986) .......... 11

*United States v. Classic*,
313 U.S. 299 (1941) .......... 10

*Von Glahn v. Hoskins*,
No. SC 101805, 2026 WL 2628846 (Mo. Sept. 3, 2026) .......... passim

*Wise v. Circosta*,
978 F.3d 93 (4th Cir. 2020) (en banc) .......... 19

**CONSTITUTIONAL PROVISIONS**

Mo. Const. art. III, § 52(b) .......... 1, 16

Mo. Const. art. V, § 2 .......................................................... 19–20

Mo. Const. art. V, § 3 .......................................................... 19–20

U.S. Const. amend. XIV .......................................................... 11

U.S. Const. art. I, § 2 .......................................................... 9–10

U.S. Const. art. I, § 4 .......................................................... 14

**STATUTES**

2 U.S.C. § 2a .......................................................... 18

Mo. Rev. Stat. § 115.125.2 .......................................................... 18

**RULES**

Fed. R. App. P. 29 .......................................................... 4

**OTHER AUTHORITIES**

David A. Lieb & Hannah Schoenbaum, *Opponents of Trump-Backed Redistricting in Missouri Submit a Petition to Force a Public Vote*, PBS News (Dec. 10, 2025), https://bit.ly/491AIKs .......................................................... 5

*Statement from Missouri Secretary of State Denny Hoskins*, Mo. Sec'y of State (Sept. 10, 2026), https://bit.ly/4cO1Lf4 .................... 18

## INTEREST OF AMICI CURIAE

In trying to cure an imagined constitutional injury, the District Court entered a temporary restraining order ("TRO") that precipitates an actual one.

Under the Missouri Constitution, a "measure referred to the people shall take effect when approved by a majority of the votes cast thereon, *and not otherwise*." Mo. Const. art. III, § 52(b) (emphasis added). This is the essence of the people's referendum right: As the Missouri Supreme Court recognized a half-century ago, the

> [p]urpose of referendum is to suspend or annul a law which *has not gone into effect* and to provide the people a means of giving expression to a legislative proposition, and require their approval *before it become operative as a law*; and its purpose does not intend to invalidate a law already operative.

*State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706 (Mo. 1952) (emphasis added) (citation modified).

The District Court, however, issued a TRO requiring that House Bill 1 ("HB 1")—a *proposed* congressional map that has been referred to the people of Missouri for approval or rejection—be used in the November general election even though it "is not the law and has never been the law." *Von Glahn v. Hoskins*, No. SC 101805, 2026 WL 2628846, at *6 n.8 (Mo. Sept. 3, 2026). Enforcing referred legislation like HB 1 before Missourians vote to approve



Appellate Case: 26-2797 Page: 6 Date Filed: 09/15/2026 Entry ID: 5683942

it does not merely undermine the constitutional referendum right but vitiates it altogether.

Amici Curiae Jake Maggard and Gregg Lombardi ("Amici") are qualified Missouri voters who signed HB 1 referendum petitions and plan to cast ballots in the upcoming election, both to approve or reject HB 1 and to elect members of Congress. They therefore have a clear interest in the outcome of this appeal and urge the Court to reverse and vacate the TRO. Under the Missouri Constitution, the people "reserve[] a share of the legislative power *for themselves* …. to serve as a check on the legislature." *No Bans on Choice v. Ashcroft*, 638 S.W.3d 484, 489 (Mo. 2022) (emphasis added). Each Amici possesses a share of the legislative power and therefore has a personal stake in safeguarding the right to cast a meaningful vote in the HB 1 referendum free from interference—and, for that mater, in voting for a congressional delegation under a lawfully enacted map. After all, "[v]oting in a lawfully apportioned district … is a personal right; participating in the political process is a fundamental individual liberty." *Abbott v. Mexican Am. Legis. Caucus*, 647 S.W.3d 681, 694 (Tex. 2022).

While Amici share the referendum and voting rights of their fellow Missourians, their interest here is particularly strong since they themselves litigated these issues previously. In December 2025, once it was apparent that Missouri Secretary of State Denny Hoskins (the "Secretary") was intent



Appellate Case: 26-2797 Page: 7 Date Filed: 09/15/2026 Entry ID: 5683942

on using the HB 1 map in this year's midterms, Amici filed suit in Missouri state court under the theory that HB 1 was suspended as an operation of law when signed referendum petitions were timely submitted. The Missouri Supreme Court ultimately disagreed with Amici on the particular mechanism of suspension, concluding in May that, until the Secretary completed his process for verifying the sufficiency of the submitted petitions, "it [wa]s impossible to say … whether the December 9 referendum petition filing was 'legal, sufficient, and timely' and, therefore, whether HB 1 went into effect on December 11 or whether HB 1 was referred to the people as of December 9 and can only go into effect when approved by a majority of the votes cast thereon." *Maggard v. State*, 733 S.W.3d 411, 420 (Mo. 2026).

The Missouri Supreme Court's opinion two weeks ago delivered on the earlier *Maggard* decision:

> There is only one valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022…. Regardless of any confusion, expense, or practical difficulties caused by the secretary's delay and incorrect assumption about whether the referendum petition would be deemed sufficient, simply continuing to utilize the congressional redistricting in HB 1 does not comport with the Missouri Constitution because *the 2022 map is the only map in effect*.

*Von Glahn*, 2026 WL 2628846, at *6 n.8 (emphasis added). Amici therefore have another interest relevant to this brief: vindicating their previous efforts to defend the referendum right.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (a)(4)(E), Amici state that all parties have consented to the filing of this brief; that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than Amici or their counsel contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

"The voters of Missouri first adopted a constitutional amendment establishing the right of referendum more than 100 years ago," "reserv[ing] a share of the legislative power for themselves" and "ensur[ing] that 'those who have no access to or influence with elected representatives may take their cause directly to the people.'" *No Bans*, 638 S.W.3d at 486, 489 (quoting *Missourians to Protect Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. 1990)). For over a century, the Missouri Supreme Court—having recognized that "an erroneous interpretation of powers conferred always ends in trouble," *State ex rel. Drain v. Becker*, 240 S.W. 229, 233 (Mo. 1922)—has zealously defended the boundaries of the referendum right against procedural chicanery and mischief. The court long ago acknowledged the "prudence" of the people reserving "the right to correct any evils which may result from unwise legislation" and decided that this "absolute power" is "immune



Appellate Case: 26-2797 Page: 9 Date Filed: 09/15/2026 Entry ID: 5683942

from obstructive interference *from any source* until the purpose for which it is exercised has been consummated." *Id.* at 231–32 (emphasis added).

Two weeks ago, the Missouri Supreme Court was required once again to safeguard Missourians' share of the legislative power, the latest leg of the "unseemly race between the Governor, the Legislature, and the people" that has always accompanied the referendum right. *Becker*, 240 S.W. at 233. The court's intervention was sorely needed. Since the Secretary received 691 boxes containing nearly 50,000 pages of signed referendum petitions last December—totaling over 300,000 signatures, far more than necessary to refer HB 1 for popular approval—he has done everything in his power to deny Missouri voters their right to have their say before HB 1 goes into effect. The Secretary did not hide his intentions or motivation: Within one day of submission, he told the Associated Press he was "going to do everything [he] can to protect" HB 1.[1]

Delay was the Secretary's chosen strategy, and he refused to make a final certification decision until just one hour before his statutory deadline on August 4, 2026—primary day. This in turn postponed the inevitable suspension of HB 1, allowing the Secretary to implement the new map in Missouri's August primary even though, the Missouri Supreme Court later

[1] David A. Lieb & Hannah Schoenbaum, *Opponents of Trump-Backed Redistricting in Missouri Submit a Petition to Force a Public Vote*, PBS News (Dec. 10, 2025), https://bit.ly/491AIKs.



Appellate Case: 26-2797 Page: 10 Date Filed: 09/15/2026 Entry ID: 5683942

explained, that map was never actually enacted. "[B]ecause a 'legal, sufficient, and timely' referendum petition was filed on December 9—*before* HB 1 went into effect on December 11—HB 1 did not take effect on December 11, HB 1 was 'referred to the people' as of December 9, and HB 1 'shall take effect when approved by a majority of the votes cast thereon, and not otherwise.'" *Von Glahn*, 2026 WL 2628846, at *5 (quoting *Maggard*, 733 S.W.3d at 420). After undertaking this straightforward application of Missouri law, the court had a pointed response to the Secretary's newfound concerns about "the confusion, expense, and practical difficulties that may result from not utilizing the congressional redistricting in HB 1 for the November 2026 election": "[T]hese arguments are particularly misplaced given the secretary's delay created the confusion, expense, and practical difficulties of which he complains." *Id.* at *6 n.8.

The Missouri Supreme Court was right on the law and on the equities. Any logistical difficulties were a problem entirely of the Secretary's own making, a byproduct (if not the intended effect) of his promise to do "everything [he] can to protect" HB 1 by subverting Missourians' constitutional referendum right. And because HB 1 was properly referred to the people, it cannot take effect—and cannot be implemented—unless and until the people vote to approve it. *Von Glahn* should have been the end of this story.

Instead, the District Court injected new chaos and uncertainty on the eve of the general election. As the Missouri Supreme Court made clear on September 3, the day it handed down the *von Glahn* decision, the one and only operative congressional map in Missouri is the map adopted by the General Assembly in 2022. *See* 2026 WL 2628846, at *6 n.8 ("[T]he 2022 map is the only map in effect."). *That* was the status quo at the time the District Court issued its TRO. And yet, in a remarkable departure from comity, the District Court's order would *prohibit* use of Missouri's only lawful congressional map. More shocking still, the District Court premised its merits decision on legal theories that just moments earlier had been considered—*and rejected*—by Justice Kavanagh, who denied the Secretary's emergency stay application seeking the same relief on the same grounds.

The U.S. Supreme Court's stay of the TRO last Thursday (issued with no noted dissents) further confirms that reversal of the District Court's order is needed for at least two reasons.

*First*, the District Court's conclusion that use of the 2022 map will result in "disenfranchisement" has no merit. No authority requires perfect symmetry between the electorates in primary and general elections or otherwise suggests that the Missouri Supreme Court's injunction would produce an unconstitutional result. And no Missouri voter will be denied the right to vote for a member of Congress if required to cast ballots under the same map

used in the 2022 and 2024 elections. Ultimately, it is the District Court itself that risks constitutional deprivation here, since use of the HB 1 map in the general election would deny Missouri voters their right to referendum.

*Second*, the U.S. Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election" and "in turn has often stayed lower federal court injunctions that contravened that principle." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays). By upending the state-law status quo—use of the 2022 congressional plan, Missouri's only lawfully enacted map—on the eve of the general election, the District Court violated *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), and disregarded the compelling equitable concerns militating against emergency relief.

## ARGUMENT

Following the Missouri Supreme Court's clear directive that the 2022 congressional map be used in the upcoming election, the District Court flouted any recognizable theory of federalism and enjoined Missouri officials from using a congressional map other than HB 1, a map that, in a legal sense, *does not exist and has never existed*. The premise underlying the TRO—that, since the Secretary intentionally violated state law by administering a primary election under an unlawful map (for concededly partisan purposes),



Appellate Case: 26-2797 Page: 13 Date Filed: 09/15/2026 Entry ID: 5683942

Missouri must now conduct a *second* election under the same unlawful map—doubles down on a lawless act. Two wrongs don't make a right, and because repeating the Secretary's error is inconsistent with federal and state law, the TRO should be vacated.

## I. The TRO, not the Missouri Supreme Court's *von Glahn* opinion, threatens the constitutional rights of Missouri voters.

The District Court's conclusion that "[u]sing a map other than HB 1's would disenfranchise primary-election voters," R. Doc. 35, at 5, 9, does not bear scrutiny. Using Missouri's only lawfully enacted congressional map will not violate Article I, Section 2 of the U.S. Constitution or the Equal Protection Clause or otherwise disenfranchise any Missouri voters.

**Article I, Section 2.** The U.S. Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2, cl. 1. Nothing the Missouri Supreme Court ordered in *von Glahn* will prevent Missouri voters from "cho[osing]" the state's congressional delegation to the U.S. House of Representatives as Article I, Section 2 requires. After all, the 2022 map has been used in two prior elections—and there is certainly no argument that Missouri voters were denied their constitutional right to elect members of Congress in 2022 or 2024.



Appellate Case: 26-2797 Page: 14 Date Filed: 09/15/2026 Entry ID: 5683942

As for 2026, all that has changed since the Missouri Supreme Court decided *von Glahn* is that some voters will find themselves in different congressional districts with candidates other than those they voted for in the August primary. The District Court cited no authority foreclosing this outcome, and no wonder: There is nothing inherently or necessarily static about the composition of an electorate between a primary and general election. After all, plenty of voters sit out primaries, but they are still perfectly able to cast votes in general elections. Other voters move between districts after a primary but before the general election—meaning they too find new candidates on their general-election ballots. What matters is that voters have the opportunity to vote in a primary and a general election. Missourians were able to do so this year. That the district lines (and the voters within them) might have changed between the elections is of no constitutional moment.

The cases the District Court relied on underscore this point. *See* R. Doc. 35, at 8. In *United States v. Classic*, the U.S. Supreme Court held that, "[w]here the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, *the right of the elector to have his ballot counted at the primary*, is likewise included in the right protected" by the U.S. Constitution. 313 U.S. 299, 318 (1941) (emphasis added). Here, no Missouri voter was denied that right—and thus Article I, Section 2 has not been violated or even undermined. *Morse v.*

*Republican Party of Virginia*, 517 U.S. 186 (1996); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986); and *Klein v. United States*, 176 F.2d 184 (8th Cir. 1949), all stand for the same principle: States cannot "exclude[] voter[s]" from primaries and prevent them from "cast[ing] a vote for [their] candidate," *Morse*, 517 U.S. at 207 (op. of Stevens, J.), but that did not happen here. No primary votes have been "nullif[ied]"; "[v]oters reassigned to different district[s]" might cast ballots for candidates other than those they voted for in the primary, but their primary ballots still counted and the candidates they selected will still appear on the ballot. R. Doc. 35, at 9.[2] And *none* of the cases cited by the District Court held that deviations between primary and general electorates run afoul of the U.S. Constitution.

**Equal Protection Clause.** The District Court's equal-protection analysis fails for a simple reason: No Missourian's vote for Congress will be worth more than any other's. *Contra* R. Doc. 35, at 9–11. Each voter will be able to cast a single vote for a member of Congress. Again, all that has changed is that some voters will find themselves in different congressional districts, but the District Court found no authority proscribing this result on equal-protection grounds or any other. Its cited cases all concerned the right of voters to cast ballots in a primary, *see, e.g.*, *Ill. State Bd. of Elections v.*

---

[2] Notably, members of Missouri's congressional delegation do not need to live in the districts they represent, so any candidates who find themselves in new districts will not be prevented from serving if they are elected from their primary districts.



Appellate Case: 26-2797 Page: 16 Date Filed: 09/15/2026 Entry ID: 5683942

*Socialist Workers Party*, 440 U.S. 173, 184 (1979) (addressing "[r]estrictions on access to the ballot," not symmetry between primary and general electorates)—and no one was denied that opportunity here.

In short, no Missouri voters have been "divested of their fundamental electoral rights" by the Missouri Supreme Court's order. *Contra* R. Doc. 35, at 10. Instead, it is *the District Court itself* that is now on the brink of a constitutional violation. If the HB 1 map is used in the upcoming general election *before* the people approve the map at the ballot box, then the Missouri Constitution's referendum right will be effectively vitiated because the "[p]urpose of referendum is to suspend or annul a law which has not gone into effect … and its purpose *does not intend to invalidate a law already operative*." *Toberman*, 250 S.W.2d at 706 (emphasis added) (citation modified). This purpose would be clearly and irreparably subverted if legislation like HB 1 could take effect before voters approve it—just like the gubernatorial veto power would be diminished if legislation could become effective before a governor has a chance to exercise the veto. *See Nichols v. Robinson*, 211 S.W. 11, 13 (Mo. 1919) (explaining that "[t]he legislative authority in Missouri is not wholly with the General Assembly" because "[t]he Governor is a factor in legislation" and thus "[i]t would be far-fetched to say that the legislative body meant that [a] law should become effective without the presentation to the Governor").



Appellate Case: 26-2797 Page: 17 Date Filed: 09/15/2026 Entry ID: 5683942

The District Court's TRO would force Amici and other Missourians to vote on whether to approve or reject HB 1 *at the very same time* they elect members of Congress from districts drawn by that legislation. The referendum right would lose any meaning or value if voters rejected HB 1 in the general election and yet were still forced to live under its map for the duration of the 120th Congress. That potential injury—dilution of the referendum right, which Missourians reserved to themselves as a check on the legislature—is far more real and immediate than any of the manufactured constitutional injuries contained in the District Court's order.[3]

Additionally, "[a] state legislature's exercise of authority under the Elections Clause" of the U.S. Constitution "must be in accordance with the method which the State has prescribed for legislative enactments." *Moore v. Harper*, 600 U.S. 1, 24 (2023) (citation modified). Consistent with that admonition, "[t]here is only one valid congressional redistricting in effect—the congressional redistricting the General Assembly established in 2022." *Von Glahn*, 2026 WL 2628846, at *6 n.8. No other map has been in effect since then. Accordingly, requiring use of HB 1 would not just dilute the state

[3] It is not just this map and this election that are at stake. If the Secretary's gambit succeeds, then the General Assembly could draw a new congressional map every year, repeat the Secretary's maximum-delay playbook, and thereby prevent Missourians from ever effectively exercising their referendum right.



Appellate Case: 26-2797 Page: 18 Date Filed: 09/15/2026 Entry ID: 5683942

constitutional referendum right but also impair Missouri's federal constitutional obligation to draw its congressional maps pursuant to its legislative process, referendum included. Whatever else might be said of such a result, it is hardly consistent with *any* constitution—federal or state.[4]

## II. The TRO fundamentally misconstrues the equities.

The equities do not favor the relief ordered by the District Court, as a matter of either fairness or federalism.

*First*, the TRO rewards the Secretary for his intentionally dilatory tactics and gamesmanship. His hands are decidedly unclean here because, true to his promise to do "everything [he] can to protect" HB 1, the Secretary delayed his certification decision as long as possible to ensure that the inevitable challenge to that decision would come only after HB 1 was used in the

[4] The plaintiffs have filed a cross-appeal "seeking review of the [District Court's order] insofar as it declined to grant temporary restraining relief on their Elections Clause claim." Pls.-Appellees' Mot. to Consolidate Related Appeal & Retain Existed Expedited Briefing & Argument Schedule 2. Setting aside the jurisdictional shortcomings of this effort, the District Court was correct to reject their Elections Clause claim. The U.S. Supreme Court long ago rejected as "plainly without substance" the notion that referenda on congressional maps are "repugnant to" the Elections Clause, *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916), and just three years ago reaffirmed *Hildebrant* when confirming that "[a] state legislature may not create congressional districts independently of' requirements imposed by the state constitution with respect to the enactment of laws," *Moore v. Harper*, 600 U.S. 1, 26 (2023) (citation modified). Under more than a century of consistent Elections Clause precedent, Missouri's congressional maps are subject to the referendum right because "the referendum and initiative petition power ... is an essential part of the state's lawmaking process under the Missouri Constitution." *Von Glahn*, 2026 WL 2628846, at *4. Full stop.

August primary. As the Missouri Supreme Court explained, "[i]n December 2025," immediately after the signed HB 1 referendum petitions were filed,

> a federal district court advised the secretary and the state that, if the referendum petition is sufficient, "the new map will be frozen until after the referendum, which could significantly disrupt the 2026 elections." At the same time, the federal district court noted the secretary had the ability to declare the petition insufficient based on his argument ... that the Missouri Constitution does not permit a referendum as to congressional redistricting passed by the General Assembly.

*Von Glahn*, 2026 WL 2628846, at *6 n.8 (citation omitted) (quoting *Mo. Gen. Assembly v. von Glahn*, No. 25-CV-1535-ZMB, 2025 WL 3514277, at *2 (E.D. Mo. Dec. 8, 2025)). "[T]here is no apparent reason," the federal court earlier observed, "why [the Secretary] would incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient." *Mo. Gen. Assembly*, 2025 WL 3514277, at *2 n.2. And yet the Secretary "chose to delay his certification until the last possible day," waiting until *4 p.m. on primary day*, August 4—the certification deadline—to reject the HB 1 referendum on the same ground he raised in federal court nearly eight months earlier. *Von Glahn*, 2026 WL 2628846, at *6 n.8.

Moreover, nearly three months before the certification deadline, the Missouri Supreme Court put the Secretary on notice that a sufficiency determination would suspend HB 1 and prevent its further use no matter when



Appellate Case: 26-2797 Page: 20 Date Filed: 09/15/2026 Entry ID: 5683942

that determination was made: “If … the December 9 referendum petition filing is ultimately determined to be sufficient,” the court made clear, then “HB 1 did not take effect on December 11, HB 1 was ‘referred to the people’ as of December 9, and HB 1 ‘shall take effect when approved by a majority of the votes cast thereon, and not otherwise.’” *Maggard*, 733 S.W.3d at 420 (quoting Mo. Const. art. III, § 52(b)). And yet the Secretary still delayed until the last possible hour.

The result? HB 1 was used in the August primary, even though it was never properly enacted—just as the Secretary planned. His tactics denied Missourians the opportunity to vote under a lawful congressional map, an injury that should not be compounded in the general election. That, however, is exactly how the District Court would have it: “The primary already happened,” it laments, “and the clock cannot be turned back.” R. Doc. 35, at 11. But even setting aside the absence of a colorable legal theory justifying the TRO, the equities do not favor rewarding the Secretary’s machinations and delay at the expense of Missourians’ constitutional referendum right—which is precisely what the District Court’s order would do by mandating use of the HB 1 map.

*Second*, apart from the Secretary’s gamesmanship, the TRO constitutes a glaring violation of *Purcell*. The U.S. Supreme Court “has repeatedly emphasized that lower federal courts should ordinarily not alter the election

rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). The *Purcell* principle "is infused with federalism concerns, arising from the notion that federal courts should show a degree of caution before they intervene in state-created election procedures that could bollix up the management of an election by state officials." *Democratic Senatorial Campaign Comm. v. Pate*, 950 N.W.2d 1, 15 (Iowa 2020) (Appel, J., specially concurring); *see, e.g.*, *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (purpose of *Purcell* is to avoid "upsetting the delicate federal-state balance in elections").

Put plainly, the District Court failed to exercise the restraint required by *Purcell*, deciding instead to intrude on the Missouri Supreme Court's injunction and issue a "conflicting order[]" that creates "voter confusion" and administrative chaos on the eve of voting. 549 U.S. at 4–5. If effective, the TRO would put Missouri in an impossible situation: The HB 1 map cannot be used (because the Missouri Supreme Court enjoined it, *see von Glahn*, 2026 WL 2628846, at *7), but nor could any other map (because the District Court would have enjoined them, *see* R. Doc. 35, at 13). In creating this catch-22, the District Court failed to

> weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases .... Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent



Appellate Case: 26-2797 Page: 22 Date Filed: 09/15/2026 Entry ID: 5683942

incentive to remain away from the polls. As an election draws closer, that risk will increase.

*Purcell*, 549 U.S. at 4–5. The TRO would effectively leave Missouri voters without a usable congressional map in contravention of well-settled equitable rules counseling restraint in the leadup to elections—*and* in violation of federal law requiring that "a State [be] redistricted in the manner provided by the law thereof." 2 U.S.C. § 2a(c).

Timing-wise, the Secretary previously represented to the U.S. Supreme Court that "Missouri has a state-law deadline of *September 8* to alter the ballot." Emergency Application for Stay and Administrative Stay Pending Appeal at 6, *Hoskins v. von Glahn*, No. 26A304 (U.S. Sept. 4, 2026) (emphasis added) (citing Mo. Rev. Stat. § 115.125.2). And yet the District Court ordered a change in the congressional map *on that very date*, even though the 2022 map had already been operative as a legal matter since at least September 3.[5]

---

[5] The Secretary also represented that, because "UOCAVA requires Missouri to send out absentee ballots on September 19," a final decision on the operative map would be needed "**no later than September 14, 2026**." Emergency Application, *supra*, at 6. Given the Secretary finally "direct[ed] local election authorities to use the 2022 congressional map" on September 10, *Statement from Missouri Secretary of State Denny Hoskins*, Mo. Sec'y of State (Sept. 10, 2026), https://bit.ly/4cO1Lf4, it is now too late to change course under the Secretary's own reasoning.

The District Court "[a]dmitted[]" that, in cases like this, "courts normally invoke the *Purcell* principle to caution against federal-court intervention in the election decisions of state legislatures, and no federal court has ordered the use of the 2022 map." R. Doc. 35, at 12. But rather than follow this directive, the District Court tried to wave it away, explaining that "[t]his case presents *Purcell* in reverse" because the TRO "would preserve, rather than disturb, the election rules" given that the HB 1 map was used in the August primary. *Id.* This reasoning misapprehended the status quo in Missouri at the time the TRO issued. Because "[t]he *Purcell* principle is a presumption against disturbing the status quo," "[t]he question [ ] is who sets the status quo? The Constitution's answer is generally the state legislature," *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020), subject to the "requirements imposed by the state constitution with respect to the enactment of laws"—including, where applicable, popular referenda, *Moore*, 600 U.S. at 23–26 (citation modified). In other words, the starting point when applying *Purcell* is the status quo *as established by state law*. *See, e.g.*, *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (en banc) ("[I]t is the state's action—not any intervening federal court decision—that establishes the status quo.").

Here, the Missouri Supreme Court—the "highest court in the state," with "exclusive appellate jurisdiction in all cases involving the validity … of a



Appellate Case: 26-2797 Page: 24 Date Filed: 09/15/2026 Entry ID: 5683942

statute or provision of the constitution of" Missouri, Mo. Const. art. V, §§ 2–3; *see Riley v. Kennedy*, 553 U.S. 406, 425 (2008) (recognizing that "[a] State's highest court is unquestionably the ultimate expositor of state law" and that its "prerogative … to say what [state] law is merits respect in federal forums" (citation modified))—established the state-law status quo when it ruled that "the 2022 map is the only map in effect," *von Glahn*, 2026 WL 2628846, at *6 n.8. This "status quo ([Missouri's] duly-enacted election law) was disrupted by the [Missouri] Secretary of State" when he conducted the August primary election using a map that was, ultimately, never lawfully enacted. *Carson*, 978 F.3d at 1062. But the injury should go no further.

Under *Purcell* and the principles of federalism it embraces, the District Court did not have license to order for the November general election the same unlawful result orchestrated by the Secretary for the August primary—and it certainly was not at liberty to upend the status quo established by the Missouri Supreme Court. "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of applications for stays). The District Court might have "disagree[d] with [the Missouri Supreme Court's] decision[ ]," but under these circumstances, it was not entitled to "defy" it. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,



Appellate Case: 26-2797 Page: 25 Date Filed: 09/15/2026 Entry ID: 5683942

145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part).

* * *

"To the victor belong only those spoils that may be constitutionally obtained." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990). The District Court's TRO ultimately presents a twofold violation of this precept. The plaintiffs who brought this lawsuit—and the State defendants that, at least through issuance of the TRO, declined to enforce Missouri law and instead acquiesced—cannot be considered "victors" in any sense given their legal claims fail at the threshold. Nor could the TRO be constitutionally obtained given Missourians' right to approve or reject HB 1 *before it takes effect*. The TRO certainly cannot be equitably obtained; if the District Court's order doesn't violate the *Purcell* principle, then it is all but impossible to imagine what would.

Missourians like Amici have every right and expectation to vote under a congressional map that is, their state's highest court has concluded, the "only [] valid congressional redistricting in effect." *Von Glahn*, 2026 WL 2628846, at *6 n.8. The U.S. Constitution certainly doesn't require otherwise.



Appellate Case: 26-2797 Page: 26 Date Filed: 09/15/2026 Entry ID: 5683942

## CONCLUSION

The District Court should be reversed and the TRO vacated.

Respectfully submitted this 15th day of September, 2026.


_s/ Jonathan P. Hawley_
Kevin J. Hamilton
Matthew P. Gordon
Jonathan P. Hawley
ASHURST PERKINS COIE US LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Matthew.Gordon@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

Tori Schafer
P.O. Box 11424
Clayton, Missouri 63105
(314) 947-8674
torimschafer@gmail.com

*Counsel for Amici Curiae*
*Jake Maggard and Gregg Lombardi*

## CERTIFICATES OF COMPLIANCE

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 29(a)(5)'s type-volume limitation because it contains 5,152 words, excluding the parts exempted by Rule 32(f), which is no more than one-half the maximum length authorized for the parties' principal briefs.

I also certify that this brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared using 14-point Georgia font.

Pursuant to Eighth Circuit Rule 28A(h), I also certify that this brief has been scanned for viruses and that the brief is virus-free.

*s/ Jonathan P. Hawley*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Jonathan P. Hawley*