**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

Case Nos. 26-2797 and 26-2827

---

**CONGRESSMAN ROBERT "BOB" ONDER,**
**RICHARD "RICK" BRATTIN, PAT THOMAS,**
**and DEBRA HAVENS,**
*Plaintiffs-Appellees/Cross-Appellants,*

v.

**STATE OF MISSOURI and DENNY HOSKINS,**
**in his official capacity as Missouri Secretary of State,**

*Defendants,*

**PEOPLE NOT POLITICIANS and RICHARD VON GLAHN,**

*Intervenor-Defendants/Appellants/Cross-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Missouri
Case No. 4:26-cv-01424-SRC

---

**BRIEF OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**


Respectfully submitted,
**ELLINGER BELL LLC**

By: */s/ Marc H. Ellinger*
Marc H. Ellinger, #40828(MO)
Stephanie S. Bell, #61855(MO)
Cole D. Bradbury, #62760(MO)

308 East High Street, Suite 300
Jefferson City, MO 65101
Telephone: (573) 750-4100
Facsimile: (314) 334-0450
mellinger@ellingerlaw.com
sbell@ellingerlaw.com
cbradbury@ellingerlaw.com

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

**TABLE OF CONTENTS**

**INTRODUCTION** ........ 9

**JURISDICTIONAL STATEMENT** ........ 11

**STATEMENT OF THE ISSUES** ........ 13

**STATEMENT OF THE CASE** ........ 14

**SUMMARY OF ARGUMENT** ........ 19

**ARGUMENT** ........ 21

I. Intervenor-Appellants Lack Article III Standing to Remain Parties to This Action, Not Merely to Maintain This Appeal. ........ 22

A. Intervenor-Appellants Independently Lack Standing to Appeal an Order Directed Solely to the State Defendants. ........ 22

B. Article III Requires a Personal Injury That Is Concrete, Traceable, and Redressable. ........ 26

C. Intervenor-Appellants Have Identified No Personal Injury Arising from the Underlying Federal Controversy. ........ 28

D. Intervenor-Appellants' Independent Requests for Relief Require Their Dismissal from the District Court Action as Well. ........ 36

E. Intervenor-Appellants' Claimed Interest Fails for a Second, Independent Reason: The Elections Clause Forecloses the Very Referendum Right They Invoke. ........ 41

II. The District Court Properly Exercised Jurisdiction Over This Action. ........ 44

A. The District Court Found Jurisdiction: It Ordered and Received Briefing on It Before Ruling. ........ 44

B. This Case Is Not Collusive. ........ 45

C. Rooker-Feldman Does Not Bar Relief. ........ 47

D. The Anti-Injunction Act Does Not Bar the TRO ........ 49

E. No Abstention Doctrine Requires Dismissal or a Stay. ........ 54

III. This Suit Also Did Not Require a Three-Judge Panel ........ 57

IV. The District Court's Constitutional Rulings Entitle Plaintiffs to a Permanent Injunction Against the 2022 Map. ..... 58

A. The Mid-Cycle Map Switch Violates the Equal Protection Clause. ..... 58

B. The District Court Correctly Found a High Probability of Success under Article I, Section 2. ..... 62

C. Plaintiffs-Appellees Have Suffered an Irreparable Injury for Which No Remedy at Law Exists. ..... 65

D. The Balance of Hardships and the Public Interest Weigh Decisively in Favor of Relief. ..... 67

V. The District Court Erred in Rejecting Plaintiffs' Elections Clause Claim—an Independent, Additional Ground for the Injunction Plaintiffs Seek. ..... 70

**CONCLUSION ..... 73**

**CERTIFICATE OF COMPLIANCE AND SERVICE ..... 75**



Appellate Case: 26-2797 Page: 3 Date Filed: 09/15/2026 Entry ID: 5684039

## TABLE OF AUTHORITIES



Appellate Case: 26-2797 Page: 4 Date Filed: 09/15/2026 Entry ID: 5684039

**Cases**

*Abbott v. Perez*, 585 U.S. 579, 594 (2018) .......... 12
*Allen v. Wright*, 468 U.S. 737, 754 (1984) .......... 24
*Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) .......... 67
*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 801, 814 (2015) .......... 42, 71–72
*Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 65–66 (1997) .......... 33
*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286, 297 (1970) .......... 49, 51–52
*Bullock v. Carter*, 405 U.S. 134, 140–41 (1972) .......... 58
*Bush v. Vera*, 517 U.S. 952 (1996) .......... 64
*Cantor v. Personhuballah*, 575 U.S. 931 (2016) .......... 64
*Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (per curiam) .......... 71
*Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892) 45
*Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 151 (1988) .......... 54
*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 816–17 (1976) .......... 44, 55–57
*Cooper v. Aaron*, 358 U.S. 1, 4 (1958) .......... 51
*Cnty. of Imperial, Cal. v. Munoz*, 449 U.S. 54, 59 (1980) .......... 52
*Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016) .......... 64
*Diamond v. Charles*, 476 U.S. 54 (1986) .......... 20, 25–26, 32–33, 35–36, 39–40, 42–44
*Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993) .......... 59–60
*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) .... 65, 67–68
*Eggers v. Evnen*, 48 F.4th 561, 566–67 (8th Cir. 2022) .......... 68
*Elrod v. Burns*, 427 U.S. 347, 373 (1976) .......... 66
*Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) .......... 53
*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) .......... 47
*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) .......... 26, 32
*Gray v. Sanders*, 372 U.S. 368, 379 (1963) .......... 58, 61
*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) .......... 72
*Growe v. Emison*, 507 U.S. 25 (1993) .......... 55–57



Appellate Case: 26-2797 Page: 5 Date Filed: 09/15/2026 Entry ID: 5684039

*Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 378 (1939) .......................... 52
*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) .................. 41
*Hollingsworth v. Perry*, 570 U.S. 693 (2013) ............................................................ 20, 24–25, 27, 30, 32–36, 39
*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 (1975) .......................... 55–56
*Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) .................................................................................. 59
*INS v. Chadha*, 462 U.S. 919, 939 (1983) ........................................ 46–47
*Karcher v. May*, 484 U.S. 72, 81 (1987) ........................................... 33, 35
*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) .......... 27, 29, 41
*Lance v. Dennis*, 546 U.S. 459, 460 (2006) (per curiam) ........................ 48
*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) .................................... 27–28, 31, 38, 40
*Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ............................... 42
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ................. 27, 30
*Maggard v. State*, 733 S.W.3d 411, 421 (Mo. banc 2026) ....................... 15
*Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996) ......................... 27
*Mitchum v. Foster*, 407 U.S. 225, 234–35, 243 (1972) ...................... 50, 54
*Mo. Gen. Assembly v. von Glahn*, 2025 WL 3514277, at *2 (E.D. Mo. 2025) ............................................................................................ 69
*Moore v. Harper*, 600 U.S. 1, 34–36 (2023) ...................................... 42, 71
*Muskrat v. United States*, 219 U.S. 346, 361 (1911) ............................... 45
*New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) ........................ 13
*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) ......................................................................... 56
*Page v. Va. State Bd. of Elecs.*, 58 F. Supp. 3d 533, 554 (E.D. Va. 2014) .................................................................................. 64
*Preisler v. Sec'y of State of Mo.*, 341 F. Supp. 1158 (W.D. Mo. 1972) ..... 53
*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ............................................... 70
*Quinn v. Missouri*, 839 F.2d 425, 426 (8th Cir. 1988) (per curiam) . 12–13
*Republican Party of Ore. v. Kiesling*, 959 F.2d 144 (9th Cir. 1992) ....... 59
*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................. 59, 66
*Rodgers v. Bryant*, 942 F.3d 451, 454 (8th Cir. 2019) ............................ 21



Appellate Case: 26-2797 Page: 6 Date Filed: 09/15/2026 Entry ID: 5684039

*Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 (1982)............. 60
*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577–78 (1999)........... 44
*Sackett v. EPA*, 598 U.S. 651, 679–80 (2023) ........................................ 72
*Shapiro v. McManus*, 577 U.S. 39, 41 (2015) ......................................... 57
*Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).................................. 41
*Smith v. Allwright*, 321 U.S. 649, 660 (1944) .................................. 60, 63
*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) ....................... 56
*State ex rel. McClellan v. Kirkpatrick*, 504 S.W.2d 83, 86 (Mo. banc 1974)................................................................................................. 63
*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)... 44–45
*Storer v. Brown*, 415 U.S. 724, 735 (1974)............................................. 63
*Summers v. Earth Island Inst.*, 555 U.S. 488, 495 n.* (2009)................ 32
*Terrazas v. Slagle*, 821 F. Supp. 1154, 1159 (W.D. Tex. 1992) .............. 64
*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ...... 37–38, 40
*United States v. Classic*, 313 U.S. 299, 318 (1941)................................ 63
*United States v. Johnson*, 319 U.S. 302, 304–05 (1943).................. 43, 46
*United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) ................. 13
*United States v. Windsor*, 570 U.S. 744, 757–59 (2013)......................... 47
*Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). 22, 26–27
*Vera v. Richards*, 861 F. Supp. 1304, 1351 (S.D. Tex. 1994)................. 64
*Von Glahn v. Hoskins*, No. SC101805 (Mo. banc Sept. 3, 2026); No. 26AC-CC00440 (Cir. Ct. Cole County) .....9, 15–17, 20, 26, 31, 33–34, 38–39, 41, 45, 47–48, 50–56, 60, 69, 72
*West Virginia v. EPA*, 597 U.S. 697, 723 (2022).................................... 72
*Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–40 (2021).............. 45
*Wittman v. Personhuballah*, 578 U.S. 539, 543–44 (2016)......... 22–23, 27
*Younger v. Harris*, 401 U.S. 37, 40–41 (1971) ................................ 44, 55

## Constitutional Provisions

Mo. Const. art. III, § 49 .................................................. 14, 16, 42, 71–72
Mo. Const. art. III, §§ 52(a), 52(b).......................................................... 15
Mo. Const. art. IV, § 14 .......................................................................... 65



Appellate Case: 26-2797 Page: 7 Date Filed: 09/15/2026 Entry ID: 5684039

U.S. Const. amend. XIV ........... 9–11, 14, 18–19, 21, 33, 35, 53, 57–62, 73
U.S. Const. art. I, § 2.......... 9–10, 14, 18–19, 21, 33, 35, 57–58, 62–64, 73
U.S. Const. art. I, § 4, cl. 1 9–11, 13–14, 18, 21, 29, 33, 35, 41–42, 49, 58, 70–73

## Statutes and Rules

28 U.S.C. § 1292(a)(1)............................................................... 12–13
28 U.S.C. § 1331 ....................................................................... 11
28 U.S.C. § 1343(a)(3)-(4) ......................................................... 11
28 U.S.C. § 1359 ....................................................................... 44
28 U.S.C. § 2283 ................................................................... 49–54
28 U.S.C. § 2284 ............................................ 12, 14, 20, 44, 57–58
42 U.S.C. § 1983 ............................................................. 11, 47, 54
Fed. R. App. P. 32(a)(5), (a)(6)................................................. 75
Fed. R. Civ. P. 24(a)(2) ......................................................... 36, 43
Mo. Rev. Stat. § 115.339............................................................. 63
Mo. Rev. Stat. § 115.343............................................................. 63
Mo. Rev. Stat. § 115.363............................................................. 63

## Other Authorities

Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026)................................ 15

## INTRODUCTION

Plaintiffs-Appellees/Cross-Appellants Congressman Robert "Bob" Onder, Richard "Rick" Brattin, Patricia "Pat" Thomas, and Debra Havens ("Plaintiffs") cross-appeal the District Court's September 8, 2026 Temporary Restraining Order (the "Order" or "TRO") (R.Doc. #35) denying relief under Article I, § 4 of the Constitution of the United States as a basis for the issuance of a temporary restraining order.

Chief Judge Clark correctly issued his Order enjoining Secretary Hoskins from implementing the Missouri Supreme Court's *von Glahn* order for the November 3, 2026 general election. After full briefing, the District Court found a high probability of success on Plaintiffs' Article I, Section 2 and Equal Protection claims, irreparable harm that cannot be remedied after the election is held, that the balance of harms strongly favors maintaining the election rules already in place for the primary, and that the public interest favors preserving the electoral status quo. The Order (R.Doc. #35) is supported on these two bases by well-established constitutional law and the equities of this case. However, the Order does not correctly address the Elections Clause of the Constitution of the United States in that the referendum is banned under that



Appellate Case: 26-2797 Page: 9 Date Filed: 09/15/2026 Entry ID: 5684039

provision and the Order should have been entered on this basis, in addition to the other two bases upon which the Order was founded.

This Court has jurisdiction to decide this appeal on the merits now. Although styled as a temporary restraining order, the Order has the practical effect of an appealable preliminary injunction, and the Supreme Court's own decision to stay its enforcement pending disposition of this appeal in this Court and of a Petition for Writ of Certiorari, No. 26A326, only confirms how serious and election-altering its consequences are. On the merits, the record is not genuinely disputed: switching congressional maps between the primary and general election violates both Article I, Section 2 and the Equal Protection Clause, each independently sufficient grounds for relief.

The District Court's rejection of Plaintiffs' related Elections Clause claim was itself error and, corrected on appeal, supplies a third, independent ground for the same relief. No abstention or jurisdictional doctrine Intervenor-Appellants invoke barred the District Court from so holding. Plaintiffs ask this Court to affirm those holdings and direct that the District Court enter a permanent injunction barring use of the 2022 Map for the remainder of this election cycle.



Appellate Case: 26-2797 Page: 10 Date Filed: 09/15/2026 Entry ID: 5684039

Separately and independently, Intervenor-Appellants are not properly parties to this action at all: they have identified no injury the TRO inflicts on them personally, as opposed to a generalized preference about how the State administers an election, and State Defendants—the only parties the TRO restrains—have not appealed. This Court should dismiss Intervenor-Appellants for lack of standing, but that jurisdictional defect in Intervenor-Appellants' own position does not stand in the way of the merits relief Plaintiffs seek because a live case or controversy exists between Plaintiffs and the State Defendants.

This Court should affirm the District Court's constitutional holdings under Article I, § 2 and the Equal Protection Clause and reverse the District Court's holding on the Elections Clause and therefore direct entry of a permanent injunction against the 2022 Map. This Court should further dismiss Intervenor-Appellants for lack of standing to remain parties to this action.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under the Constitution and 42 U.S.C. § 1983. A single district judge, rather than a

three-judge court convened under 28 U.S.C. § 2284, properly heard the case because Plaintiffs do not challenge the constitutionality of the apportionment of congressional districts; they challenge Secretary Hoskins's mid-cycle conduct administering the 2026 general election. *See infra* Part III.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The Order remains in effect and is the Order under review; the Supreme Court's September 10 order related to Intervenor-Appellants' emergency stay application, No. 26A326, only stayed enforcement of the Order pending disposition of this appeal and a petition for writ of certiorari but did not vacate, modify, or supersede it.

Although styled a temporary restraining order, the Order has the practical effect of an appealable preliminary injunction and may be treated as one under § 1292(a)(1): it followed full adversarial briefing, rests on detailed findings and conclusions of the kind ordinarily associated with a preliminary-injunction order, and has governed which congressional map applies to an ongoing federal election for weeks, not the days Rule 65(b) contemplates. See *Quinn v. Missouri*, 839 F.2d 425, 426 (8th Cir. 1988) (per curiam); *Abbott v. Perez*, 585 U.S. 579, 594 (2018)

(practical effect, not label, governs § 1292(a)(1) jurisdiction over an order that determines which map governs an approaching election).[1]

This Court's own scheduling order, directing full briefing and argument on the merits of this appeal, reflects the same conclusion, and Plaintiffs agree that the appeal is properly before this Court for decision on the merits.

## STATEMENT OF THE ISSUES

1. Whether Intervenor-Appellants, who have identified no injury from the TRO personal and particularized to them, have Article III standing to remain parties to this action at all, where State Defendants—the only parties the TRO restrains—have not appealed, and whether, independently, the Elections Clause forecloses the referendum right on which their claimed interest depends.

2. Whether the district court had jurisdiction to enter the TRO, where no abstention doctrine applies, neither the Anti-Injunction Act nor

[1] Intervenor-Appellants have already told this Court exactly that, in seeking relief from this same order for their own purposes. See Mot. for Summ. Reversal for Lack of Jurisdiction or to Stay the Dist. Ct.'s TRO at 8 (No. 26-2797) (filed Sept. 9, 2026) ("It 'has the practical effect of a preliminary injunction' and is therefore immediately appealable.") (quoting *Quinn v. Missouri*, 839 F.2d 425, 426 (8th Cir. 1988))). Having invoked that characterization to bring their own request for relief from this order before this Court, Intervenor-Appellants may not now be heard to deny it. See *New Hampshire v. Maine*, 532 U.S. 742, 749-750 (2001) (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (C.A.5 1993) ("prohibiting parties from deliberately changing positions according to the exigencies of the moment.")

*Rooker-Feldman* bars relief, and this case is genuinely adverse rather than collusive.

3. Whether 28 U.S.C. § 2284 required a three-judge district court, where this action challenges the Secretary of State's mid-cycle conduct in administering the general election rather than the constitutionality of an apportionment plan.

4. Whether the district court correctly held that requiring Missouri to conduct its general election under different congressional districts than those used in the primary for the same offices violates the Equal Protection Clause and Article I, Section 2, entitling Plaintiffs to a permanent injunction against use of the 2022 Map.

5. Whether the district court erred in holding that Plaintiffs were unlikely to succeed on their Elections Clause claim, where Missouri's general referendum provision, Mo. Const. art. III, § 49, does not satisfy the clear-statement rule required to divest the General Assembly of its Elections Clause authority over congressional redistricting.

## STATEMENT OF THE CASE

On September 12, 2025, the Missouri General Assembly passed HB1, repealing the congressional districts established in 2022 and

enacting new districts. On December 9, 2025, a group called People Not Politicians ("PNP"), through its executive director Richard von Glahn, submitted a referendum petition seeking a statewide vote on HB1. While election officials were reviewing the petition, two plaintiffs separately challenged HB1's effectiveness. The Missouri Supreme Court unanimously rejected those claims, holding that "the December 9 referendum petition filing did not automatically suspend HB 1 under article III, sections 49, 52(a), or 52(b) of the Missouri Constitution." *Maggard v. State*, 733 S.W.3d 411, 421 (Mo. banc 2026).

Following that ruling, Missouri's Attorney General issued her opinion that "State and local election officials" should "take all appropriate steps to ensure the HB 1 map is fully implemented in advance of the 2026 primary elections." Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026). The State successfully implemented the HB1 Map for the August 4, 2026, congressional primary elections. More than 1.2 million Missourians voted in those elections under the HB1 Map. Congressman Onder won the Republican nomination for Missouri's Third Congressional District under that map, Rick Brattin won the Republican nomination for Missouri's Fifth Congressional District, and Pat Thomas

and Debra Havens voted in the primary as residents of the Fifth Congressional District under that map.

On August 4, 2026 (the last day to vote in Missouri's congressional primary election), Secretary Hoskins certified the referendum petition insufficient, concluding the Missouri Constitution does not authorize a referendum on congressional redistricting. Appellant von Glahn filed suit in state court, which upheld the Secretary's certification. The state trial court specifically found that, at this late juncture, it would be "impossible" for election officials to conduct the ongoing 2026 general election under any congressional redistricting plan other than the HB1 Map. See Exhibit 2 to Complaint, *von Glahn v. Hoskins*, No. 26AC-CC00440, trial court judgment, at p. 36.

On September 3, 2026, the Missouri Supreme Court reversed Secretary Hoskins's certification in *von Glahn*, holding that Article III, Section 49 of the Missouri Constitution authorizes a referendum on "any act of the general assembly," including HB1. The Missouri Supreme Court ordered the Secretary to place the referendum on the November 2026 ballot and to refrain from implementing or mandating the use of the HB1 Map for the November 3, 2026, general election "unless and until

HB1 is approved by the voters." *von Glahn*, slip op. at 13. The Missouri Supreme Court did not mention, let alone overturn, the circuit court's finding that using a plan other than HB1 for the 2026 general election would be "impossible."

As a result, without the TRO, the State was left to do the "impossible" and conduct the November 3, 2026, general election using congressional districts different from those used in the August 4, 2026, primary for the same offices. The District Court enjoined that course of action.

Plaintiffs, two candidates and two voters, filed their Complaint and a motion for a temporary restraining order and preliminary injunction in the United States District Court for the Eastern District of Missouri, Case No. 4:26-cv-01424-SRC, on September 4, 2026, seeking to enjoin Secretary Hoskins from implementing the *von Glahn* order to their detriment. They asked the District Court to require the November 3, 2026, general election to be conducted under the HB1 Map. Appellants intervened as Intervenor-Defendants.

On September 8, 2026, Judge Clark issued a Memorandum and Order granting Plaintiffs' motion for a temporary restraining order. The

District Court found a high probability of success on the Article I, Section 2 and Equal Protection claims, found irreparable harm, and found that the balance of harms and the public interest strongly favor preserving the election rules under which the primary was conducted. The District Court held, however, that Plaintiffs were unlikely to succeed on their related Elections Clause claim, Order at 7–9—a ruling Plaintiffs challenge on this appeal as an independent, additional ground for the same relief, *see infra* Part V. The TRO remains in effect for 14 days, pending a preliminary injunction hearing to be scheduled.

Intervenor-Appellants appealed and sought a stay pending appeal. This Court denied that initial request for two independent reasons: it concluded that it lacked jurisdiction over an interlocutory appeal from the grant of a TRO, and, separately, that the traditional stay factors were not satisfied. The next day, Intervenor-Appellants filed a further motion in this Court arguing, for the first time, that the TRO has the practical effect of a preliminary injunction and is therefore immediately appealable—the same practical-effect doctrine Plaintiffs invoke below. See supra Jurisdictional Statement at n.1. Intervenor-Appellants also sought emergency relief in the Supreme Court; on September 10, 2026,

the Supreme Court stayed enforcement of the TRO pending disposition of this appeal and a petition for a writ of certiorari, No. 26A326, without vacating, modifying, or superseding the TRO itself. This Court has since ordered expedited briefing and argument on the merits of this appeal.

## SUMMARY OF ARGUMENT

Switching congressional maps between the primary and general election violates both Article I, Section 2 and the Equal Protection Clause, each an independently sufficient ground for relief, and no abstention or jurisdictional doctrine Intervenor-Appellants invoke barred the District Court from so holding. Plaintiffs ask this Court to affirm those holdings and direct that the District Court enter a permanent injunction barring use of the 2022 Map for the remainder of this election cycle.

Separately and independently, Intervenor-Appellants' lack of standing requires their dismissal from this action altogether, not merely denial of relief on appeal. They have identified no injury the TRO inflicts on them personally, as opposed to a shared interest in how Missouri implements a referendum—the paradigmatic generalized grievance

Article III does not recognize. The State and Secretary Hoskins, the only parties the TRO actually restrains, have not appealed. Under *Hollingsworth v. Perry,* 570 U.S. 693 (2013) and *Diamond v. Charles*, 476 U.S. 54 (1986) a private intervenor in that position cannot seek relief at all, and should be dismissed for want of jurisdiction. Part I below explains why that result follows here, and why it reaches Intervenor-Appellants' status in this litigation generally, not merely their capacity to prosecute this particular appeal.

The district court also had jurisdiction to enter the TRO. Section 2284 did not require a three-judge panel because this suit challenges the Secretary's mid-cycle administrative conduct, not the constitutionality of an apportionment plan. *Rooker-Feldman* does not apply because Plaintiffs were strangers to *von Glahn*. The Anti-Injunction Act does not apply because the TRO restrains an executive officer, not a state-court proceeding. And no abstention doctrine applies because *von Glahn* is a concluded state case in which Plaintiffs never had, and could not have had, any opportunity to raise their own federal claims. Parts II and III below.

On the merits, the District Court correctly held that switching congressional maps between the primary and general election violates Article I, Section 2 and the Equal Protection Clause, each an independently sufficient basis for the TRO and for a permanent injunction. Requiring Thomas and Havens to vote in the general election under districts different from the ones in which they cast their primary ballots, and different from the districts under which Onder and Brattin were nominated, fractures the single instrumentality Missouri law makes of its primary and general elections and treats similarly situated voters unequally depending on nothing more than the timing of a state court's order. The District Court also erred in rejecting Plaintiffs' related Elections Clause claim, which, when corrected on appeal, supplies a third, independently sufficient ground for the same relief.

## ARGUMENT

This Court reviews the District Court's legal conclusions—including its rulings on standing, subject-matter jurisdiction, abstention, and the constitutional merits—*de novo*, and its factual findings for clear error. See *Rodgers v. Bryant*, 942 F.3d 451, 454 (8th Cir. 2019). No discretionary stay standard applies to this merits appeal.



Appellate Case: 26-2797 Page: 21 Date Filed: 09/15/2026 Entry ID: 5684039

## I. Intervenor-Appellants Lack Article III Standing to Remain Parties to This Action, Not Merely to Maintain This Appeal.

### *A. Intervenor-Appellants Independently Lack Standing to Appeal an Order Directed Solely to the State Defendants.*

Even if Intervenor-Appellants properly participated below without proving independent standing, their attempt to prosecute this appeal alone presents a separate and insurmountable jurisdictional defect. The State officials responsible for administering Missouri's elections are the parties restrained by the TRO. Those officials have not appealed. Intervenor-Appellants cannot borrow the State's asserted sovereign or administrative injury and cannot "step into the shoes" of the State unless they independently satisfy Article III. *Wittman*, 578 U.S. at 544.

*Virginia House* is nearly controlling on its facts. Voters challenged a redistricting plan, state election officials were named as defendants, and the Virginia House intervened to defend the plan. *Va. House*, 587 U.S. at 660–61. After the district court enjoined the plan, Virginia's Attorney General declined to appeal, leaving the intervenor to pursue the appeal alone. *Id.* at 661–62. The Supreme Court dismissed for lack of standing, holding that "to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing." *Id.* at 663. If a chamber of the state legislature that participated in

drawing the challenged districts could not appeal without its own concrete injury, private referendum proponents cannot do so merely because they favor a particular map or obtained a related state-court judgment. *See id.* at 667–68.

*Wittman* supplies an equally direct redistricting analogue. There, Virginia declined to appeal an order invalidating its congressional map, and intervenor Members of Congress attempted to appeal in its place. *Wittman*, 578 U.S. at 541–42. The Court unanimously dismissed because the intervenors had not established a record-supported, redressable injury of their own. *Id.* at 541, 543–46. Even allegations that a new map might impair incumbents' reelection prospects were insufficient without supporting evidence. *Id.* at 545. Here, Intervenor-Appellants do not allege even that sort of individualized electoral injury.

Intervenor-Appellants may answer that suspension itself is part of the referendum right and that temporary use of HB1 frustrates the legal consequence their petition secured. Assuming that state-law premise for purposes of standing, Intervenor-Appellants *still* do not establish that the resulting injury is personal to them. A rule suspending a generally applicable redistricting enactment governs the State's administration of

elections; Intervenor-Appellants must explain how departure from that rule injures them concretely, rather than merely contradicting their understanding of the law. And framing the suspension of HB1 as a constitutional right does not answer whose particularized interest the TRO impairs (i.e., Plaintiffs). Nor does the importance of suspension dispense with that inquiry. *See Allen v. Wright*, 468 U.S. 737, 754 (1984) (an asserted right to have the government act in accordance with law is not by itself sufficient to confer standing).

*Hollingsworth* supplies the pertinent distinction. *Hollingsworth*, 570 U.S. at 705–07. There, the official proponents of a successful initiative sought to appeal an order invalidating the measure after state officials declined to appeal. *Id.* at 702–03, 705. Their special status under state law and interest in defending the initiative did not establish a personal stake distinguishable from the public's interest in its enforcement. *Id.* at 705–07, 711–15. To be sure, *Hollingsworth* distinguished proponents' role during the enactment process from their subsequent enforcement interest. *Id.* at 706–07. But the pending referendum here does not eliminate the need to identify an injury to that role. Intervenor-Appellants point to no restriction on their petitioning,

campaigning, or voting activities imposed by this TRO. Instead, they assert an interest that state officials give the petition its claimed suspensive effect by using the 2022 Map. Their continuing role as proponents does not, without more, convert that enforcement interest into a personal injury. *See Diamond*, 476 U.S. at 65–66 (a proponent's professional or organizational interest in a measure's enforcement, without a personal stake in the specific dispute, does not supply Article III standing).

The TRO confirms the absence of appellate injury. It commands Intervenor-Appellants to do nothing and prohibits them from doing nothing. It runs only against the State officials responsible for administering the election. That was decisive in *Hollingsworth*: the initiative proponents lacked standing because the district court "had not ordered them to do or refrain from doing anything." *Hollingsworth*, 570 U.S. at 705. The same is true here. Vacating the TRO would alter the instructions governing state election officials, but it would neither restore nor protect any personal right belonging to Intervenor-Appellants. Their referendum would remain on the ballot, their campaign could continue, and their votes could still be cast and counted.

Intervenor-Appellants cannot convert an injury allegedly suffered by the State into their own merely by labeling the state-court judgment "under attack." The federal action does not appeal, vacate, or reverse that judgment. It asks whether the State's implementation of that judgment violates Plaintiffs' independent federal rights, which were not at issue in *von Glahn*. Any sovereign interest in defending the State's election machinery belongs to Missouri, and Missouri has not invoked this Court's jurisdiction. Because Intervenor-Appellants identify no personal injury from the TRO that a favorable appellate decision would redress, this appeal must be dismissed for lack of Article III standing. *See Diamond*, 476 U.S. at 68 (dismissing appeal for want of jurisdiction where the intervenor-appellant lacked Article III standing to pursue it alone).

### *B. Article III Requires a Personal Injury That Is Concrete, Traceable, and Redressable.*

Article III standing is a "bedrock constitutional requirement." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). A party invoking federal jurisdiction must establish "(1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). The injury must be "actual or

imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted), and must affect the party "in a personal and individual way." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). A litigant asserting only "a generally available grievance about government" does not satisfy Article III. *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (*per curiam*). Standing is jurisdictional, "cannot be waived or forfeited," and must exist throughout "all stages of litigation," including on appeal. *Va. House*, 587 U.S. at 662–63.

Intervenor-Appellants must therefore establish both a personal Article III stake in the controversy they entered and an independently redressable injury from the order they alone seek to appeal. The Eighth Circuit holds that "a would-be intervenor" seeking distinct judicial relief not sought by any other party "must have standing as well." *Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996)). And when the party principally subject to an order declines to appeal, "an intervenor must independently demonstrate standing" to invoke appellate jurisdiction. *Va. House*, 587 U.S. at 663; *accord Wittman*

*v. Personhuballah*, 578 U.S. 539, 543–44 (2016). Intervenor-Appellants satisfy neither requirement.

*C. Intervenor-Appellants Have Identified No Personal Injury Arising from the Underlying Federal Controversy.*

Intervenor-Appellants sought judicial relief from the TRO, so they were required to establish Article III standing in the District Court. *See, e.g.*, *Liddell*, 894 F.3d at 965. But Intervenor-Appellants' own description of their supposed interest demonstrates its inadequacy to satisfy that burden. They assert that they "prosecuted the underlying state court action," "obtained the judgment now under attack," and possess rights under the Missouri Constitution—including the right to referendum. Intervenors' Mem. at 8. But those assertions describe their prior litigation activity and their interest in a public-law question. They do not identify any concrete injury this federal action or the TRO inflicted.

Most importantly, the premise that their referendum right is "under attack" is false. Plaintiffs do not challenge Intervenor-Appellants' ability to circulate a petition, campaign for the referendum, place the referendum before Missouri voters, cast ballots upon it, or obtain a determination of its validity. The temporary restraining order alters none of those rights. It addresses an entirely different constitutional

injury: the State's attempt to conduct a primary election under one set of congressional districts and the corresponding general election under another. It merely preserves, for 14 days, the HB1 districts under which candidates ran, and voters selected nominees in the primary. The referendum remains intact and may proceed regardless of which map governs the general election.

Intervenor-Appellants may prefer that the referendum's asserted suspensive effect immediately return the state to the 2022 districts. But a preference about how state officials should implement state law is not a personal injury. It is the paradigmatic generalized grievance—an allegation that government has not applied the law as the litigant believes it should. *Lance* is particularly instructive. There, voters challenged the use of a congressional map on the theory that the Elections Clause had not been followed. *Lance*, 549 U.S. at 438–39. The Supreme Court held that "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed," which was insufficient because it was shared by the public generally. *Id*. at 442. The same is true here. Whatever interest Intervenor-Appellants possess in enforcing their understanding of Missouri's referendum provisions is

common to every Missouri citizen. Article III does not convert that public interest into a private injury merely because Intervenor-Appellants organized the petition or previously persuaded a state court to accept their legal position. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992) (a litigant's special involvement in the events giving rise to a widely shared injury does not convert a generalized grievance into a particularized one).

*Hollingsworth* forecloses any contention that sponsorship of a referendum supplies the missing injury. The appellants there were the official proponents of a successful statewide initiative. *Hollingsworth*, 570 U.S. at 700–03. They had invested substantial effort in obtaining its adoption, possessed special status under state law, intervened to defend the measure, and appealed after state officials declined to do so. *Id.* at 700–03, 706. Nevertheless, the Supreme Court held that their interest in defending the initiative's validity was "by definition a generalized one" and therefore insufficient under Article III. *Id.* at 712. Intervenor-Appellants have an even weaker claim here: unlike the order in *Hollingsworth*, the TRO does not invalidate their referendum or prevent it from becoming law. *See id.* at 702, 705. It temporarily restrains only

one asserted collateral consequence of the referendum—the State's proposed mid-election change of congressional districts.

Nor have Intervenor-Appellants alleged any map-specific personal injury. Von Glahn[2] does not claim that the TRO changes the district in which he votes, dilutes his votes, subjects him to an unlawful racial classification, prevents him from voting, excludes him from the candidate-selection process, disqualifies a candidate they support, or otherwise burdens them differently from Missouri voters generally. That omission is decisive. *Cf. Liddell*, 894 F.3d at 966–67 (finding standing where intervenors alleged that the challenged action would divert millions of dollars from the schools their children attended and diminish their children's educational opportunities). Here there is no comparable allegation of direct, individualized harm—only disagreement with the map the State must temporarily administer.

People Not Politicians cannot manufacture organizational standing by devoting resources to opposing the TRO or advocating for implementation of the 2022 Map. An organization that has not suffered an independently cognizable injury "cannot spend its way into standing"

[2] PNP, as an entity, has no vote.



Appellate Case: 26-2797 Page: 31 Date Filed: 09/15/2026 Entry ID: 5684039

through voluntary advocacy expenditures. *FDA*, 602 U.S. at 394. Nor has the organization identified a particular member who will personally suffer a concrete, map-specific injury from the temporary use of the HB1 districts, a defect which cannot now be remedied. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 495 n.* (2009) (declining to consider additional standing affidavits submitted after judgment and the filing of a notice of appeal because parties who failed to establish standing at judgment "could not remedy the defect retroactively"). Its commitment to the referendum campaign may be sincere and intense, but "the presence of a disagreement, however sharp and acrimonious," does not create an Article III controversy. *Hollingsworth*, 570 U.S. at 704 (quoting *Diamond*, 476 U.S. at 62).

Thus, Intervenor-Appellants' claimed interests reduce to three propositions: they brought the state lawsuit, they obtained a favorable judgment, and they want state officials to implement that judgment in the manner they prefer. None establishes a personal injury. A litigant does not acquire a proprietary interest in a judicial ruling merely by obtaining it, and success in earlier litigation does not confer permanent standing to contest every later proceeding that may affect the ruling's

practical operation. *See Karcher v. May*, 484 U.S. 72, 81 (1987); *Diamond v. Charles*, 476 U.S. 54, 66–68 (1986); *Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 65–66 (1997); *Hollingsworth*, 570 U.S. at 704–07.

Start from the Complaint, which exposes the full extent of Intervenor-Appellants' disassociation from this case. Plaintiffs sued only the State of Missouri and Secretary Hoskins. Compl. (R.Doc. 1) at 1. They ask this Court to decide a single federal question: whether requiring Missouri to conduct its general election under different congressional districts than those used weeks earlier, for the same offices, in the same election cycle, violates Article I, Section 2, the Equal Protection Clause, and the Elections Clause. Compl. ¶¶ 50–89. Nowhere does the Complaint ask this Court to disturb the Missouri Supreme Court's judgment in *von Glahn*, to reopen whether PNP's referendum petition was legal, sufficient, or timely, or to prevent the referendum from proceeding to a statewide vote at all. Compl. ¶¶ 18–26. Intervenor-Appellants are not named as defendants because Plaintiffs have no claim against them: nothing in this suit asks a court to order them to do anything, refrain from doing anything, or answer for anything they have done.

That is the defect no relabeling can cure: whatever interest Intervenor-Appellants have in seeing HB1 suspended and the 2022 Map restored, the Missouri Supreme Court has already given them everything that interest could possibly demand. *Von Glahn*, slip op. at 12–14. This suit does not ask whether HB1 is a law under the Missouri Constitution; the Missouri Supreme Court answered that question unanimously, and Plaintiffs have never asked any court to revisit it. *See supra* Statement of the Case. It asks a distinct, downstream federal question that the referendum never touched: once Missouri has already conducted a primary under HB1, does the federal Constitution permit reverting to a different map for the general election in the same cycle? Intervenor-Appellants' stake in the answer to that question is not the stake of a litigant; it is the stake of any citizen who would like to see the map they prefer take effect as completely and as quickly as possible, and no more. *Hollingsworth* forecloses precisely that stake: declining to let a referendum's official proponents litigate a question distinct from the referendum itself does not deprive them of any right the referendum gives them; it only denies them a vehicle to litigate rights that belong, if to anyone, to the State. *See* 570 U.S. at 705–08.



Appellate Case: 26-2797 Page: 34 Date Filed: 09/15/2026 Entry ID: 5684039

Put simply, this is not Intervenor-Appellants' case. It is Missouri's. The Elections Clause vests redistricting authority in the General Assembly; Article I, Section 2 and the Equal Protection Clause constrain how State actors, specifically here the Secretary of State, administer elections conducted under that authority. Both provisions run to the State and its officers, not to a private advocacy organization or an individual referendum sponsor. Intervenor-Appellants would have this Court treat their victory in a state-law referendum dispute as a standing license to litigate any subsequent federal question that happens to touch the same map, regardless of who is sued or what claim is asserted. No authority supports that theory, and *Hollingsworth* and *Diamond* foreclose it directly: a proponent's role in securing a favorable enactment or judgment, however central, does not carry forward into a personal stake in every later dispute about that enactment's implementation. *See Diamond*, 476 U.S. at 65–71; *Karcher*, 484 U.S. at 81.

Nothing in the Complaint, the state-court record, or Intervenor-Appellants' own filings below identifies a single allegation to the contrary. Plaintiffs' claims run entirely against the Secretary's conduct in administering the general election, not against any act, statement, or

right of Intervenor-Appellants. Compl. ¶¶ 1–49. Intervenor-Appellants' own motion to intervene likewise never asserts that this suit threatens anything belonging to them personally; it asserts only that no existing party could be trusted to adequately defend the Missouri Supreme Court's judgment. Mot. to Intervene, R.Doc. 12 ¶¶ 6–7. That may be a reason Rule 24(a)(2) let them into the District Court—it is not, and cannot be, a personal Article III injury. *See Diamond*, 476 U.S. at 62, 68. Intervenor-Appellants do not merely lack standing to appeal this particular TRO; they never had a legally cognizable interest in this litigation to begin with, and every filing they have made in this case—their motion to intervene, their motion to dismiss, their emergency stay applications in this Court and in the Supreme Court, and their motion for summary reversal—rests on the same uncured defect.

### *D. Intervenor-Appellants' Independent Requests for Relief Require Their Dismissal from the District Court Action as Well.*

The foregoing establishes two jurisdictional defects, each with its own consequence. Intervenor-Appellants lack standing to prosecute an appeal that State Defendants have declined to pursue. That requires dismissal of this appeal. *Hollingsworth*, 570 U.S. at 715; *Diamond*, 476



Appellate Case: 26-2797 Page: 36 Date Filed: 09/15/2026 Entry ID: 5684039

U.S. at 68–71. Their continued participation below presents a separate question: whether they may invoke the District Court's authority to obtain relief no original party seeks, despite identifying no personal injury that relief would redress. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439–40 (2017). The answer turns on their own District Court requests, not on the jurisdictional failure of their subsequent appeal.

*Town of Chester* supplies the governing distinction. The Court did not decide that every intervenor must independently establish Article III standing. It held that an intervenor seeking relief different from that sought by a party with standing must do so. *Id.* at 439–40. The inquiry therefore concerns the relief sought, not simply the existence of litigation between other parties. An intervenor cannot rely on jurisdiction over the original controversy to obtain a judicial remedy for which no party seeking that remedy has standing. *Id.* at 439. Nor does this rule arise only when an intervenor appeals: *Town of Chester* addressed the standing necessary to intervene and pursue distinct relief in the underlying action itself. *Id.* at 435, 440–42.



Appellate Case: 26-2797 Page: 37 Date Filed: 09/15/2026 Entry ID: 5684039

That is the problem here. Plaintiffs and State Defendants agreed the TRO was appropriate. Intervenor-Appellants sought relief from it. *See* Emergency Application for Stay, Doc. 38. They also urged the District Court to abstain in light of the *von Glahn* judgment. Their own intervention motion identified the separation expressly: without their participation, "no party before this Court will present a defense of the Missouri Supreme Court's judgment." Mot. to Intervene, Doc. 12 ¶ 6. That statement alone describes a difference in litigation position; their requests for relief give the difference jurisdictional significance. They asked the District Court to undo the restraint the original parties accepted and secure the operation of the state judgment that they alone sought to enforce. Those requests required an independent basis for invoking the District Court's remedial authority. *See Town of Chester*, 581 U.S. at 439–40.

*Liddell* demonstrates both the requirement and what satisfies it. There, parents sought to intervene to oppose enforcement of a settlement agreement in a manner that would divert funding from the charter schools their children attended. *Liddell*, 894 F.3d at 963–64. This Court required Article III standing and found it because the parents alleged a



Appellate Case: 26-2797 Page: 38 Date Filed: 09/15/2026 Entry ID: 5684039

concrete consequence to their own families: reduced funding would impair their children's educational opportunities. *Id.* at 964–66. Their disagreement with the requested enforcement was accompanied by an identifiable personal injury. *Id.* at 965–66. Intervenor-Appellants have supplied the disagreement without the injury. As Part I.B explains, they identify no comparable harm to von Glahn, to PNP itself, or to an identified member of PNP that their requested relief would redress.

Their reliance on the *von Glahn* judgment does not fill that gap. The question is what personal interest the judgment protects that the challenged federal relief impairs. Intervenor-Appellants point to their success in obtaining the judgment and their interest in having state officials implement its asserted consequences. As explained above, they identify no resulting injury distinct from the public's interest in administration of the law. A litigant's commitment to a legal position, however substantial, cannot substitute for that missing stake. *See Diamond*, 476 U.S. at 66–67. Likewise, official involvement in securing a measure does not, without more, establish a particularized interest in its enforcement. *Hollingsworth*, 570 U.S. at 705–07. Their state-court



Appellate Case: 26-2797 Page: 39 Date Filed: 09/15/2026 Entry ID: 5684039

victory must therefore be examined for the personal interest allegedly impaired; it cannot simply be offered in place of one.

Nor does the asserted inadequacy of State Defendants' representation answer this objection. Intervenor-Appellants' contention that someone must defend the state judgment explains why they wish to litigate. It does not establish why they are entitled to obtain the independent relief they demand. The requirements for intervention and the constitutional basis for invoking judicial power remain distinct inquiries. *Diamond*, 476 U.S. at 68–69; *Liddell*, 894 F.3d at 964. A perceived deficiency in another party's advocacy cannot supply the concrete injury missing from their own allegations. *See Diamond*, 476 U.S. at 62, 66–69.

Dismissal from the District Court action thus follows from the defect in the intervention they actually pursued: they sought independent relief without identifying a personal injury that would permit them to obtain it. *See Town of Chester*, 581 U.S. at 439–40; *Liddell*, 894 F.3d at 964. Dismissal of this appeal follows independently from their attempt to obtain appellate relief without standing of their own. *Diamond*, 476 U.S. at 68–71. They cannot obtain a different result

from the original parties merely by demanding one. They must identify a personal injury that authorizes a federal court to grant it. They have done neither below nor here.

*E. Intervenor-Appellants' Claimed Interest Fails for a Second, Independent Reason: The Elections Clause Forecloses the Very Referendum Right They Invoke.*

Intervenor-Appellants' own filings below identify no personal stake beyond what Part I.B, supra, already shows is a generalized grievance. Von Glahn is alleged only as "a Missouri citizen . . . taxpayer, and qualified voter." Mot. to Intervene, R.Doc. 12 ¶ 2. PNP's asserted interest is that its "constitutional rights under the Missouri Constitution—including the right to a referendum on legislative acts—are at stake." Intervenors' Mem., R.Doc. 12-1 at 8. Neither description supplies anything *Lance*, supra, does not already foreclose. PNP fares no better as an organization: an organization's "mere interest in a problem," including one it organized a petition drive to address, is not itself a cognizable injury absent some showing of harm to the organization—a showing Intervenor-Appellants have never attempted. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); cf. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

The defect runs deeper than an undifferentiated interest. Part V, infra, explains why Missouri's general referendum provision, Mo. Const. art. III, § 49, does not supply the clear statement the Elections Clause requires before a State may divest its legislature of congressional redistricting authority. *See Moore v. Harper*, 600 U.S. 1, 34–36 (2023); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 801, 814 (2015). If that is right, Intervenor-Appellants' asserted "right to a referendum" as applied to HB1 is not merely generalized—it is not a legally protected interest at all, because it is a right the Elections Clause does not permit the Missouri Constitution to confer over congressional redistricting. A private party's interest in the enforcement of state action the federal Constitution forecloses cannot substitute for the personal, particularized stake Article III demands. *See Diamond*, 476 U.S. at 65–66; *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (a private citizen "lacks a judicially cognizable interest in the prosecution or nonprosecution of another"). This Court need not resolve Part V's merits to credit the point here: that Plaintiffs' Elections Clause argument, is at minimum, substantial reason to doubt that Intervenor-Appellants' entire asserted stake in this litigation—a stake that depends

on the referendum's validity as applied to congressional redistricting—can be the kind of legally protected interest Article III requires of a party invoking this Court's own jurisdiction.

Intervenor-Appellants' own motion to intervene underscores the distinction. They argued below that intervention was necessary because, without them, "no party before this Court will present a defense of the Missouri Supreme Court's judgment" and because the existing Defendants' posture raised doubts, under *United States v. Johnson*, 319 U.S. 302, 305 (1943), whether a genuine adversarial proceeding exists. Mot. to Intervene, R.Doc. 12 ¶¶ 6–7; Intervenors' Mem., R.Doc. 12-1 at 10–12. Whatever force that argument carries under Rule 24(a)(2)'s adequacy-of-representation factor, it answers a different question than the one Article III asks of a party who seeks to invoke this Court's own appellate jurisdiction. A perceived gap in another party's incentive to litigate is not a personal injury to the party pointing it out; it explains why Rule 24 let Intervenor-Appellants into the case below,[3] not why

[3] Plaintiffs-Appellees do not concede that intervention below was proper. As explained above, Intervenor-Appellants lacked the legally protectable interest required by Rule 24(a)(2) from the outset. They may not like the State's litigation posture, but such a concern supplies neither the missing interest necessary for intervention nor the independent Article III standing required to pursue this appeal. See Fed. R. Civ. P. 24(a)(2); *Diamond v. Charles*, 476 U.S. 54, 68–69 (1986).



Appellate Case: 26-2797 Page: 43 Date Filed: 09/15/2026 Entry ID: 5684039

Article III lets them ask this Court, on their own, to reverse it. *See Diamond*, 476 U.S. at 62, 68.

## II. The District Court Properly Exercised Jurisdiction Over This Action.

Below, Intervenor-Appellants raised threshold jurisdictional issues: that 28 U.S.C. § 2284 required a three-judge court; that *Rooker-Feldman* deprives the District Court of jurisdiction; that *Younger* abstention, the *Colorado River* doctrine, or the Anti-Injunction Act bar relief, and that 28 U.S.C. § 1359 defeats jurisdiction. None of these defeat jurisdiction. This Court reviews each *de novo*.

### *A. The District Court Found Jurisdiction: It Ordered and Received Briefing on It Before Ruling.*

The District Court properly considered its own jurisdiction. *Steel Co.* and *Ruhrgas* condemn deciding the merits while bypassing an unresolved jurisdictional objection—not entering emergency relief without a freestanding jurisdictional opinion. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577–78 (1999). By Intervenor-Appellants' own account, the District Court did the opposite: it ordered supplemental briefing on *Rooker-Feldman* and abstention, R.Doc. 13, received briefs from both

sides addressing those doctrines, R.Doc. 29; R.Doc. 30, and only then entered the TRO. A court cannot grant injunctive relief while remaining agnostic about whether it has power to act at all; entering the TRO is itself the jurisdictional determination Intervenor-Appellants say never happened. That the TRO's text does not re-narrate that analysis sentence by sentence reflects the brevity of same-day emergency relief, not the hypothetical jurisdiction *Steel Co.* forbids. Any residual doubt is this Court's to resolve on *de novo* review—which the jurisdictional arguments addressed throughout this brief confirm favor Plaintiffs.

### *B. This Case Is Not Collusive.*

The collusion doctrine polices cases where a defendant already has the power to give the plaintiff everything it wants and simply declines to contest the case. See *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892); *Muskrat v. United States*, 219 U.S. 346, 361 (1911). That is not this case: Secretary Hoskins is bound by the *von Glahn* judgment and cannot unilaterally give Plaintiffs the relief they seek without a court order, so the fact that he agrees with them is not evidence of collusion. See *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–40 (2021).

Intervenor-Appellants' remaining collusion argument relies solely on the fact that Plaintiffs' counsel also represents other, aligned interests in a separate proceeding. Imputing collusion from shared counsel would mean that any lawyer who represents more than one client with overlapping interests across different matters has thereby destroyed the case-or-controversy status of every one of those matters. That rule would functionally penalize the choice of counsel itself.

It also mistakes what the collusion doctrine asks. A suit is collusive when the nominal parties are not genuinely adverse to one another—as in *Johnson*, where the plaintiff had never employed or met the attorney who sued in his name, did not know who had paid the filing fee, and learned the amount of the judgment entered against him from a newspaper. *United States v. Johnson*, 319 U.S. 302, 304–05 (1943). Nothing of the sort is alleged here, nor could it be: Plaintiffs retained their own counsel, control this litigation, and bear its risks.

Nor does a defendant's agreement with the plaintiff's view of the law defeat adverseness, so long as the defendant remains bound to act against the plaintiff absent judicial relief. In *Chadha*, the INS agreed with Chadha that the legislative veto was unconstitutional, yet Article



Appellate Case: 26-2797 Page: 46 Date Filed: 09/15/2026 Entry ID: 5684039

III adverseness was adequate because the INS would have deported him absent the judgment. *INS v. Chadha*, 462 U.S. 919, 939 (1983). In *Windsor*, the United States agreed that DOMA was unconstitutional and continued to enforce it anyway; a live controversy persisted because the judgment ordered the Treasury to pay. *United States v. Windsor*, 570 U.S. 744, 757–59 (2013). Secretary Hoskins stands in precisely that position. He is bound by the *von Glahn* injunction and may not lawfully use the HB1 Map for the November 3, 2026, general election unless and until a federal court orders otherwise. That Plaintiffs need an injunction from this Court, rather than a stipulation from the Secretary, is itself proof that the dispute is real.

*C.* Rooker-Feldman *Does Not Bar Relief.*

Intervenor-Appellants also argue this suit is a disguised appeal of the Missouri Supreme Court's *von Glahn* judgment, barred by the *Rooker-Feldman* doctrine. App. 3. *Rooker-Feldman* applies "only to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (emphasis added). Plaintiffs here were not parties to the

*von Glahn* state court proceeding, much less losers. They bring independent federal constitutional claims arising from Secretary Hoskins's election administration following the *von Glahn* order. *Rooker-Feldman* has never been extended to nonparties to a state court proceeding, and Appellants cite no authority for doing so. *See Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam) (*Rooker-Feldman* does not bar claims by a party who was not a party to the state-court judgment, even if in privity with one who was).

Under materially identical circumstances, the U.S. Supreme Court held the same. After the Colorado legislature had performed a mid-decade redistricting, the state attorney general sued the secretary of state, seeking to require the use of the previous redistricting map. *Lance*, 546 U.S. at 460. The Colorado Supreme Court construed the Colorado Constitution "to limit congressional redistricting to 'once per decade'" and "ordered the secretary of state to use the [previous plan]." *Id.* at 460–61 (citation omitted). Following that decision, four Coloradans, "unhappy with [the decision,] filed an action in the District Court seeking to require the secretary of state to use the legislature's [new redistricting] plan." *Id.* at 461. Those plaintiffs "argued that [the Colorado Constitution], as

interpreted by the Colorado Supreme Court, violated the Elections Clause of Article I, § 4, of the U.S. Constitution." *Id.* The Supreme Court held that the citizen-plaintiffs "were plainly not parties to the underlying state-court proceeding" and were "not in a position to ask this Court to review the state court's judgment." *Id.* at 465 (citation and quotation omitted). Thus, *Rooker-Feldman* did not bar that federal action, even though the Secretary of State was the defendant in both the original state suit and the federal suit. *See id.* at 460–61 & n.1. A contrary position would rob many voters and candidates of their right to bring federal claims in federal court after the State lost a case in state court.

*D. The Anti-Injunction Act Does Not Bar the TRO.*

The Anti-Injunction Act, 28 U.S.C. § 2283, provides that a federal court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Intervenor-Appellants invoke the Act's "absolute prohibition" and its rule that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion." *Atl. Coast Line R.R. Co. v. Bhd.*

*of Locomotive Eng'rs*, 398 U.S. 281, 286, 297 (1970). Both propositions are correct, and neither helps Intervenor-Appellants, because the TRO does not do the one thing § 2283 restricts: it does not stay any proceeding in any Missouri court. No Missouri court proceedings are pending against Plaintiffs, or anyone else, that the TRO stays, enjoins, or interferes with. The TRO restrains a state executive officer—Secretary Hoskins—from taking a specific administrative action on independent federal constitutional grounds no Missouri court has ever considered.[4] Section 2283 was never meant to reach that. *See Mitchum v. Foster*, 407 U.S. 225, 234–35, 243 (1972) (the Anti-Injunction Act restrains only injunctions against pending state-court proceedings, not a state officer's independent future conduct).

Intervenor-Appellants' contrary argument does not identify a state-court proceeding the TRO stays; it argues instead that the TRO is in tension with what the Missouri Supreme Court decided in *von Glahn* — that HB1 "is not the law" and that the 2022 districts govern. *Von Glahn*, slip op. at n.8. That may describe a disagreement between the TRO and

---

[4] *See Von Glahn v. Hoskins*, No. SC101805 (Mo. banc Sept. 3, 2026), slip op. at 5 n.5 (holding that Secretary Hoskins had "waived and abandoned" "claimed federal law violations and whether the congressional redistricting in HB 1 should or must remain in place through the 2026 election cycle[.]").

the state judgment's substance, but § 2283 does not ask whether a federal injunction is in tension with what a state court decided; it asks whether the injunction stays a proceeding in a state court. It does not. Nor does the Missouri Supreme Court's September 8 show-cause order[5] change the analysis: that order is a contempt proceeding against Secretary Hoskins regarding his compliance with *von Glahn*, and the TRO neither stays it, restrains it, nor purports to resolve it—the Missouri Supreme Court remains as able to hold the Secretary in contempt, or not, on whatever timeline it chooses, as it was the day before the TRO issued. See *infra* Section II.E.

Nor is this the kind of case *Atlantic Coast Line* addressed. Section 2283's prohibition "cannot be evaded by addressing the order to the parties," *id.* at 287–88, but the injunction there ran between the same two litigants who had just finished fighting the underlying dispute in state court, and its entire practical effect was to stop the railroad from

[5] A case which has now concluded and been resolved regardless. *See Von Glahn v. Hoskins,* No. SC101805*, Judgment of Contempt* (Mo. banc Sept. 10, 2026). Plaintiffs-Appellees would be remiss they did not call out the unique status of that contempt proceeding: a state court held a state officer in contempt for complying with an order of a United States District Court. *But see, e.g., Cooper v. Aaron*, 358 U.S. 1, 4 (1958) (rejecting the "Little Rock School Board's plan to do away with segregated public schools in Little Rock until state laws and efforts to upset and nullify [the] holding in *Brown v. Board of Education* have been further challenged and tested in the courts."). Plaintiffs' rights under the United States Constitution plainly supersede any state-law command, whether it come from a state constitution or court. *See id.* at 18. "No state legislator or executive *or judicial officer* can war against the Constitution without violating his undertaking to support it." *Id.* (emphasis added).



Appellate Case: 26-2797 Page: 51 Date Filed: 09/15/2026 Entry ID: 5684039

availing itself of a state-court injunction issued in that same dispute. *Id.* Here, Plaintiffs were never parties to *von Glahn*, and the TRO does not nullify anything the Missouri Supreme Court ordered as between the parties to that case. It directs Secretary Hoskins's future conduct on an independent federal claim those parties never raised and that court never decided. The concern *Atlantic Coast Line* addresses—a litigant dressing up an injunction against a state-court adversary as an injunction against a nonparty—is not present when a different plaintiff, on a different claim, asks a federal court to direct an executive officer's future conduct.

Two further, independent lines of authority confirm that § 2283 does not reach this case at all. First, a state-court proceeding does not bind a stranger to it. *Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 378 (1939), rejected the argument that a state mandamus proceeding "bound the independent suitor in the federal court as though he were a party to the litigation in the state court," holding flatly that "this, of course, is not so." *Accord Cnty. of Imperial, Cal. v. Munoz*, 449 U.S. 54, 59 (1980) (remanding because the lower courts had not determined whether the federal plaintiffs were "strangers" to the state proceeding—a finding that would take the case outside § 2283 entirely). Plaintiffs were strangers to



Appellate Case: 26-2797 Page: 52 Date Filed: 09/15/2026 Entry ID: 5684039

*von Glahn* in exactly this sense: they were not parties, did not participate, and are not bound by it.

Second, and independently, the Eighth Circuit has squarely held that § 2283 does not reach state administrative or executive action at all, regardless of any party-identity question. *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) (§ 2283's "plain language refers only to injunctions issued by federal courts to stay proceedings in a State court," and "every circuit to have addressed th[e] question" agrees the statute does not reach administrative or executive proceedings). Federal courts within this Circuit have enjoined Missouri secretaries of state from implementing congressional maps without ever treating § 2283 as a barrier, because such injunctions restrain executive conduct, not a state court. *Preisler v. Sec'y of State of Mo.*, 341 F. Supp. 1158 (W.D. Mo. 1972) (enjoining the Missouri Secretary of State from conducting elections under an unconstitutional congressional redistricting act). Nothing about this case calls for a different result.

Even if this Court concluded the TRO restrains a state-court proceeding after all—it does not, for the reasons above—the Act would still not bar relief. Plaintiffs bring their Article I, § 2 and Equal Protection

claims under 42 U.S.C. § 1983, and the Supreme Court has held that § 1983 is itself an Act of Congress "expressly authoriz[ing]" federal injunctions against state proceedings notwithstanding § 2283. *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972). Every path leads to the same place: § 2283 does not bar the TRO.

Intervenor-Appellants would have this Court read § 2283 to bar any federal relief that is inconvenient to a state judgment, no matter who seeks it, on what claim, or against whom. That reading has no footing in the statute's text, which speaks only to injunctions against proceedings in a State court, and none in the case law construing it, which has rejected exactly that expansion for nearly a century. The TRO restrains an executive officer's future conduct on an independent federal claim Plaintiffs—strangers to *von Glahn*—were never able to raise there. Section 2283 has nothing to say about it. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 151 (1988) (the Act's exceptions are narrowly construed, and its prohibition reaches only injunctions directed at state-court proceedings themselves).

*E. No Abstention Doctrine Requires Dismissal or a Stay.*

Intervenor-Appellants previously invoked three abstention doctrines—*Younger*, *Colorado River*, and *Growe*. None applies. *Younger* and *Colorado River* require a qualifying pending state proceeding, and none exists. Younger v. Harris, 401 U.S. 37, 40–41 (1971); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 816–17 (1976); see supra Section II.D. *Growe's* distinct redistricting-deferral principle is inapplicable for the reasons discussed below. *Growe v. Emison*, 507 U.S. 25 (1993). The Missouri Supreme Court's judgment in *von Glahn* became final on September 3, 2026, and the court denied a stay of its own judgment the next day. Intervenor-Appellants' argument boils down to the claim that the theoretical availability of a discretionary certiorari petition to the U.S. Supreme Court—a petition no one has filed—keeps a concluded state case "ongoing." That is not the law. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 (1975) (a state proceeding is no longer "ongoing" once the state courts have finally resolved it, whether or not further discretionary review remains theoretically available).

None of the three doctrines gets past the same threshold problem: Plaintiffs were never parties to *von Glahn*, which is a concluded state case, not an ongoing one. *Younger* requires the case to fall within one of

three categorical exceptions identified in *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) (NOPSI), and Intervenor-Appellants' motion does not attempt to identify which of the three this case fits—because none does; *von Glahn* was a civil declaratory action between private and state parties, not a criminal prosecution, a state civil-enforcement action, or an order enforcing a state court's authority over parties before it. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). Even on Intervenor-Appellants' own three-factor framing, there is no "ongoing proceeding": the Missouri Supreme Court's judgment is final, and the theoretical availability of a certiorari petition no one has filed does not keep a concluded state case alive. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 605–06, 609 (1975). Nor was there ever an adequate opportunity to litigate Plaintiffs' claims in that proceeding: they were not parties to it, and the Missouri Supreme Court expressly held that federal-law arguments were "waived and abandoned" and outside the scope of its review. *Von Glahn*, slip op. at 5 n.5.

*Colorado River* and *Growe* fail for the related, independent reason that both require a currently pending parallel state proceeding, and none exists: *von Glahn* is over, and a not-yet-filed discretionary certiorari



Appellate Case: 26-2797 Page: 56 Date Filed: 09/15/2026 Entry ID: 5684039

petition is not a parallel proceeding of any kind. *Colorado River*, 424 U.S. at 817–18. *Growe*'s deferral principle presupposes "timely consideration" of redistricting by a state court, *Growe*, 507 U.S. at 37; it does not apply to Plaintiffs' request that Missouri simply continue using, for the general election, the same map already used in the primary.

**III. This Suit Also Did Not Require a Three-Judge Panel.**

Section 2284(a) requires a three-judge district court when an action is filed "challenging the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a). Intervenor-Appellants argue that Plaintiffs are challenging congressional apportionment. Not so. Plaintiffs do not challenge the constitutionality of either apportionment plan. They challenge switching district maps between the primary and general election—mid-election-cycle administrative conduct by Secretary Hoskins—as a violation of their federal constitutional rights under Article I, Section 2 and the Equal Protection Clause. Such a claim does not invoke § 2284. *Shapiro v. McManus*, 577 U.S. 39, 41 (2015) (§ 2284 applies to challenges to the "constitutionality" of an apportionment "plan," not to challenges to the manner of election administration). And even if § 2284 applied, § 2284(b)(3) expressly preserves the single district

judge's power to "grant a temporary restraining order" pending convening of a three-judge court, 28 U.S.C. § 2284(b)(3), so the TRO here is exactly what that provision contemplates.

## IV. The District Court's Constitutional Rulings Entitle Plaintiffs to a Permanent Injunction Against the 2022 Map.

The District Court correctly found a high probability of success on Plaintiffs' Article I, Section 2 and Equal Protection claims, each of which independently supports the TRO. Intervenor-Appellants' Elections Clause argument, even if credited, does not undermine the Order.

### *A. The Mid-Cycle Map Switch Violates the Equal Protection Clause.*

The mid-cycle change in congressional districts violates the Equal Protection Clause. Primary-election procedures are "state action within the meaning of the Fourteenth Amendment" and "must be exercised in a manner consistent with the Equal Protection Clause." *Bullock v. Carter*, 405 U.S. 134, 140–41 (1972). "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).



Appellate Case: 26-2797 Page: 58 Date Filed: 09/15/2026 Entry ID: 5684039

Switching congressional maps between the primary and general election creates two classes of voters: those whose district stays the same and retain the full benefit of their primary vote, and those like Thomas and Havens who are reassigned to a new district and must choose among candidates they never had the opportunity to evaluate, support, or oppose in the primary. That disparity in voting power is itself the equal-protection violation; it arises not from any defect in either map standing alone, but from switching maps between the two stages of a single election. No compelling interest has been offered by Intervenor-Appellants or the State to justify this disparity. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979); *Reynolds v. Sims*, 377 U.S. 533 (1964).

Intervenor-Appellants contend "Equal Protection does not guarantee voters an uninterrupted opportunity to determine who represents them, let alone who is nominated to represent them." Motion at 22. But the cases they cite show the opposite: that all voters in each district were treated *equally*. *Republican Party of Ore. v. Kiesling*, 959 F.2d 144 (9th Cir. 1992) (all voters had equal right to vote for senators whenever staggered terms arose); *Donatelli v. Mitchell*, 2 F.3d 508 (3d



Appellate Case: 26-2797 Page: 59 Date Filed: 09/15/2026 Entry ID: 5684039

Cir. 1993) (no voters in district had voted for new senator assigned to the district). And those cases confirm that the Equal Protection Clause requires that "[a]ll qualified voters" have "an equal opportunity to select a district representative in the general election," *Donatelli*, 2 F.3d at 517 (quoting *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 (1982)), an opportunity that would be denied to Thomas and Havens here without the TRO. *Rodriguez* recognized that "when a state . . . has provided that its representatives be elected, a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." 457 U.S. at 10 (cleaned up). *Rodriguez* therefore *forecloses*, rather than justifies, the Missouri Supreme Court's fracturing of the State's "single instrumentality for the choice of officers" formed by the primary and general elections. *Smith v. Allwright*, 321 U.S. 649, 660 (1944).

Congressman Onder and candidate Brattin were nominated by, and campaigned to, the HB1-district electorate; Thomas and Havens cast primary ballots as residents of the Fifth Congressional District under that same map. Requiring the general election to proceed instead under the districts ordered in *von Glahn* would subject each of them to exactly

the harm the Equal Protection Clause forbids. The TRO was therefore appropriate.

The doctrinal anchor for this disparity is *Gray v. Sanders*: "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." 372 U.S. 368, 379 (1963). Intervenor-Appellants' attempt to distinguish *Gray v. Sanders* because it involved malapportioned rural and urban votes rather than a mid-cycle map switch gets the point backward: it is precisely such unequal treatment of voters—here, between those who kept the same district and those reassigned to a new one between the primary and general election—that the Missouri Supreme Court's injunction and the Secretary's carrying out of that injunction inflicts.

Nor do the "ordinary consequences of redistricting, vacancies, and candidate substitution" rescue the injunction, as Intervenor-Appellants suggest. None of those ordinary consequences involves unequal treatment of voters as they participate in elections: a voter moved into a new district by routine redistricting still competes on the same terms as every other voter in that district going forward, and a candidate vacancy

or substitution leaves no voter in the district with a prior opportunity to consider the replacement candidate that other voters lack. Here, by contrast, some Missouri voters will select their members of Congress from the field they already narrowed in the primary, while others—including Thomas and Havens—must choose among candidates they never had any opportunity to evaluate, support, or oppose. That is not an ordinary consequence of redistricting; it is the unequal treatment the Equal Protection Clause forbids. It also bears noting that no candidate has ever been certified under the 2022 Map for this election cycle—that map has not produced a single nominee—so the injunction Intervenor-Appellants defend would not merely redraw district lines but would leave the general-election ballot without any candidate lawfully elected in the same 2022 districts to appear on the ballot in those districts they seek to compel.

*B. The District Court Correctly Found a High Probability of Success under Article I, Section 2.*

The District Court found a high probability of success on Plaintiffs' Article I, Section 2 claim. Article I, Section 2 guarantees that "[t]he House of Representatives shall be composed of Members chosen every second

Year by the People of the several States." U.S. CONST. art. I, § 2. Where state law makes the primary "an integral part of the procedure of choice," the right to have one's primary ballot counted is itself "included in the right protected by Article I, § 2." *United States v. Classic*, 313 U.S. 299, 318 (1941). Missouri law makes the primary integral to that choice: "all candidates for elective office shall be nominated at a primary election," Mo. Rev. Stat. § 115.339, and the primary winner "shall be the only candidate of that party for the office at the general election," Mo. Rev. Stat. § 115.343, subject to replacement only for death, disqualification, or withdrawal, Mo. Rev. Stat. § 115.363.3(1)-(3), .4. Missouri courts have accordingly recognized that "primary elections have constitutional stature" as "an integral part of [the State's] election machinery." *State ex rel. McClellan v. Kirkpatrick*, 504 S.W.2d 83, 86 (Mo. banc 1974). Because of "the fusing . . . of the primary and general elections into a single instrumentality for choice of officers," *Smith*, 321 U.S. at 660, and because the primary is "a[n] integral part of the entire election process," *Storer v. Brown*, 415 U.S. 724, 735 (1974), changing the congressional districts between the primary and general election does not merely alter the ballot—it fractures that single instrumentality, stripping the HB1-



Appellate Case: 26-2797 Page: 63 Date Filed: 09/15/2026 Entry ID: 5684039

district primary electorate's chosen nominees of the mandate their voters conferred. Critically, the District Court's holding does not depend on the lawfulness of HB1 itself. Instead, it turns on what map voters and candidates relied upon when they participated in the primary.

Prior judicial decisions declining to change congressional districting plans between a primary and a general election comport with Article I, Section 2, as the Supreme Court has previously construed it. See, e.g., *Page v. Va. State Bd. of Elecs.*, 58 F. Supp. 3d 533, 554 (E.D. Va. 2014), *vacated sub nom. Cantor v. Personhuballah*, 575 U.S. 931 (2016). So, too, do judicial decisions declining to alter other types of redistricting plans between a primary and a general election (which likewise underscore that equitable considerations foreclose the injunction here). *See, e.g., Terrazas v. Slagle*, 821 F. Supp. 1154, 1159 (W.D. Tex. 1992); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016); *Vera v. Richards*, 861 F. Supp. 1304, 1351 (S.D. Tex. 1994), *aff'd, Bush v. Vera*, 517 U.S. 952 (1996).

Judge Clark's reasoning is straightforward and consistent with settled constitutional doctrine. On August 4, 2026, more than 1.2 million Missourians voted in the congressional primary under HB1, relying on

Secretary Hoskins's exercise of authority under MO. CONST. art. IV, § 14. Requiring the general election to proceed under the different districts fractures the single election instrumentality those voters and candidates relied upon. The District Court was right to find a high probability of success on this claim.

**C. Plaintiffs-Appellees Have Suffered an Irreparable Injury for Which No Remedy at Law Exists.**

A plaintiff seeking a permanent injunction must demonstrate "that it has suffered an irreparable injury"; "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The District Court weighed those same factors below. Parts IV.A through IV.B supply it twice over, on independently sufficient grounds that produce the same injury and call for the same remedy.

The injury is the deprivation of a constitutional right, and deprivations of constitutional rights are irreparable by their nature. "The

loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The franchise stands on no lesser footing: "the right of suffrage is a fundamental matter in a free and democratic society," and "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

Nor is there a remedy at law, because an election cannot be un-held. If the November 3 general election proceeds under the 2022 Map, Thomas and Havens will have cast primary ballots in one congressional district and general-election ballots in another, choosing among nominees they were given no opportunity to evaluate, support, or oppose. No judgment entered after election day returns to them the vote they were denied, and no sum of money substitutes for it. Missouri's own courts have confirmed the point in the only way that matters here: they decline to unwind elections already conducted, even under maps later held unconstitutional. *See supra* Part IV.B. If the injury cannot be undone after the election, it must be prevented before it.



Appellate Case: 26-2797 Page: 66 Date Filed: 09/15/2026 Entry ID: 5684039

The District Court so found, and Intervenor-Appellants never contested it. The court found irreparable harm and found that the balance of harms and the public interest strongly favored preserving the election rules under which the primary had already been conducted. Order at __. Those are findings of fact, reviewed for clear error. *See supra* Standard of Review. Intervenor-Appellants put no contrary evidence before the District Court, because by their own account they "w[ere] neither ordered to, nor did respond to[,] the application for TRO." Mot. for Summ. Reversal at 8. They now ask this Court to set aside findings they declined to contest, on a record they declined to make.

**D. The Balance of Hardships and the Public Interest Weigh Decisively in Favor of Relief.**

The District Court's weighing of the equities is reviewed only for abuse of discretion, *eBay*, 547 U.S. at 391, and its findings of fact stand unless clearly erroneous: "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). The final two

*eBay* factors require little discussion, because Intervenor-Appellants have nothing of their own to place on the other side of the scale. A party that cannot identify an injury sufficient to satisfy Article III, *see supra* Part II, is in no position to claim a hardship that outweighs the loss of the franchise.

The referendum survives a permanent injunction entirely intact. Nothing in the relief Plaintiffs-Appellees seek restrains Intervenor-Appellants from circulating their petition, campaigning for it, placing it before Missouri voters, casting ballots upon it, or obtaining a determination of its validity. The injunction reaches one thing only: which congressional map governs a general election whose primary has already been held. Intervenor-Appellants' reliance on *Eggers v. Evnen*, 48 F.4th 561, 566-67 (8th Cir. 2022), inverts that distinction. *Eggers* concerned a federal injunction that barred a State from conducting its elections under a valid provision of its own constitution. The injunction here does the opposite: it keeps Missouri's general election on the same map as the primary Missouri itself conducted, under the statute the General Assembly itself enacted.



Appellate Case: 26-2797 Page: 68 Date Filed: 09/15/2026 Entry ID: 5684039

Whatever disruption attends this election cycle was foreseeable, and none of it is of Plaintiffs-Appellees' making. A federal court warned in December 2025, before a single primary ballot was cast, that if the referendum petition were held sufficient, "the new map will be frozen until after the referendum, which could significantly disrupt the 2026 elections." *Mo. Gen. Assembly v. von Glahn*, 2025 WL 3514277, at *2 (E.D. Mo. 2025). The Missouri Supreme Court itself found that it was Secretary Hoskins's delay that "created the confusion, expense, and practical difficulties of which he complains." *Von Glahn*, slip op. at 12 n.8. Intervenor-Appellants ask this Court to charge that delay to the voters who had nothing to do with it.

The public interest points the same direction, and the practical record removes any doubt. The state circuit court found it "impossible" for election officials to administer the 2026 general election under any plan other than HB1: the centralized voter registration system is locked until at least mid-November, and implementing a different map would require transferring hundreds of thousands of voters through a multi-week process that cannot be completed in time. Compl. (R. Doc. 1) ¶¶ 27-32. The Missouri Supreme Court never addressed that finding. Compl. ¶

34. And no candidate has ever been certified under the 2022 Map in this cycle; the Secretary's August 25, 2026 certification named the nominees chosen in the August 4 primary, conducted under HB1. An order compelling use of the 2022 Map would therefore not merely redraw district lines — it would produce a general-election ballot with no lawfully certified nominee on it.

More than 1.2 million Missourians voted in the August 4 congressional primaries under the HB1 map. The public interest lies in giving those votes their intended effect, not in nullifying them weeks before the general election. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Little would erode that confidence faster than telling 1.2 million voters that the primary the State invited them to join selected nominees for districts in which they may not vote.

**V. The District Court Erred in Rejecting Plaintiffs' Elections Clause Claim—an Independent, Additional Ground for the Injunction Plaintiffs Seek.**

The District Court also held that Plaintiffs had not demonstrated a likelihood of success on their Elections Clause claim. Order at 7–9. That



Appellate Case: 26-2797 Page: 70 Date Filed: 09/15/2026 Entry ID: 5684039

holding was error, and this Court should reverse it as an independent, additional ground for the injunction Plaintiffs seek. The Elections Clause vests the authority to prescribe "the Times, Places and Manner of holding Elections for . . . Representatives" in "the Legislature" of each State. U.S. Const. art. I, § 4, cl. 1. A State may divest its legislature of that authority only through a clear and deliberate choice reflected in a clear statement of state law; state courts "do not have free rein" to intrude on the legislature's Elections Clause authority absent "a fair reading" of state law limiting that power. *Moore v. Harper*, 600 U.S. 1, 34–36 (2023); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 801, 814 (2015) (upholding a transfer of redistricting authority only because the state constitution "directly and immediately" and expressly did so). Because the Elections Clause is "a direct grant of authority" from the federal Constitution, other state actors may not use general or ambiguous state-law provisions to override the legislature's exercise of that authority. *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (per curiam).

Article III, Section 49 of the Missouri Constitution is a general referendum provision. It does not mention congressional redistricting,



Appellate Case: 26-2797 Page: 71 Date Filed: 09/15/2026 Entry ID: 5684039

and—unlike the Arizona constitutional provision at issue in Arizona State Legislature—it does not expressly transfer congressional redistricting authority away from the General Assembly. *Von Glahn*'s construction of that general provision to reach HB1 does not supply the clear, deliberate statement the Elections Clause demands before a State may divest its legislature of redistricting authority. *See Ariz. State Legislature*, 576 U.S. at 801, 814; id. at 843 (Roberts, C.J., dissenting) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)) ("[i]f the drafter was doing something as significant as transforming state law into federal law, he presumably would have taken care to make that dramatic step 'unmistakably clear.'"); *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *Sackett v. EPA*, 598 U.S. 651, 679–80 (2023). The District Court's contrary conclusion rested on deference to the Missouri Supreme Court's interpretation of its own constitution, but that deference has no place here: the question is not what Article III, Section 49 means as a matter of Missouri law, but whether it satisfies a distinct, more demanding federal constitutional requirement—and a general referendum provision that never mentions redistricting cannot.



Appellate Case: 26-2797 Page: 72 Date Filed: 09/15/2026 Entry ID: 5684039

This ground is independent of, and in addition to, the Article I, Section 2 and Equal Protection grounds addressed above; this Court need not resolve it to affirm the injunction, but should, because it corrects a legal error below and gives Plaintiffs' request for a permanent injunction against the 2022 Map a third, independently sufficient foundation.

## CONCLUSION

For the foregoing reasons, this Court should enter its injunction enjoining the use of any map except the HB 1 map, and barring the use of any other map, on the basis of Plaintiffs claims  that switching congressional maps between the primary and general election violates Article I, Section 2 and the Equal Protection Clause; and that Plaintiffs are also entitled to prevail on the merits on their Elections Clause claim; or, in the alternative, affirm the District Court's holdings and direct that the District Court enter a permanent injunction barring use of the 2022 Map for the remainder of this election cycle. This Court should also dismiss Intervenor-Appellants for lack of Article III standing to remain parties to this action.

Respectfully submitted,

**ELLINGER BELL LLC**

By: /s/ Marc H. Ellinger
Marc H. Ellinger, #40828(MO)
Stephanie S. Bell, #61855(MO)
Cole D. Bradbury, #62760(MO)
308 East High Street, Suite 300
Jefferson City, MO 65101
Telephone: (573) 750-4100
Facsimile: (314) 334-0450
E-mail: mellinger@ellingerlaw.com
E-mail: sbell@ellingerlaw.com
E-mail: cbradbury@ellingerlaw.com

*Attorneys for Plaintiffs/Appellees/ Cross-Appellants*

## CERTIFICATE OF COMPLIANCE AND SERVICE

This Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 12,981 words.

This Brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. The undersigned certifies that the electronically filed brief has been scanned for viruses and is virus-free.

I hereby certify that on September 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Marc H. Ellinger*
Marc H. Ellinger