Nos. 26-2797, 26-2827

# In the United States Court of Appeals For the Eighth Circuit

CONGRESSMAN ROBERT "BOB" ONDER, *et al.*,

*Plaintiffs-Appellees / Cross-Appellants*,

v.

STATE OF MISSOURI, and DENNY HOSKINS, *in his official capacity as Missouri Secretary of State*,

*Defendants*,

RICHARD VON GLAHN, and PEOPLE NOT POLITICIANS,

*Intervenors-Defendants-Appellants / Cross-Appellees*.

Appeal from the U.S. District Court for the Eastern District of Missouri (4:26-cv-01424-SRC)

**BRIEF OF DEFENDANTS STATE OF MISSOURI AND MISSOURI SECRETARY OF STATE**


**CATHERINE L. HANAWAY**
ATTORNEY GENERAL
815 Olive Street, Ste. #200
St. Louis, Missouri 63101
Tel. (573) 645-9662
Louis.Capozzi@ago.mo.gov

Louis J. Capozzi III, #77756MO
*Solicitor General*
William J. Seidleck, #77794MO
*Principal Deputy Solicitor General*
J. Michael Patton, #76490MO
*Deputy Solicitor General*
Graham D. Miller, #77656MO
*Deputy Solicitor General*

*Counsel for the State of Missouri and Secretary of State Denny Hoskins*

## SUMMARY OF THE CASE

The Court has already scheduled oral argument in this case, which raises several questions of exceptional importance that are worthy of the Court's close attention. The Court's resolution of these questions will impact elections throughout the Eighth Circuit for decades to come.

First, this case implicates whether a referendum petition—signed by just 3.3% of a State's electorate—can suspend a duly-enacted congressional map enacted by the state legislature. The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof." U.S. Const. art. I, § 4 (emphasis added). To the extent that means *anything*, it certainly militates against suspension of a law based on a referendum petition signed by a small fraction of voters.

Second and third, this case raises important questions about whether state law can mandate switching the congressional districts of hundreds of thousands of voters between a primary and a general election. As the District Court held, both Article I, Section 2 of the U.S. Constitution and the Equal Protection Clause forbid that maneuver. This Court should clarify those points in this appeal.

## TABLE OF CONTENTS

**SUMMARY OF THE CASE** .......... ii

**TABLE OF AUTHORITIES** .......... iv

**JURISDICTIONAL STATEMENT** .......... 1

**STATEMENT OF ISSUES** .......... 2

**INTRODUCTION** .......... 3

**STATEMENT OF THE CASE** .......... 8

I. The enactment of the HB 1 map and subsequent failed challenges to it. .......... 8

II. The *von Glahn* state-court litigation. .......... 13

III. The *Onder* lawsuit. .......... 17

IV. The Missouri Supreme Court holds the Secretary of State in contempt of court. .......... 24

**STANDARD OF REVIEW** .......... 28

**SUMMARY OF THE ARGUMENT** .......... 30

**ARGUMENT** .......... 32

I. The Secretary acknowledges the U.S. Supreme Court's stay order. .......... 32

II. The Court should clarify the merits questions at issue in this appeal, even if it denies preliminary relief on the equities. .......... 33

A. The Elections Clause .......... 35

B. Article I, Section 2 .......... 41

C. The Equal Protection Clause .......... 46

**CONCLUSION** .......... 51

## TABLE OF AUTHORITIES

**Cases**

*Am. Party of Tex. v. White*,
415 U.S. 767 (1974) .......... 47, 48

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 36, 39

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016) .......... 42

*Democratic Nat'l Comm. v. Wisc. State Legislature*,
141 S. Ct. 28, (2020) .......... 35

*Dunn v. Blumstein*,
405 U.S. 330 (1972) .......... 49

*Ex parte Young*,
209 U.S. 123 (1908) .......... 18

*Free Enterprise Fund v. Public Co. Accounting Bd.*,
561 U.S. 477 (2010) .......... 37

*Gonzales-Perez v. Harper*,
241 F.3d 633 (8th Cir. 2001) .......... 34

*Hadley v. Junior Coll. Dist. of Metro. Kansas City*,
460 S.W.2d 1 (Mo. 1970) .......... 12, 14

*Hawke v. Smith*,
253 U.S. 221 (1920) .......... 35

*Healey v. Missouri*,
732 S.W.3d 827 (Mo. 2026) .......... 11



Appellate Case: 26-2797 Page: 4 Date Filed: 09/15/2026 Entry ID: 5684059

*Hoskins v. von Glahn*,
No. 26A304, 2026 WL 2647016 (U.S. Sept. 8, 2026) ........................ 4, 17

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*,
115 F.4th 889 (8th Cir. 2024) ............................................................ 27

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) ........................................................................... 48

*In re Rose*,
No. 26-0916, 2026 WL 2672098 (Tex. Sept. 11, 2026) ......................... 43

*In re Rutledge*,
956 F.3d 1018 (8th Cir. 2020) .............................................................. 1

*Klein v. United States*,
176 F.2d 184 (8th Cir. 1949) ............................................................... 44

*La Belle Dairy, LLC v. Sharpe Holdings, Inc.*,
183 F.4th 606 (8th Cir. 2026) ............................................................... 1

*Lance v. Dennis*,
546 U.S. 459 (2006) ........................................................................... 22

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) ....................................................................... 40

*Luther v. Hoskins*,
730 S.W.3d 567 (Mo. 2026) ................................................................ 11

*Maggard v. Missouri*,
733 S.W.3d 411 (Mo. 2026) ........................................................... 10, 11

*Malliotakis v. Williams*,
146 S. Ct. 809 (2026) ......................................................................... 20

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ......................................................................... 28



Appellate Case: 26-2797 Page: 5 Date Filed: 09/15/2026 Entry ID: 5684059

*Mo. Gen. Assembly v. von Glahn*,
No. 4:25-CV-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025) .. 10

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 36, 37

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .......... 36

*NAACP v. Kehoe*,
734 S.W.3d 338 (Mo. 2026) .......... 11

*Nat'l Republican Senatorial Comm. v. FEC*,
146 S. Ct. 2404 (2026) .......... 18

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 27

*Ohio ex rel. Davis v. Hildebrandt*,
241 U.S. 565 (1916) .......... 39

*Onder v. People Not Politicians*,
No. 26-2797, 2026 WL 2661912 (8th Cir. Sept. 9, 2026) .......... 5, 23

*Page v. Va. State Bd. of Elections*,
58 F. Supp. 3d 533 (E.D. Va. 2014) .......... 42

*People Not Politicians v. Hoskins*,
No. SC101801, 2026 WL 2628848 (Mo. Sept. 3, 2026) .......... 38

*People Not Politicians v. Onder*,
No. 26A326, 2026 WL 2659767 (U.S. Sept. 10, 2026) .......... *passim*

*Pollard v. Bd. of Police Comm'rs*,
665 S.W.2d 333 (Mo. banc 1984) .......... 43

*Ramos v. Louisiana*,
590 U.S. 83 (2020) .......... 48



Appellate Case: 26-2797 Page: 6 Date Filed: 09/15/2026 Entry ID: 5684059

*Reynolds v. Sims*,
377 U.S. 533 (1964)........................................................46, 47, 48

*Schmitt v. Rebertus*,
148 F.4th 958 (8th Cir. 2025) ................................................7, 33

*Smiley v. Holm*,
285 U.S. 355 (1932)..................................................................36

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986)..................................................................43

*United States v. Mosley*,
238 U.S. 383 (1915)...........................................................42, 45

*von Glahn v. Hoskins*,
No. SC101805, 2026 WL 2628846 (Mo. Sept. 3, 2026)................*passim*

**Constitutional Provisions & Statutes**

28 U.S.C. § 1292 ........................................................................1

28 U.S.C. § 1651 ......................................................................32

52 U.S.C. § 20302 ....................................................................21

Mo. Rev. Stat. § 115.125.............................................................21

Mo. Rev. Stat. § 115.343.............................................................44

Mo. Rev. Stat. § 116.120.......................................................10, 11

Mo. Rev. Stat. § 116.130.............................................................11

Mo. Rev. Stat. § 116.150.......................................................11, 12

U.S. Const. amend. XIV .........................................................*passim*

U.S. Const. art. I, § 2 ........ *passim*

U.S. Const. art. I, § 4 ........ *passim*

U.S. Const. art. VI ........ 31

**Other Authorities**

Jason Rosenbaum, *Missouri's stack of redistricting lawsuits expected to grow over whether new map is in effect*, St. Louis Public Radio (Dec. 16, 2025) ........ 10

Jen Rice, *Missouri court upholds GOP's gerrymandered map for midterms, other legal challenges continue*, Democracy Docket (Mar. 12, 2026) ........ 9

Kurt Erickson, *Unions move to block 'right to work' law in Missouri*, ST. LOUIS POST-DISPATCH (Aug. 18, 2017) ........ 38

Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026) ........ 13

Mo. Sec'y of State, Certificate of Insufficiency of Referendum Petition 2026-R004 (Aug. 4, 2026) ........ 13, 17

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1292(a), the Court possesses jurisdiction over the parties' cross appeals of the District Court's temporary restraining order requiring enforcement of the House Bill 1 ("HB 1") map for the 2026 General Election. Defs.' App. 168–80, R. Doc. 35.

To be sure, this Court "ordinarily lack[s] jurisdiction to hear an interlocutory appeal from [a] district court's grant or denial of a TRO." *In re Rutledge*, 956 F.3d 1018, 1026 (8th Cir. 2020). But the Court recognizes exceptions to this rule, including when the lower court's order "has the 'practical effect' of granting an injunction." *La Belle Dairy, LLC v. Sharpe Holdings, Inc.*, 183 F.4th 606, 611 (8th Cir. 2026) (quoting *Abbott v. Perez*, 585 U.S. 579, 594 (2018)).

This appeal clearly falls under a relevant exception because the U.S. Supreme Court assumed jurisdiction over this appeal when it stayed the District Court's original temporary restraining order. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026). Because the Supreme Court assumed jurisdiction over this appeal, it is appropriate for this Court to do so as well.

## STATEMENT OF ISSUES

**I. Whether permitting a referendum *petition*—signed by just 3.3% of Missouri's electorate—to suspend a duly-enacted congressional map violates the U.S. Constitution's Elections Clause.**

- U.S. Const. art. I, § 4
- *Moore v. Harper*, 600 U.S. 1 (2023)
- *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015)
- *Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916)

**II. Whether changing a congressional map between a primary and general election—and forcing the primary nominees to run in the new districts—violates Article I, Section 2 of the U.S. Constitution.**

- U.S. Const. art. I, § 2
- *United States v. Classic*, 313 U.S. 299 (1941)
- *Klein v. United States*, 176 F.2d 184 (8th Cir. 1949)
- *Montano v. Lefkowitz*, 575 F.2d 378 (2d Cir. 1978)

**III. Whether changing a congressional map between a primary and general election—and forcing the primary nominees to run in the new districts—violates the Equal Protection Clause.**

- U.S. Const. amend. XIV, § 1
- *Gray v. Sanders*, 372 U.S. 368 (1963)
- *Reynolds v. Sims*, 377 U.S. 533 (1964)
- *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982)

## INTRODUCTION

This fall, hundreds of thousands of Missouri voters will consider a slate of congressional candidates in the 2026 General Election that they never had the opportunity to consider in the Primary. *See* App. 44, 69, R. Doc. 1-2 at 4, 29. How, and why, Missouri ended up here merits careful consideration. Under Missouri law, a referendum petition—signed by just "five percent of the legal voters in each of two-thirds of [Missouri's] congressional districts" (approximately 3.3% of the State's electorate)—can unilaterally suspend a duly-enacted congressional map. Mo. Const. art. III, §§ 52(a), 52(b). On September 3, the Missouri Supreme Court held—for the first time—that referenda may proceed against federal congressional maps, and that the congressional map Missouri used for the Primary Election must be switched for the General Election. *See von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846 (Mo. Sept. 3, 2026).

In state-court litigation about Missouri's 2026 congressional map, the Secretary cautioned that changing a congressional map between the Primary and General Elections would violate Article I, Section 2 and the Equal Protection Clause of the U.S. Constitution. *See* Respondent's Br. at 56–60, *von Glahn v. Hoskins*, No. SC101805 (Mo., filed Aug. 27, 2026).



Appellate Case: 26-2797 Page: 11 Date Filed: 09/15/2026 Entry ID: 5684059

The Secretary also cautioned that divesting the General Assembly of redistricting authority based on a referendum petition—signed by just 3.3% of the State's electorate—would violate the U.S. Constitution's Elections Clause. *Id.* at 49–52. But the Missouri Supreme Court held that state procedural rules prevented the Secretary from raising any argument about the federal constitutional implications of suspending Missouri's congressional map. *See von Glahn*, 2026 WL 2628846, at *2 n.5. That court also held that it would render an impermissible "advisory opinion" if the court considered the federal implications of its decision and its resulting injunction. *Id.*

The Secretary attempted to prevent these federal constitutional harms by applying for a stay of the Missouri Supreme Court's injunction in the U.S. Supreme Court. *Hoskins v. von Glahn*, No. 26A304, 2026 WL 2647016, at *1 (U.S. Sept. 8, 2026). But that application was denied without reasoning. *Id.* Then, when two candidates and Missouri voters ("Plaintiffs") sued the Secretary in federal District Court, the Secretary noted his agreement with their arguments—while also not opposing intervention by People Not Politicians and Richard von Glahn ("Intervenors"). Defs.' App. 123–24, R. Doc. 19 at 14–15. The District



Appellate Case: 26-2797 Page: 12 Date Filed: 09/15/2026 Entry ID: 5684059

Court agreed that Plaintiffs faced a "palpably notable" threat to their voting rights, so it entered a TRO "on federal law grounds." Defs.' App. 172, 180, R. Doc. 35 at 5, 13. The TRO:

> [E]njoin[ed], on federal law grounds, Secretary of State Hoskins—as well as his officers, agents, employees, and attorneys—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026 general election.

*Id.* at 13. On appeal, this Court declined to stay the District Court's TRO. *Onder v. People Not Politicians*, No. 26-2797, 2026 WL 2661912, at *1 (8th Cir. Sept. 9, 2026). However, the Supreme Court disagreed and granted a stay. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026).

While the federal TRO was in effect, the Secretary attempted to comply and directed local election authorities to implement the HB 1 map. Yet the Secretary reversed course—and complied with the Missouri Supreme Court's injunction—once the U.S. Supreme Court stayed the federal TRO. Even still, the Missouri Supreme Court held the Secretary in contempt of court last Thursday, September 10, 2026, because the Secretary violated the Missouri Supreme Court's injunction while the



Appellate Case: 26-2797 Page: 13 Date Filed: 09/15/2026 Entry ID: 5684059

federal TRO was in effect. *See* Judgment of Civil Contempt, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026).

The Secretary has attempted to defend the voting rights of Missourians—and the prerogatives of Missouri's General Assembly—at every step of the seesaw of injunctions over the last couple weeks. But the Secretary's attempts at compliance with a federal TRO has led to him being held in contempt by the Missouri Supreme Court. *See id.* Meanwhile, voters across Missouri have wondered which congressional map they will vote on for the November General Election. Indeed, the legally-required map changed three times in a week—the 2022 map on September 3, *von Glahn v. Hoskins*, 2026 WL 2628846, at *7; to the HB 1 map on September 8, *see* Defs.' App. 180, R. Doc. 35 at 13; to the 2022 map on September 10, *People Not Politicians*, 2026 WL 2659767, at *1.

More than anything, Missourians need clarity about the map that they will vote under in the November General Election. Because the Supreme Court has already granted a stay forcing Missouri to use the 2022 congressional map for the 2026 General Election, the Secretary is complying with that ruling.



Appellate Case: 26-2797 Page: 14 Date Filed: 09/15/2026 Entry ID: 5684059

Even so, the Court should assess Plaintiffs' likelihood of success on the merits, which is the "most significant" factor in the preliminary-injunction analysis. *See Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025) (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). This case may involve the first attempt in American history to suspend a congressional map based on a referendum petition signed by a small minority of voters. But it certainly will not be the last. The Secretary anticipates that small fractions of Missouri's electorate will attempt to suspend duly-enacted congressional redistricting plans every time the State redistricts in the future.

Thus, in light of the Court's jurisdiction to assess Plaintiffs' likelihood of success on the merits, *Schmitt*, 148 F.4th at 966, the Court can and should hold that the origin of this drama—a referendum petition suspending a congressional map—is unconstitutional under the Elections Clause. The Court should also hold that changing a congressional map between a Primary and General Election—as the Missouri Supreme Court did here—violates Article I, Section 2 and the Equal Protection Clause of the U.S. Constitution. Such clarity would be

extremely beneficial for Secretary Hoskins, for future Missouri Secretaries of State, and for other States inside and outside this Circuit.

## STATEMENT OF THE CASE

### I. The enactment of the HB 1 map and subsequent failed challenges to it.

On September 12, 2025, the Missouri General Assembly passed House Bill 1 (“HB 1”), which redistricted the boundaries of Missouri’s eight congressional districts. HB 1 abrogated Missouri’s previous congressional map enacted in 2022. These two maps are quite different, as these reproductions demonstrate:

**Missouri’s 2025 Congressional Map**



**Missouri's 2022 Congressional Map**




In response, Intervenors initiated the referendum campaign at issue in this case. Their public statements have long emphasized that they wanted a statewide vote on the HB 1 map. *See, e.g.*, Jen Rice, *Missouri court upholds GOP's gerrymandered map for midterms, other legal challenges continue*, Democracy Docket (Mar. 12, 2026).[1] But they also acknowledged a less democratic goal: suspending the State's congressional map merely by submitting a referendum *petition* signed by "five percent of the legal voters in each of two-thirds of the congressional districts in the state" (approximately 3.3% of Missouri's voters).

---

[1] https://archive.is/QeQPj.



Appellate Case: 26-2797 Page: 17 Date Filed: 09/15/2026 Entry ID: 5684059

Mo. Const. art. III, §§ 52(a), 52(b); *see also* Jason Rosenbaum, *Missouri's stack of redistricting lawsuits expected to grow over whether new map is in effect*, St. Louis Public Radio (Dec. 16, 2025).[2]

Intervenors' latter goal put Missouri in a quandary that led to this case. No court had ever addressed whether a small minority of voters could void a congressional map by submitting signatures, and the concept seemed implausible to state officials. The State tried to obtain guidance from a federal district court in October 2025—arguing that a referendum was not permitted under state law and would violate the Elections Clause. *See Mo. Gen. Assembly v. von Glahn*, No. 4:25-CV-1535-ZMB, 2025 WL 3514277, at *1 (E.D. Mo. Dec. 8, 2025). But that court dismissed on ripeness grounds and abstained so the Missouri Supreme Court could potentially avoid the federal constitutional question. *Id.* at *1, *4 n.4 (citing Mo. Rev. Stat. § 116.120).

After the federal court's decision, Intervenors submitted their referendum petition. *See Maggard v. Missouri*, 733 S.W.3d 411, 412–13 (Mo. 2026). The Secretary strictly complied with his state-law duties in processing Intervenors' referendum petition. *See* Mo. Rev. Stat.

[2] https://archive.is/m00Zy.



Appellate Case: 26-2797 Page: 18 Date Filed: 09/15/2026 Entry ID: 5684059

§§ 116.120–116.150. Within two weeks of the petition's submission, the Secretary forwarded Intervenors' referendum petition to Missouri's 116 local election authorities so that they could begin reviewing the signatures on Intervenors' petition to verify validity. *See id.* § 116.130.1. That process takes a long time, which is why state law gave local election officials until July 28 and the Secretary until August 4, 2026—the day of the Primary Election—to finish the process. *See id.* §§ 116.130.2, 116.150.3.

While county officials processed signatures, substantial state-law litigation against the map ensued. The Missouri Supreme Court rejected all four challenges to the map it considered. *See Luther v. Hoskins*, 730 S.W.3d 567 (Mo. 2026); *Healey v. Missouri*, 732 S.W.3d 827 (Mo. 2026); *Maggard*, 733 S.W.3d 411; *NAACP v. Kehoe*, 734 S.W.3d 338 (Mo. 2026). In one of those cases—*Maggard*—the Missouri Supreme Court held that the Secretary of State could enforce HB 1 despite a referendum petition being *submitted*, but the court suggested in dictum that a certified referendum would result in the law being retroactively deemed void. 733 S.W.3d at 420. The court also, however, expressly reserved the question whether federal congressional maps are subject to referenda under state



Appellate Case: 26-2797 Page: 19 Date Filed: 09/15/2026 Entry ID: 5684059

law at all. *Id.* at 414 n.7. And the court did not address the State's argument that—under the state-law equivalent of the *Purcell* principle, it was *already* too late to change maps in 2026. *See Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 460 S.W.2d 1, 2–3 (Mo. 1970). Even though the State invoked *Hadley* in all four cases, the Missouri Supreme Court never indicated that it would order last-minute changes to the HB 1 map.

When the Missouri Supreme Court issued its *Maggard* decision in May 2025, the Secretary faced an imminent Primary Election. *Cf. Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) (staying order affecting congressional map much further in advance of upcoming primary election). Candidate filing had closed in March 2026 under the HB 1 map, and campaigns had already long relied on the HB 1 map. Mo. Rev. Stat. § 115.349.1. Under those circumstances, the Secretary issued a certificate rejecting the referendum petition on the final day permitted by the state-law deadline—the same day as the 2026 Primary Election. *Id.* § 116.150.3. He did not dispute that Intervenors had obtained enough signatures. But he expressed his view that Missouri law does not authorize referenda on congressional maps, that the U.S. Constitution's Elections Clause prohibits suspending maps before statewide



Appellate Case: 26-2797 Page: 20 Date Filed: 09/15/2026 Entry ID: 5684059

referendum votes, and that switching maps between the Primary and General Elections would violate the U.S. Constitution and federal statutes. *See* Add. 1–8, Mo. Sec'y of State, Certificate of Insufficiency of Referendum Petition 2026-R004 (Aug. 4, 2026); *see also von Glahn*, 2026 WL 2628846, at *2 n.5.

That same day, Missouri held its Primary Election. About 1.2 million Missourians voted in the elections. Defs.' App. at 43–44, R. Doc. 1-2 at 3–4. The State did so following the Missouri Supreme Court's repeated upholding of the HB 1 and the Attorney General's issuance of an opinion letter on May 13, 2026, explaining why the 2026 Primary Election must occur under the HB 1 map. *See* Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026). No court ever suggested that Missouri could not use the HB 1 map for the Primary Election.

## II. The *von Glahn* state-court litigation.

Intervenor von Glahn promptly sued in state court the day of the Primary Election—represented by the same lawyers who now represent him in this litigation. His complaint sought an injunction "reversing Defendant Hoskins' certification decision," and an injunction "[r]estrain[ing]" the Secretary "and those acting in concert with him from



Appellate Case: 26-2797 Page: 21 Date Filed: 09/15/2026 Entry ID: 5684059

taking any further steps to implement or mandate the use of HB 1." *See* Pet. at 8, *von Glahn v. Hoskins*, No. 26AC-CC00440 (Mo. Cole Cnty. Cir. Ct., filed Aug. 4, 2026).

The state trial court rejected Intervenors' requests on several grounds, holding that both the Missouri and U.S. Constitutions prohibit referenda on Missouri's congressional map. App. 46–62, R. Doc. 1-2 at 6–22. It also held that the U.S. Constitution's Elections Clause forbids changing Missouri's congressional map based on a referendum petition signed by just "five percent of the legal voters in each of two-thirds of the congressional districts in the state." *Id.* at 23–24; Mo. Const. art. III, §§ 52(a), 52(b). The court further held that changing Missouri's congressional map between the Primary and General Elections would violate Article I, Section 2 of the U.S. Constitution and the Equal Protection Clause. App. 67–70, R. Doc. 1-2 at 27–30. Finally, the trial court held that it would not change the HB 1 map before the 2026 election in light of *Hadley*—which is Missouri's version of the *Purcell* principle. *Id.* at 31–36 (citing *Hadley*, 460 S.W.2d 1).

The state trial court supported its holdings with several factual findings—none of which were subsequently contested (or mentioned) by



Appellate Case: 26-2797 Page: 22 Date Filed: 09/15/2026 Entry ID: 5684059

the Missouri Supreme Court. The trial court found that "changing the maps at this late juncture is not just 'impractical,' it is impossible." *Id.* at 36. It also found that, "Candidate filing closed months ago. Over 1.2 million Missourians voted in the August 4 Primary. Nominees have been selected. Campaigns for the general election are underway." *Id.* at 34. Also, the trial court found that "revert[ing] Missouri to the plan the General Assembly repealed in HB 1 … would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections[.]" *Id.* at 4. The court also held that "[t]hose voters would possess materially less voting power than voters whose district remained the same." *Id.* at 29.

The state trial court further emphasized that "Plaintiff has not demonstrated how State officials could reverse course and implement some entirely new map, how nominees selected by voters in one set of districts would campaign in different ones, or how voters would make sense of a last-minute overhaul of the districts they just voted in." *Id.* at 34. In light of these findings, the trial court "decline[d] to order an unprecedented remedy that is impossible to implement." *Id.* at 36.



Appellate Case: 26-2797 Page: 23 Date Filed: 09/15/2026 Entry ID: 5684059

Surprisingly, the Missouri Supreme Court reversed and directly issued an injunction prohibiting the Secretary—"and all those acting in concert with him"—"from implementing, using, or mandating the use of the congressional redistricting in HB 1." *See von Glahn*, 2026 WL 2628846, at *7. Although the court provided no detail on *how* Missouri is to comply with its order, a footnote in the court's opinion stated that Missouri must use "the congressional redistricting [plan] the General Assembly established in 2022." *Id.* at *6 n.8. That court justified this injunction by concluding that, under the Missouri Constitution, just 3.3% of the State's voters can unilaterally override the state legislature and impose their preferred congressional map for an entire election cycle. *See id.* at *2 n.5, *5–7 & n.8 (citing Mo. Const. art. III, §§ 52(a), 52(b)). That court also explicitly eschewed any consideration of the "confusion, expense, and practical difficulties" that "may result" from its injunction. *Id.* at *6 n.8. And it did so while never questioning or discussing the trial court's finding that "changing the maps at this late juncture is not just 'impractical,' it is impossible." *See* App. 76, R. Doc. 1-2 at 36.

The Missouri Supreme Court also refused to address the Secretary's federal defenses. The court stated in a footnote that it deemed these

arguments waived because the Secretary did not raise these points in his certificate of insufficiency, 2026 WL 2628846, at *2 n.5—even though the certificate expressly incorporated by reference an attached Attorney General opinion specifically prepared to address these arguments, *see* Add. 1–8, Mo. Sec'y of State, Certificate of Insufficiency of Referendum Petition 2026-R004 (Aug. 4, 2026).

One day after the decision, the Secretary asked the U.S. Supreme Court for an emergency stay. In opposing the stay, Intervenor von Glahn argued—among other things—that the Missouri Supreme Court's decision was supported by an adequate and independent state-law ground and that Secretary Hoskins could not invoke equitable principles as the applicant. Respondent's Br. at 14–17, 35–37, *Hoskins v. von Glahn*, No. 26A304 (U.S. Sept. 7, 2026). On September 8, Justice Kavanaugh denied the application without comment. *See Hoskins v. von Glahn*, No. 26A304, 2026 WL 2647016 (U.S. Sept. 8, 2026).

## III. The *Onder* lawsuit.

On September 4, two congressional candidates and two voters who were moved to new congressional districts by the Missouri Supreme Court's order sued Secretary Hoskins and the State of Missouri itself

(hereafter, the "Secretary").[3] The Secretary argued that Missouri would—because of the Missouri Supreme Court's order—imminently violate the Plaintiffs' federal constitutional rights by changing congressional maps. Of course, the Secretary was adverse to Plaintiffs because he lacked the power to voluntarily give them the relief they sought due to the Missouri Supreme Court's order. Yet, the Secretary informed the District Court that he agreed with Plaintiffs' argument that the Missouri Supreme Court's order would force the State to violate the U.S. Constitution, and the Secretary argued that the equities favored maintaining the congressional map that governed the Primary Election. *See* App. 110–141, R. Doc. 19; *cf. Hollingsworth v. Perry*, 570 U.S. 693, 708–09 (2013); *Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2413 (2026) (federal government declining to defend unconstitutional statute). To be clear, the Secretary did not enter a consent decree with Plaintiffs.

[3] The State of Missouri has moved to dismiss Plaintiffs' claims based on sovereign immunity under the Eleventh Amendment. App. 142–43, R. Doc. 28. The Secretary, however, "acknowledge[s] that Plaintiffs' constitutional claims for equitable relief may proceed against [a] state officer Defendant." *Id.* at 2 (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)). The State of Missouri's motion to dismiss under the Eleventh Amendment remains pending in the District Court.



Appellate Case: 26-2797 Page: 26 Date Filed: 09/15/2026 Entry ID: 5684059

Intervenors promptly moved to intervene—and were granted intervention without opposition by the Secretary. Defs.' App. 146–47, R. Doc. 32; Defs.' App. 124, R. Doc. 19 at 15. Intervenors moved to dismiss on several procedural grounds. Defs.' App. 148–167, R. Doc. 33. The District Court also ordered all parties to address the Court's own questions, about whether abstention doctrines applied, the applicability of the *Rooker-Feldman* doctrine, and how the Supreme Court's anticipated stay decision in the *von Glahn* case would affect the case before it. Defs.' App. 108, R. Doc. 13.

After the stay denial in *von Glahn*, the District Court granted Plaintiffs' request for a TRO and ordered the State to use the HB 1 map for the General Election. Defs.' App. 168–80, R. Doc. 35. On the merits, the District Court found Plaintiffs have a "high probability of success" because the State was poised to "disenfranchise voters of their votes in the primary election, in clear violation of Article I, Section 2" of the U.S. Constitution. *Id.* at 8–9. The District Court also found a "high probability of success" on Plaintiffs' Equal Protection Clause claim. *Id.* at 9–11. The court reasoned that: "Using any map other than HB 1's for the general election creates two classes of voters: those who happen to

stay in their HB 1 congressional districts, and those who do not. Likewise, it divides candidates between those who retain the same electorate, and those who do not. In both situations, those who 'do not' are divested of their fundamental electoral rights." *Id.* at 10. Finally, the District Court rejected an argument under the Elections Clause that the U.S. Constitution requires—but the Missouri Constitution lacks—a clear statement authorizing referenda against congressional maps. *Id.* at 6–7. The District Court did not respond to a separate argument that the Missouri Constitution violates the Elections Clause by permitting 3.3% of registered voters to void a governing congressional map *before* a statewide vote. Defs.' App. 133, 135–37, R. Doc. 19 at 24, 26–28.

The District Court also analyzed the other TRO factors. The District Court found Plaintiffs would be irreparably harmed absent relief because voters "would have to cast their general-election votes for candidates whom they had no role in nominating" and candidates had "campaign[ed] and raise[d] money in the HB 1 districts that Missouri's highest election authority presented to them." Defs.' App. 171–17, R. Doc. 35 at 4–5.

On the equities, the District Court cited the Supreme Court's decision in *Malliotakis v. Williams*, 146 S. Ct. 809 (2026), and reasoned that the *Purcell* principle supports—or at least does not foreclose—relief to prevent chaos in Missouri's imminent federal election. App. 178–79, R. Doc. 35 at 11–12. And Missouri being forced to use "a different map for the general election would wreak havoc on the fairness and orderliness of Missouri's congressional elections, calling into question the candidacy of those nominated in the primaries and the votes of those who voted in the primaries." *Id.* at 12. The court also noted that "[w]idespread voter confusion would inevitably follow." *Id.* The court thus ordered the Secretary to use the HB 1 map for the 2026 General Election. *See id.* at 13.

Following the District Court's decision, Missouri's state-law deadline for altering the ballot for the 2026 General Election passed. Mo. Rev. Stat. § 115.125.2. Accordingly, in accordance with the District Court's order, the Secretary instructed county election officials to comply promptly with the Court's order. With the deadline to send out military and absentee ballots just eleven days away at that time, 52 U.S.C.



Appellate Case: 26-2797 Page: 29 Date Filed: 09/15/2026 Entry ID: 5684059

§ 20302(a)(8), local election officials needed confirmation so that they could begin preparing absentee ballots.

Intervenors took two quick steps in response to the District Court's TRO. First, a couple hours after the District Court rendered its order, Intervenor von Glahn filed a motion on the Missouri Supreme Court's *von Glahn* docket and asked that court to hold Secretary Hoskins in contempt and to issue an order barring him from complying with the federal court's order. *See* Emergency Mot. for Contempt, *von Glahn v. Hoskins*, No. SC101805 (Mo., filed Sept. 8, 2026). The motion was signed, submitted, and argued for by Charles Hatfield, *id.* at 4—who also represents Intervenors as their lead counsel in this appeal. Specifically, Intervenor von Glahn asked the Missouri Supreme Court to "make clear that regardless of other orders (except from the United States Supreme Court) the Missouri Secretary of State must comply with this court's injunction." *Id.* The Missouri Supreme Court promptly issued a show-cause order that noted the District Court's decision but suggested it was issued in violation of the *Rooker-Feldman* doctrine (an argument Intervenors later



Appellate Case: 26-2797 Page: 30 Date Filed: 09/15/2026 Entry ID: 5684059

dropped in the U.S. Supreme Court).[4] *See* Order to Show Cause, *von Glahn v. Hoskins*, No. SC101805 (Mo., filed Sept. 8, 2026).

Second, Intervenors asked this Court for a stay of the District Court's injunction pending appeal. On September 9, this Court rejected the stay application without waiting for Plaintiffs or the Secretary to respond. *Onder v. People Not Politicians*, No. 26-2797, 2026 WL 2661912, at *1 (8th Cir. Sept. 9, 2026). Intervenors then sought a stay from the U.S. Supreme Court, which that Court granted in an unreasoned order. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026).

Shortly thereafter, this Court, "[o]n [its] own motion," directed the clerk to issue an "expedited schedule for briefing and arguing the merits of this appeal." Order, *Onder v. von Glahn*, No. 26-2797 (8th Cir., filed Sept. 10, 2026); *see also* Order, *Onder v. Missouri*, No. 26-2827 (8th Cir.,

---

[4] The *Rooker-Feldman* doctrine does not bar *non-parties* from bringing federal claims. *See Lance v. Dennis*, 546 U.S. 459, 465–66 (2006) (per curiam). This is doubly true here, where the Missouri Supreme Court expressly declined to consider any federal questions counseling against its injunction. *See von Glahn*, 2026 WL 2628846, at *2 n.5. The District Court addressed *Rooker-Feldman* and Intervenors' other erroneous jurisdictional arguments in its order denying a stay of the TRO. *See* App. 181–88, Add. 22–29, R. Doc. 49.

filed Sept. 11, 2026). Under the Court's order, this case will be argued in two days, on Thursday, September 17, 2026.

## IV. The Missouri Supreme Court holds the Secretary of State in contempt of court.

Meanwhile, on September 10, 2026, the Missouri Supreme Court held the Secretary in contempt of court for failing to comply with the state-court injunction while the federal TRO was in effect. *See* Judgment of Civil Contempt, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026).

The Missouri Supreme Court's contempt order noted that, "On September 3," after the court's opinion in *von Glahn*, "Missouri Secretary of State Denny Hoskins complied with the Court's September 3 injunction by sending notice to local election authorities to use the 2022 congressional district map." *Id.* at 2. However, "on September 8, the secretary reversed course. The secretary sent an e-mail to the same local election authorities directing them to utilize the HB 1 congressional district map pursuant to a temporary restraining order entered by the United States District Court for the Eastern District of Missouri." *Id.*

As a reminder, the District Court's TRO provided, in relevant part:

> [T]he Court grants Plaintiffs' motion for a temporary restraining order and enjoins, on federal law grounds, Secretary of State Hoskins—as well as his officers, agents, employees, and attorneys—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026 general election.

Defs.' App. 180, R. Doc. 35, at 13. Acknowledging the existence of this order, the Missouri Supreme Court still found the Secretary in contempt and concluded "any assertion that [the Secretary] was not attempting to defy this Court's order but merely trying to comply with a federal court order is disingenuous." Judgment of Civil Contempt at 3 n.2, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026). That court faulted the Secretary for "consent[ing] to the request for a temporary restraining order from the federal district court and advocat[ing] for the federal district court's intervention in spite of th[e] Court's clear directive enjoining him from implementing, using, or mandating the use of the congressional redistricting in HB 1 for the November 2026 general election." *Id.*

Additionally, the Missouri Supreme Court's contempt order reasoned that the District Court's TRO allowed the Secretary to simply do *nothing*—which seemingly meant freezing the 2022 map at the state-law statutory deadline despite the District Court's order. *Id.* at 3–4;



Appellate Case: 26-2797 Page: 33 Date Filed: 09/15/2026 Entry ID: 5684059

Mo. Rev. Stat. § 115.125.2. The Missouri Supreme Court held that the "language" of the federal TRO "did not require [the Secretary] to order local election authorities to implement the HB 1 map for the 2026 general election." Judgment of Civil Contempt at 3–4, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026). "In fact," the court continued, "the temporary restraining order did not require the secretary to affirmatively act at all. Rather, it simply enjoined him from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026, general election." *Id.* at 4. According to the court, "[t]he secretary offer[ed] no explanation as to why he could not comply with both this Court's order and the federal district court's temporary restraining order by simply telling the local election authorities to take no action until further clarification was received from the courts." *Id.*

The Missouri Supreme Court then found that "Missouri Secretary of State Denny Hoskins was in civil contempt and, pursuant to section 476.120, RSMo 2016, he could be subject to punishment." *Id.* The court continued, "however, that the secretary ha[d] purged himself of said contempt" by implementing the 2022 map after the U.S. Supreme Court's

stay. *Id.* Thus, the court "enter[ed] no order of commitment and impose[d] no fine in relation to its contempt finding." *Id.*

## STANDARD OF REVIEW

Last Thursday, the U.S. Supreme Court vacated the District Court's TRO in an unreasoned order. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026). Thus, in seeking re-imposition of a preliminary injunction or TRO, Plaintiffs seek "judicial intervention that has [previously] been withheld." *See Nken v. Holder*, 556 U.S. 418, 429 (2009) (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)). The burden is therefore on Plaintiffs to make "a clear showing" that they are "entitled to such relief." *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 892 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)).

This Court assess four factors in determining whether to grant preliminary injunctive relief:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 893 (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is "a matter of equitable discretion," and "a preliminary injunction does not follow as a

matter of course from a plaintiff's showing of a likelihood of success on the merits." *Id.* at 894 (quoting *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 894 (quoting *Benisek*, 585 U.S. at 158). Accordingly, a court can deny preliminary injunctive relief on the equities alone, even if the movant is likely to succeed on the merits. *See id.*

This is especially true in the elections context, where courts regularly deny injunctive relief based on the equities—including the proximity of a judicial order to an upcoming election. *See Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in grant of applications for stays) ("[T]he *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures.").



Appellate Case: 26-2797 Page: 37 Date Filed: 09/15/2026 Entry ID: 5684059

## SUMMARY OF THE ARGUMENT

The U.S. Supreme Court granted a stay in this case, suggesting it believes the 2022 congressional map should govern Missouri's 2026 General Election. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026) (staying TRO without reasoning); *see also Hoskins v. Von Glahn*, No. 26A304, 2026 WL 2647016, at *1 (U.S. Sept. 8, 2026) (denying application of stay of the Missouri Supreme Court's injunction without reasoning). The Secretary is complying with that ruling.

Even so, Plaintiffs' likelihood of success on the merits of their constitutional claims has not changed. At the threshold, Intervenors should never have been able to force Missouri into this extraordinary situation. The underlying premise of their legal campaign is that, under the Missouri Constitution, about 3.3% of voters can void a governing congressional map merely by submitting *a petition*—and that the State must use *their* preferred congressional map before any statewide vote. If the U.S. Constitution's Elections Clause means anything, it surely prevents activists from unilaterally voiding a congressional map by submitting a bunch of signatures. *See* U.S. Const. art. I, § 4 ("The Times,

Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof …" (emphasis added)).

Even if the Court disagrees, Plaintiffs are likely correct that Missouri will imminently violate the U.S. Constitution by conducting the General Election under a dramatically different congressional map than it used during the Primary Election. This unprecedented act violates Article I, § 2 by disenfranchising scores of Missourians who voted in the Primary Election. It also violates the Equal Protection Clause by disadvantaging voters moved to new congressional districts—while giving many other voters the chance to choose candidates in the Primary Election.

## ARGUMENT

### I. The Secretary acknowledges the U.S. Supreme Court's stay order.

Although it contained no reasoning, the U.S. Supreme Court's September 10, 2026 order staying the District Court's TRO strongly suggests that the Justices have made up their minds that the 2022 congressional map should be used in the 2026 General Election. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026). The Secretary is complying with their stay order.

If this Court were to enter preliminary-injunctive relief requiring the use of the HB 1 map, the Secretary would face difficulties because he would be subject to conflicting orders again. The Missouri Supreme Court has made clear that—regardless of any order issued by this Court or a federal district court—it expects the Secretary to comply with its injunction issued under state law. *See* Judgment of Civil Contempt, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026).

Undoubtedly, the Supremacy Clause instructs that federal law controls—and the Secretary agrees that he is ultimately bound by federal law. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; … shall be the

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). That is why the Secretary attempted to comply with the District Court's TRO order. But he was punished for that attempt. *See* Judgment of Civil Contempt, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 10, 2026).

If the Court subjects the Secretary to conflicting orders, the Secretary would appreciate direct guidance on what effect a federal injunction—issued on federal legal grounds—has on a conflicting state-law injunction issued on state-law grounds. The Missouri Supreme Court has indicated that *only* the U.S. Supreme Court—and not a federal district court or this Court—can excuse the Secretary from complying with their order. *See id.* at 1, 3. The Secretary would thus also request any federal order necessary to ensure that the Secretary can comply with a federal injunction, *see* 28 U.S.C. § 1651—without threat of contempt, confinement, or other punishment by the Missouri Supreme Court.

## II. The Court should clarify the merits questions at issue in this appeal, even if it denies preliminary relief on the equities.

The Secretary continues to believe that—under the U.S. Constitution—Plaintiffs are likely correct on the merits. Even if the

Court denies relief on equitable grounds, that need not stop this Court from analyzing likelihood of success on the merits, which is the "most significant" factor in the preliminary-injunction analysis. *See Schmitt*, 148 F.4th at 966 (quoting *Home Instead*, 721 F.3d at 497).

The Secretary maintains that the Missouri Supreme Court's injunction is federally unconstitutional—for all the reasons that he attempted to explain to the Missouri Supreme Court. That court, of course, explicitly declined to address the Secretary's "claimed federal law violations and whether"—under federal law—"the congressional redistricting in HB 1 should or must remain in place through the 2026 election cycle." *von Glahn*, 2026 WL 2628846, at *2 n.5. Instead, the Missouri Supreme Court held that analysis of such federal questions would constitute "an advisory opinion, which [the] [c]ourt lacks the authority to issue." *Id.* Thus, this Court operates on a blank slate in assessing questions under the Elections Clause; Article I, Section 2; and the Equal Protection Clause of the U.S. Constitution.

For the below reasons, Plaintiffs are likely to succeed on all these claims.

### A. The Elections Clause

The Elections Clause prohibits suspending a state legislature's duly-enacted congressional map based on a referendum petition signed by just 3.3% of the State's voters. *See* U.S. Const. art. I, § 4.[5]

Missourians' elected representatives passed the HB 1 map by strong margins—21 to 11 in the Senate and 90 to 65 in the House of Representatives. *See* App. 41, R. Doc. 1-2 at 1. Nevertheless, the Missouri Supreme Court concluded that—under state law—approximately 3.3% of registered voters unilaterally suspended the HB 1 map merely by submitting a valid referendum petition. *See von Glahn*, 2026 WL 2628846, at *6 n.8 (citing Mo. Const. art. III, § 52(b)); *see also* Mo. Const. art. III, § 52(a). However, neither this Court nor the U.S.

[5] To be sure, the Plaintiffs appear to make a slightly different point. They contend that the Elections Clause forbids divesting a state legislature of redistricting authority absent a clear statement in state law. Defs.' App. 18–27, R. Doc. 1 ¶¶ 50–73; Defs.' App. 99–101, R. Doc. 2-1 at 5–7. The Secretary agrees with that position (and has briefed it before), but he focuses on a different point here—that a referendum proponent cannot divest the Missouri General Assembly of its redistricting authority merely by submitting a referendum petition signed by just 3.3% of the State's electorate. Defs.' App. 133, 135–37, R. Doc. 19 at 24, 26–28. The Secretary preserved that argument below, *id.*, and this Court can address any argument supported by the record, *Gonzales-Perez v. Harper*, 241 F.3d 633, 638 n.6 (8th Cir. 2001).

Supreme Court has *ever* sanctioned such a profoundly anti-democratic arrangement, and the Elections Clause forbids permitting a small fraction of a State's voters from suspending a congressional map—and imposing a new map—before a statewide vote. *Cf. Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay) ("The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules." (citing U.S. Const. art. I, § 4)).

The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof." U.S. Const. art. I, § 4 (emphasis added). The term "Legislature" was "not . . . of uncertain meaning when incorporated into the Constitution": It referred to "the representative body which made the laws of the people." *Hawke v. Smith*, 253 U.S. 221, 227 (1920).

"[T]he Elections Clause expressly vests power to carry out its provisions in 'the Legislature' of each State, a deliberate choice that this Court must respect." *Moore v. Harper*, 600 U.S. 1, 34 (2023). Of course,

the Supreme Court has held that the Elections Clause does not mean that *only* a state legislature can set rules for federal elections. *See id.* The Supreme Court has primarily employed a history-and-tradition-based approach in this context, *cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 79 (2022) (Kavanaugh, J., concurring), observing that gubernatorial vetoes and ordinary judicial review have coexisted with state legislative authority since the founding, *see Moore*, 600 U.S. at 24–25; *Smiley v. Holm*, 285 U.S. 355, 368 (1932). More controversially, the Supreme Court has also rejected challenges to using state-legislative redistricting commissions and statewide popular votes to set aside redistricting plans. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n* ("*AIRC*"), 576 U.S. 787, 824 (2015).

But the Supreme Court has *never* sanctioned the Missouri Supreme Court's bizarre and profoundly anti-democratic holding. According to the Missouri Supreme Court, a tiny minority of the State's registered voters can unilaterally void a redistricting map passed by the state legislature and signed by the governor *merely* by submitting a valid referendum petition. *See von Glahn*, 2026 WL 2628846, at *5–7 & n.8. No statewide vote. Just a petition signed by about 3.3% of the voters. As far as



Appellate Case: 26-2797 Page: 45 Date Filed: 09/15/2026 Entry ID: 5684059

Missouri is aware, no State has ever been forced to use a different congressional map for an election cycle merely because a small minority of voters submitted a petition. And it certainly has never been done after a completed primary election. Here, as in other contexts, "[p]erhaps the most telling indication of the severe constitutional problem" present here is that Respondent has not "located any historical analogues for this novel" arrangement. *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505–06 (2010) (internal quotation omitted).

Moreover, the Missouri Supreme Court's holding would annihilate the Missouri General Assembly's authority over redistricting. *Contra Moore*, 600 U.S. at 34 (reaffirming importance of Elections Clause's delegation of authority to state legislature). Just consider how redistricting will play out going forward in Missouri. *Every* time Missouri redistricts in a way that favors the majority political party, the minority political party will obviously be incentivized to submit a referendum petition freezing the new map. Such a step is easy; a campaign merely needs to gather signatures from "five percent of the legal voters in each of two-thirds of [Missouri's] congressional districts." *See* Mo. Const. art. III, § 52(a). Here, Intervenors gathered those signatures in about a



Appellate Case: 26-2797 Page: 46 Date Filed: 09/15/2026 Entry ID: 5684059

month. *See People Not Politicians v. Hoskins*, No. SC101801, 2026 WL 2628848, at *1 (Mo. Sept. 3, 2026) (per curiam). Even groups with far less funding than Intervenors routinely put measures on Missouri's statewide ballot. *See, e.g.*, Kurt Erickson, *Unions move to block 'right to work' law in Missouri*, ST. LOUIS POST-DISPATCH (Aug. 18, 2017).[6] Thus, political parties (and many other entities) have the resources and incentive to use Intervenors' maneuver—especially as that could give them one or more congressional seats for at least two years (as would be true here). And imagine if this happens after a decennial Census, in which Missouri gains or loses a congressional seat. Under the Missouri Supreme Court's approach, state law would seemingly require Missouri to use an old congressional map with the wrong number of seats. In all events, the General Assembly's authority over redistricting would be destroyed.

Intervenors will likely invoke *Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916), but that argument fails. Although *Hildebrandt* seemingly sanctioned statewide votes disapproving congressional maps as consistent with the Elections Clause, *but see AIRC*, 576 U.S. at 824–

---

[6] https://archive.is/MDr6z.

50 (Roberts, C.J., dissenting), it certainly did not sanction the Missouri Supreme Court's unprecedented approach. *Hildebrandt* merely recognized the ability to *veto* redistricting legislation via a statewide referendum vote. *AIRC*, 576 U.S. at 840 (Roberts, C.J., dissenting) (discussing *Hildebrandt*). "The result of the decision was to send *the Ohio Legislature* back to the drawing board to do the redistricting." *Id.* (emphasis in original). *Hildebrandt* never suggested that just 3.3% of registered voters could force a State to use their preferred map for an entire election cycle even *before* a statewide vote. If *that* is permissible, little will be left of the Elections Clause.

Nor does the Supreme Court's closely divided decision in *AIRC*, 576 U.S. 787, help Intervenors. In rejecting an Elections Clause challenge to independent redistricting commissions, the majority relied in substantial part on its belief that independent redistricting commissions could enhance democracy. *See AIRC*, 576 U.S. at 797–98; *id.* at 816–17; *id.* at 822–24. Those considerations *cannot* support the Missouri Supreme Court's ruling, which undermines democracy by giving small political minorities unstoppable political power over the majority. *See von Glahn*, 2026 WL 2628846, at *5–7 n.8. Inherent in a healthy approach to *stare*



Appellate Case: 26-2797 Page: 48 Date Filed: 09/15/2026 Entry ID: 5684059

*decisis* is respecting the logical limits of decisions. *See, e.g.*, *Louisiana v. Callais*, 146 S. Ct. 1131, 1163 (2026) ("Respect for precedent cannot be a one-way street."). That wisdom counsels against extending *AIRC*—contrary to its own reasoning—to this markedly new context.

**B. Article I, Section 2**

Intervenors have never contested that—if Missouri's congressional map changes—over one million Missourians will vote for representatives in the General Election that they never had the opportunity to consider in the Primary Election. Nor could Intervenors contest this. This is exactly what they demanded. This is also required now by Missouri law, which provides that the names of the August primary nominees must be printed on the General Election ballot—even if a vacancy arises through death or disqualification less than eight weeks before the election. *See* Mo. Rev. Stat. § 115.379.

Missouri held a Primary Election on the HB 1 map over a month ago. *See* App. 43–44, R. Doc. 1-2 at 3–4. At that time, about 1.2 million Missourians, including Plaintiffs, voted under the map. *Id.* Yet, on September 3, 2026, when the Missouri Supreme Court ordered the certification of Intervenors' referendum petition, the map was suspended

under state law. *Glahn*, 2026 WL 2628846, at *5–7. And, in light of this suspension, many Missourians will be forced to vote for a slate of candidates in the General Election that they never had an opportunity to consider in the Primary. App. 43–44, 69, R. Doc. 1-2 at 3–4, 29; App. 168–72, 175–79, R. Doc. 35 at 1–5, 8–12. As the District Court found, this plainly violates Article I, Section 2 of the U.S. Constitution because it disenfranchises Missourians from a fundamental aspect of choosing *their* representative. App. 175–76, R. Doc. 35 at 8–9.

Article I, Section 2 provides, "The House of Representatives shall be composed of Members *chosen* every second Year *by the People of the several States*." U.S. Const. art. I, § 2, cl. 1 (emphasis added). This language protects the right to vote and prohibits States from nullifying votes cast in federal congressional elections. *See id.* Additionally, the Supreme Court has recognized that the Constitution protects a fundamental right to vote. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008) (plurality op.). If that right protects *anything*, surely it prohibits forcing voters to choose between General-Election candidates that they had no role in nominating in the Primary Election. *See United States v. Mosley*, 238 U.S. 383, 386 (1915)

(recognizing that the constitutional right to vote includes "right to have one's vote counted").

Indeed, a host of federal and state judges have recognized that "[p]rimary elections for offices chosen by the electorate in separate geographical districts obviously make no sense unless the districts are the same for the ensuing general election as for the primary." *Terrazas v. Slagle*, 821 F. Supp. 1154, 1159 (W.D. Tex. 1992) (rejecting Texas's attempt to change a state legislative map between a primary and general election); *see also Covington v. North Carolina*, 316 F.R.D. 117, 176–77 (M.D.N.C. 2016) (allowing General Election "to proceed as scheduled under the challenged plans" despite being determined unconstitutional after the Primary); *Page v. Va. State Bd. of Elections*, 58 F. Supp. 3d 533, 554 (E.D. Va. 2014) (same), *vacated on other grounds sub nom.*, *Cantor v. Personhuballah*, 135 S. Ct. 1699 (2015); *Vera v. Richards*, 861 F. Supp. 1304, 1310, 1351 (S.D. Tex. 1994), *aff'd sub nom.*, *Bush v. Vera*, 517 U.S. 952 (1996); *In re Rose*, No. 26-0916, 2026 WL 2672098, at *4 (Tex. Sept. 11, 2026) (requiring Galveston County to use its precinct maps from "the March 2026 primary election in the forthcoming November general

election and to conduct a general election only for offices for which a primary election was held").

Nor does the fact that, as applied here, the Missouri Constitution nullifies a Primary Election—as opposed to a General Election—change anything. Article I, Section 2 "applies to the entire process by which federal legislators are chosen." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 227 (1986). "Where the state law has made the Primary an integral part of the procedure of choice ... the right of the elector to have his ballot counted at the Primary, is likewise included in the right protected by" the Constitution's right to vote. *United States v. Classic*, 313 U.S. 299, 318–19 (1941). And that is obviously true in Missouri, which has long recognized that congressional primaries are "an integral part of the electoral process" in the State. *Pollard v. Bd. of Police Comm'rs*, 665 S.W.2d 333, 340 (Mo. 1984) (citing *Classic*, 313 U.S. 299; *Smith v. Allwright*, 321 U.S. 649 (1944)).

Indeed, in 1949, this Court held that Missouri's primary election system—which provided that "no one can be elected to office without receiving nomination at a primary election"—was "an integral part of the general election laws of the state for the election of public officers,

including Members of Congress." *Klein v. United States*, 176 F.2d 184, 187 (8th Cir. 1949). Missouri's Primary Elections are just as integral today. Missouri law still provides that "all candidates for elective office shall be nominated at a primary election." Mo. Rev. Stat. §§ 115.339, 115.343. And the Primary "exclud[es] from the ballot on the general election the names of candidates rejected at the primary" such that it "impose[s] restrictions upon the choice of candidates by the voters save by voting at the primary election." *Classic*, 313 U.S. at 313; *see* Mo. Rev. Stat. § 115.343.

Like Louisiana's election laws in *Classic*, and like Missouri's election law in *Klein*, Missouri's law today makes the Primary Election an "integral" part of choosing representatives in Missouri. *Classic*, 313 U.S. at 314–19; *Klein*, 176 F.2d at 187. Therefore, Article I, Section 2 of the U.S. Constitution preempts any state-law suspension of a congressional map to the extent that it deprives voters of the ability to vote for their representatives in the Primary Election.

Intervenors have suggested throughout this litigation that, so long as Missourians had a right to vote in *a* Primary, that is *good enough* to satisfy their right to have their ballots counted. But Missourians are



Appellate Case: 26-2797 Page: 53 Date Filed: 09/15/2026 Entry ID: 5684059

deprived of their right to "cho[o]se" *their* representative when they are cut off from an integral aspect of Missouri's process for selecting representatives. U.S. Const. art. I, § 2; *see Mosley*, 238 U.S. at 386. "It is simply inconsistent with the concept of election of Representatives by districts that a candidate should be chosen in part by persons outside the district elected to these posts as such." *Montano v. Lefkowitz*, 575 F.2d 378, 385 (2d Cir. 1978) (Friendly, J.). As Judge Friendly aptly put it, "[i]f the state provides a primary election to select party candidates for the House of Representatives, the voters in each district are entitled to participate in it on the same basis both of equality and of independence from other districts having possibly divergent interests that they enjoy in the election itself." *Id.* at 385–86. Intervenors ask this Court to simply "close [its] eyes to [this] fact." *See Classic*, 313 U.S. at 319.

Because Article I, Section 2 prohibits cutting off voters from the right to "choose" their representative, U.S. Const. art. I, § 2, Plaintiffs are likely to succeed on the merits.

### C. The Equal Protection Clause

The Missouri Supreme Court's application of state law to Missouri's congressional map violates the Equal Protection Clause by transferring



Appellate Case: 26-2797 Page: 54 Date Filed: 09/15/2026 Entry ID: 5684059

hundreds of thousands of voters to new districts, but leaving other voters in the same district. This November, most Missourians will consider a slate of candidates that they had the opportunity to vote on in the Primary Election. However, hundreds of thousands of other Missourians—including Plaintiffs—will be denied that opportunity solely because their residence changed districts between the Primary and General Elections. *See* App. 44, 69, R. Doc. 1-2 at 4, 29. That violates the Equal Protection Clause. U.S. Const. amend. XIV, § 1.

The Equal Protection Clause requires "all who participate in [an] election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and *wherever their home may be*." *Gray v. Sanders*, 372 U.S. 368, 379 (1963) (emphasis added); *Reynolds v. Sims*, 377 U.S. 533, 576 (1964) (holding that voters have a right to their "vote[s]" being "weighted equally with those of all other citizens"). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. The Supreme Court's precedents are also clear that if a State grants some voters a privilege and "den[ies] the privilege to other classes of otherwise

qualified voters in similar circumstances, without affording a comparable alternative means to vote," the State engages in "arbitrary discrimination violative of the Equal Protection Clause." *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974).

Changing the congressional map between the Primary and General Elections violates these standards because it deprives hundreds of thousands of Missourians of the chance to choose their representative in the Primary. *See* App. 44, 69, R. Doc. 1-2 at 4, 29. All the while, most other Missourians will be able to choose their representative through both the Primary and General Elections. Here, the District Court found that "[s]witching maps now would deprive many Missourians of their equal vote in the primaries and 'impair the voters' ability to express their political preferences' by foisting new candidates on them on the eve of the election." App. 177, R. Doc. 35 at 10 (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)); *see also* App. 44, 69, R. Doc. 1-2 at 4, 29.

Intervenors have never tried to dispute this disparate treatment of voters—which materially affects voters' abilities to select their representatives. *See Gray*, 372 U.S. at 379–80. Instead, they have



Appellate Case: 26-2797 Page: 56 Date Filed: 09/15/2026 Entry ID: 5684059

argued that *Gray* and its progeny have never been applied to a scenario where discrimination occurred by virtue of categorically depriving some voters from participating in a Primary for their representative, while allowing other voters to participate. However, it is "a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases." *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020). And here, the Missouri Supreme Court's injunction would disenfranchise some voters from the right to participate in selecting their representative solely based on where they live. That is an Equal Protection Clause violation. *See Gray*, 372 U.S. at 379–80; *Reynolds*, 377 U.S. at 576; *White*, 415 U.S. at 795.

Intervenors have also cited the Supreme Court's decision in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982). But *Rodriguez* helps—rather than harms—the Secretary's position. That case concerned Puerto Rico's procedure for "filling interim vacancies" in its legislature. 457 U.S. at 5. Specifically, the late incumbent's party would appoint a replacement "without the necessity of a full-scale special election." *Id.* The Supreme Court rejected a claim that Puerto Rico's failure to host a special election resulted in an equal protection violation



Appellate Case: 26-2797 Page: 57 Date Filed: 09/15/2026 Entry ID: 5684059

because it advantaged the late incumbent's political party. *Id.* at 12. However, the Court carefully noted that nothing in its opinion should be understood to apply to elections:

> To be sure, *when a state … has provided that its representatives be elected*, 'a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.' However, the Puerto Rico statute at issue here does not restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties. *All qualified voters have an equal opportunity to select a district representative in the general election.*

*Id.* at 10 (emphasis added) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). Thus, *Rodriguez* explicitly affirms that the Equal Protection Clause applies here—where all "qualified voters" in Missouri will *not* "have an equal opportunity to select a district representative in the general election"—because voters moved by the court's order are disadvantaged compared to those not moved. *Id.*

In light of applicable precedent and the obvious disparate treatment of Missouri voters, Plaintiffs are likely to succeed on the merits.



Appellate Case: 26-2797 Page: 58 Date Filed: 09/15/2026 Entry ID: 5684059

## CONCLUSION

This Court should hold that Plaintiffs are likely to succeed on the merits of their claims. Such a holding would help ensure Missouri does not again face the election-administration disaster it is currently facing.

September 15, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

*/s/Louis J. Capozzi III*
Louis J. Capozzi III, #77756MO
*Solicitor General*
William J. Seidleck, #77794MO
*Principal Deputy Solicitor General*
J. Michael Patton, #76490MO
*Deputy Solicitor General*
Graham D. Miller, #77656MO
*Deputy Solicitor General*
Office of the Attorney General
Old Post Office Building
815 Olive St, Suite 200
St. Louis, MO 63101
Office: (314) 340-3413
Louis.Capozzi@ago.mo.gov

*Counsel for the State of Missouri and Secretary Hoskins*



Appellate Case: 26-2797 Page: 59 Date Filed: 09/15/2026 Entry ID: 5684059

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) in that it contains 9,965 words excluding the parts exempted by Fed. R. App. P. 32(f). I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) in that this document has been prepared in a proportionally spaced typeface using Microsoft Word (size 14 Century Schoolbook font).

/s/ *Louis J. Capozzi, III*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026, the foregoing was filed electronically via the Court's electronic filing system and was served by operation of the CM-ECF system on all counsel of record.

/s/ *Louis J. Capozzi, III*



Appellate Case: 26-2797 Page: 60 Date Filed: 09/15/2026 Entry ID: 5684059